Scott F. Gautier (State Bar No. 211742)
sgautier@pwkllp.com
Lauren N. Gans (State Bar No. 247542)
lgans@pwkllp.com
Kathryn F. Russo (State Bar No. 274042)
krusso@pwkllp.com
PEITZMAN, WEG & KEMPINSKY LLP
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 552-3100
Facsimile: (310) 552-3101

Proposed Attorneys for Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No.: 8: 11-bk-21690-ES |
| RITZ INTERACTIVE, INC., | Chapter 11 |
| Debtor and Debtor-in-Possession. | SMALL BUSINESS CASE UNDER FRBP 1020 |
| | **DECLARATION OF FRED H. LERNER IN SUPPORT OF EMERGENCY MOTIONS OF DEBTOR-IN-POSSESSION FOR "FIRST-DAY" RELIEF** |

I, Fred H. Lerner, declare as follows:

1. I am the President and CEO of Ritz Interactive, Inc. (the "Debtor"). The facts and matters set forth herein are true and based upon my own personal knowledge and, if called to testify, I could and would competently testify thereto. The books, records and information referred to below are prepared and maintained at my direction by the employees that I engaged for the Debtor and all of whom report directly to me on a regular and current basis to ensure that I am knowledgeable about all aspects of the Debtor's business.

2. Concurrent with the filing of this declaration, the Debtor filed a petition (the "Petition") for relief under chapter 11 of the Bankruptcy Code in order to effectuate a plan of reorganization (the "Plan") to maximize value for all creditors and other stakeholders.

3. I make this Declaration in support of several motions and an application filed by the

1

Debtor seeking emergency relief, including the following motions:

    a.    Emergency Motion of Debtor-In-Possession for Order Establishing Notice Procedures and Permitting Service on Insured Depository Institutions by First-Class Mail;

    b.    Emergency Motion of Debtor-In-Possession for Order Authorizing Debtor to Maintain Prepetition Lockbox Accounts;

    c.    Emergency Motion of Debtor-In-Possession For Order Authorizing Debtor To Pay Accrued Priority Wages and Other Employee Benefits; and

    d.    Emergency Motion of Debtor-In-Possession for Order Authorizing Debtor to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue, in the Ordinary Course of Business, Customer Programs and Practices;

    e.    Emergency Motion of Debtor-In-Possession For Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof;

    f.    Emergency Motion of Debtor-In-Possession For Order Approving The Stipulation Consenting to Debtor's Use of Cash Collateral By and Between The Debtor and Ritz Cameral & Image, LLC.

    4.    All capitalized terms that are used, but not defined, herein, shall have the meanings ascribed to such terms in the associated motion. For the convenience of the Court and parties in interest, this declaration is organized with headings that identify general background facts that are commonly germane to most motions and applications and those facts that are specifically relevant to particular motions.

    5.    Ritz Interactive, Inc. (the "Debtor") is an e-commerce network of interactive websites including: RitzCamera.com, WolfCamera.com, BoatersWorld.com, CameraWorld.com, PhotoAlley.com, eAngler.com, ScrapbookingAlley.com, NeedleCraftsEtc.com, CeilingFansandMore.com, and Greg Norman's ShopAtShark.com, that provides online shoppers with a wide selection of branded products at competitive prices.

6. The Debtor has thirty-one employees, twenty-seven of whom work from its headquarters in Irvine, California, three work from leased space in Beltsville, Maryland and one warehouseman works from leased space in a Topeka, Kansas warehouse. The Debtor's headquarters have been located in Irvine, California since it was founded in 1999. The Debtor grew from just $2.4 million in sales in its first year of operations in 1999 to $111 million in sales in 2007 and $107 million in 2008. During that time span of revenue growth, the Debtor experienced seven consecutive years of profitability from 2002 through 2008. In 2008, Internet Retailer, the leading industry publication, ranked the Debtor as the country's 32nd largest internet only e-commerce website.

7. The Debtor's primary asset is an exclusive, worldwide, nontransferable license to use and reproduce certain names, trademarks, service marks, and/or tradenames owned by Ritz Camera & Image, L.L.C. ("RCI"), (which acquired substantially all of the assets of Ritz Camera Centers, Inc. ("RCC") in July of 2009 out of RCC's bankruptcy), in conjunction with its internet business, and the right to purchase and sell inventory provided by RCI on Debtor's websites, pursuant to the Second Amended and Restated Agreement dated as of August 1, 2005, by and between RCC and the Debtor as amended by that certain Amendment to the Second Amended and Restated Agreement dated as of May 10, 2010 by and between RCI and the Debtor and that certain Second Amendment to the Second Amended and Restated Agreement dated as of December 23, 2010 (collectively the "Operations Agreement") and the Perpetual License Agreement dated as of August 1, 2005, by and between RCC and the Debtor, as later acquired by RCI (the "License Agreement"). RCI is the Debtor's principal secured creditor.

8. In 2005, the Debtor agreed to repurchase a $10 million equity stake of America Online, Inc. ("AOL") and in connection therewith issued a note payable ("AOL Note"). The AOL Note originally matured in December 2006, was amended to extend the maturity date until December 2007 and was later further amended to provide for a November 2012 maturation.

9. The Debtor began to experience a downturn in revenue in the second half of 2008 in conjunction with the U.S. economic recession. Then, in February 2009, the Debtor's primary

supplier at the time, RCC, filed for bankruptcy under Chapter 11 of the Bankruptcy Code (the "RCC Bankruptcy"). As a result of the RCC Bankruptcy, inventory availability from RCC became greatly impaired, and inventory from RCI has been below appropriate levels from mid 2009 to the current date. Aside from reduced availability from major manufacturers, Canon U.S.A. Inc. ("Canon") -- whose product historically accounted for over 15% of the Debtor's sales, generating $16.4 million in 2008 revenue -- refused to do business with RCI after having lost significant funds in connection with the RCC Bankruptcy. As a result, RCI and thus the Debtor lost access to Canon product. In addition, RCC liquidated its Boaters World stores and warehouse, and as a result, the Debtor lost its main supplier for Boatersworld.com which in 2008 accounted for 13% of its sales, generating revenues of approximately $13.5 million with a gross profit margin of nearly 40%. The U.S. economic recession, dramatic changes in Debtor's revenue from Canon products and Boatersworld.com and impaired inventory availability from RCC and RCI have resulted in operating losses in 2009, 2010 and year-to-date 2011.

10. As of November 2009, the Debtor was not able to pay all of its obligations, stopped making payments on the AOL Note and is in default thereon. The Debtor does not have any ability to make further payments on the AOL Note.

11. Moreover, the Debtor has been unable to fund the purchase of inventory on a continuing basis. In May and December 2010, the Debtor's principal supplier, RCI, offered to make further financial accommodations including amending the Operations Agreement, distinguishing between payment terms on pre-existing debt and future balances and eliminating handling and licensor fees and mark-ups on inventory. Despite these accommodations, the Debtor has not been able to remain current on its payments to RCI and continues to experience financial difficulty.

12. Following significant discussion and investigation of several alternatives, the Debtor has elected to pursue a voluntary restructuring of its debt. On August 19, 2011 (the "Petition Date"), the Debtor filed a voluntary petition commencing its chapter 11 case. The Debtor has continued the management and control of its business and property as debtor in possession pursuant to Bankruptcy Code §§ 1107 and 1108. To date, no trustee or official committee of creditors has been appointed in

4

the case.

**Requested Notice Procedures**

13. The Debtor's master mailing matrix (the "Matrix") includes over 200 entities, consisting of vendors, distributors, marketing partners, employees and other creditors. The large number of creditors and other parties in interest involved in the Debtor's chapter 11 case may impose heavy administrative and other burdens upon the Debtor, the Court and the Clerk's Office. The Debtor desires to cooperate with the Clerk's Office to help alleviate those burdens, to the fullest extent possible. Mailing notices of all pleadings and other documents in this case to all creditors, and mailing notice of all pleadings and other documents to insured depository institutions in contested matters and adversary proceedings via certified mail, would be unduly burdensome on the Debtor's estate because it is unlikely that the additional notices would confer any meaningful benefit on the creditors or the Debtor's estate.

14. If procedures limiting notice are not authorized promptly, the Debtor will be required to send multiple notices to all creditors, which will impose unnecessary administrative burdens and expenses on the Debtor and its estate that may impair the ultimate recovery for creditors.

**Accrued Pre-Petition Employee Wages and Benefits**

15. The Debtor pays its employees biweekly. In 2010, the Debtor's average aggregate monthly payroll was approximately $222,000, and average aggregate monthly payroll tax was approximately $16,000. As of the Petition Date, the Debtor's average aggregate monthly payroll for 2011 is approximately $222,000.00, and the average aggregate monthly payroll tax is approximately $18, 000.00. In addition, the Debtor reimburses eligible employees for certain out-of-pocket business expenses incurred in the ordinary course of business, such as necessary and authorized travel expenses and internet and cellphone service. In 2010, the Debtor's average aggregate monthly expense reimbursements total was approximately $3, 500. As of the Petition Date, the Debtor's average aggregate monthly expense reimbursements for 2011 is approximately $4,400.

16. In the ordinary course of business, and as is customary with most companies, the Debtor offers a broad benefits package to some or all of its employees (the "Non-Wage Employee

Benefits"), including the following: (a) paid time off for holidays, vacation, personal days and jury duty; (b) paid and unpaid leave for other appropriate circumstances; (c) medical insurance; (d) dental insurance; (e) COBRA coverage; (f) life insurance; (g) Section 125 plan; (h) long-term disability insurance; (i) 401(k) Qualified Retirement Profit Sharing Plan; (j) bonus/ commissions; (k) auto allowance; (l) premium payments for employees on leave; (m) stock option plan; (n) pay in lieu of time off; and (o) professional development reimbursement program. The combined monthly cost of the Non-Wage Employee Benefits to the Debtor is approximately $271,000 per month for all employees.

17. The Debtor is substantially current on all premium payment obligations with respect to the various insurance policies maintained for the benefit of employees. The Debtor's last payroll for the two week period ending on August 13, 2011, was paid on August 11, 2011, and its next payroll will be paid on September 2, 2011. The Debtor's employees are owed approximately $38,920 in total accrued wages based upon work performed prepetition. The Debtor seeks authority to make such payments as are necessary to ensure that all pre-petition accrued wage and Non-Wage Employee Benefit obligations (the "Employee Benefits") are promptly satisfied but in no event more than $11,725 to any individual. A chart detailing the amounts owing by the Debtor as of the Petition Date for all accrued wages and paid leave for each employee is attached hereto as Exhibit A.

18. Certain of the Debtor's employees are permitted to take paid vacation. In addition to vacation pay, certain employees are entitled other paid leave, including, without limitation, personal time-off pay. Certain employees have accrued vacation and personal time-off pay based upon work performed prepetition, totaling approximately $105,000. (See Exhibit A to the Lerner Declaration.)

19. The relief requested in the Emergency Motion of Debtor-In-Possession For Order Authorizing Debtor To Pay Accrued Priority Wages and Other Employee Benefits is essential to the continuity of the Debtor's business and to the morale of its employees, most of whom would suffer immediate financial harm if deprived of their regular paychecks, reimbursement checks and employee benefits. Indeed, the Debtor believes that, if it is not able to provide continuity in pay and benefits, many employees will simply quit and find employment elsewhere. Such a result would be

harmful to the Debtor and its estate, particularly given the extensive knowledge of the salespersons regarding the Debtor's products and customer base.

**The Debtor's Customer Programs**

1. In order for the Debtor to maintain the high level of customer service and satisfaction necessary to compete in the market, the Debtor has adopted warranty, return and other similar programs, practices and commitments to offer to its customers. As a result, over the years, the Debtor has been able, through such practices, to retain current customers, attract new customers and ultimately enhance net revenue. Most, if not all, of these practices are standard in the Debtor's industry and, without the continuance of these programs, the Debtor will risk losing its core customer base. Maintaining customer goodwill and repeat business during the pendency of the Debtor's chapter 11 case – which will erode if the Debtor is unable to fulfill its promises to customers – is necessary to preserve the going concern value of the Debtor's business. Even a short delay or gap by the Debtor in honoring obligations to its customers could irreparably harm the value of the Debtor's business, to the detriment of its creditors.

2. Prior to the Petition Date, the Debtor historically, and in the ordinary course of its business, has maintained various critical customer accommodation policies (the "Debtor Customer Policies"), including, without limitation, the Debtor's warranty and return merchandise policies under which the Debtor has historically issued credit to customers on the account of returned and/or defective merchandise, which credit has either been credited to the purchase of new merchandise or, on very rare occasion, paid to a customer in cash. Although most of the credit amounts are relatively small – typically ranging from $200 to $400 for any one customer (although some are higher)– as of the Petition Date, the Debtor's books and records showed no liability owed to its customers as a result of its credit policy. A true and correct copy of a form customer contract policy is attached hereto as Exhibit B. A true and correct copy of the return policy is attached hereto as Exhibit C.

3. The relief requested in the Emergency Motion of Debtor-In-Possession for Order Authorizing Debtor to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue, in the Ordinary Course of Business, Customer Programs and Practices is essential to the continuity of the Debtor's business and to the Debtor's relationships with its customers. Indeed, the

Debtor believes that, if it were to cancel its Debtor Customer Policies, many customers would cease doing business with the Debtor.

**The Debtor's Cash Management Systems and Prepetition Bank Accounts**

4. Prior to the Petition Date, the Debtor, in the ordinary course of its business, maintained four business banking accounts (the "Accounts"), in good standing with City National Bank. The Accounts included a checking account, and three deposit Lockbox Accounts. A list of the Accounts is attached hereto as Exhibit D. A diagram of how funds flow into and between the Accounts is attached hereto as Exhibit E.

In compliance with the U.S. Trustee's guidelines for debtors-in-possession, the Debtor has closed its old checking account and opened new debtor-in-possession checking , tax and payroll accounts. However, it would be difficult and disruptive to the Debtor's business if the Debtor were required to open new Lockbox Accounts. The Lockbox Accounts are set up to receive automatically and to credit to the Debtor's operating account, regular payments from the Debtor's customers. These payments are calculated and credited on an almost daily basis. Approximately $3 million is deposited by the Debtor's customers into the three Lockbox Accounts each month. Except for the automatic transfers to the Operating Account, there are no withdrawals or check-writing mechanisms for the Lockbox Accounts.

5. The Debtor submits that it is essential that it be permitted to maintain its Lockbox Accounts so as to not disrupt its business operations and not cause confusion among its customers.

**Requested Bar Date For Filing Proofs of Claim**

6. The Debtor is a small business with limited resources and a quick and efficient process is critical to the success of the Debtor's reorganization.

**Stipulation Consenting to Debtor's Use of Cash Collateral**

7. RCI asserts a lien on and perfected security interest in all personal property of the Debtor including, as the term is defined in section 363(a) of the Bankruptcy Code, in all "Cash Collateral" of the Debtor. The Debtor and Ritz Camera & Image, LLC ("RCI") have negotiated a stipulation providing for the Debtor's use of RCI's Cash Collateral during its Chapter 11 case attached hereto as Exhibit F.

8

8. The Debtor has a payroll due on September 2, 2011, and must continue to pay for inventory to generate new accounts receivable. This includes payment for the purchase and packaging of inventory and goods that are direct shipped to customers. Without the use of Cash Collateral the shipment of goods and inventory will cease. If the Debtor is not permitted to pay its employees and the other critical expenses immediately and in the ordinary course of its business, the Debtor likely will be required to cease operations temporarily, which will be extremely damaging, to the Debtor's business.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of August, 2011 at \_\_\_Irvine\_\_\_, California.

_____
Fred H. Lerner