1  Scott F. Gautier (State Bar No. 211742)
   *sgautier@pwkllp.com*
2  Lauren N. Gans (State Bar No. 247542)
   *lgans@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   2029 Century Park East, Suite 3100
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile: (310) 552-3101

6  Proposed Attorneys for Debtor and Debtor in Possession

7

8                **UNITED STATES BANKRUPTCY COURT**

9                **CENTRAL DISTRICT OF CALIFORNIA**

10                      **SANTA ANA DIVISION**

11  In re:                              | Case No.:  8:11-21690-ES

12  RITZ INTERACTIVE, INC.,             | Chapter 11

13       Debtor and Debtor-in-Possession. | SMALL BUSINESS CASE UNDER FRBP 1020

14                                       | ***EX PARTE* MOTION PURSUANT TO L.B.R.
                                          3017-2 FOR CONDITIONAL APPROVAL OF
15                                        DISCLOSURE STATEMENT AND
                                          SOLICITATION PROCEDURES;
16                                        DECLARATION OF FRED H. LERNER**

17

18

19      Ritz Interactive, Inc. (the "Debtor") hereby moves *ex parte* (this "Motion")*,* pursuant to L.B.R.

20  3017-2, for an order: (a) conditionally approving the Debtor's disclosure statement describing the

21  Debtor's proposed plan of reorganization; (b) approving the form of ballots and notice to be used in the

22  solicitation of votes; and (c) setting the time and dates associated with the final approval of the

23  Debtor's disclosure statement and the confirmation of the Debtor's proposed plan of reorganization.  In

24  support of this Motion, the Debtor hereby submits the attached Memorandum of Points and Authorities

25  and the Declaration of Fred H. Lerner (the "Lerner Declaration") and hereby states the following:

26                      **JURISDICTION AND VENUE**

27      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter

28  relates to the conditional approval of a disclosure statement and the setting of dates and times for

                                          1

proceedings related to confirmation of a plan and is, accordingly, a core proceeding pursuant to 28

U.S.C. § 157(b)(2)(A) and (L).  Venue of this case is proper in this Court pursuant to 28 U.S.C. §§

1408 and 1409.  The statutory predicates for the relief requested herein is section 1125(f) of title 11 of

the United States Code (the "Bankruptcy Code"), Rule 2002(b), 3017 and 3017.1 of the Federal Rules

of Bankruptcy Procedure ("FRBP") and Local Bankruptcy Rule 3017-2.

## **RELIEF REQUESTED**

By this Motion, the Debtor requests that the Court enter an order (a) conditionally approving

the Debtor's disclosure statement in the form attached hereto as Exhibit B (the "Disclosure Statement")

describing the Debtor's proposed plan of reorganization, attached as an exhibit thereto (the "Plan"); (b)

approving the form of ballots in the form attached hereto as Exhibit C ("Ballots") and notice in the

form attached hereto as Exhibit D ("Confirmation Notice") to be used in the solicitation of votes

accepting the Plan; and (c) setting the time and dates associated with the final approval of the

Disclosure Statement and the confirmation of the Plan.  A proposed order is attached hereto as Exhibit

A (the "Proposed Order").  In accordance with Bankruptcy Code section 1125(e), the Debtor also

requests that any order entered in connection with the Motion provides that any person who solicits

acceptance of the Plan in accordance with the procedures set forth in this Motion, or that participates in

the offer, issuance, sale or purchase of any securities offered or sold under the Plan, shall not be liable

on account of such solicitation or participation for violation of any applicable law, rule or regulation

governing solicitation or acceptance of a plan or the offer, issuance, sale or purchase of securities.

Dated:  September 14, 2011                    PEITZMAN, WEG & KEMPINSKY LLP


                                             By:  _____/s/ Scott F. Gautier_____
                                                      Scott F. Gautier
                                                      Lauren N. Gans
                                                      Kathryn F. Russo

                                             Proposed Attorneys for
                                             the Debtor and Debtor in Possession

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.**

<u>**FACTUAL BACKGROUND**</u>

**A.    GENERAL BACKGROUND**

Ritz Interactive, Inc. (the "Debtor") is an e-commerce network of interactive websites including: RitzCamera.com, WolfCamera.com, BoatersWorld.com, CameraWorld.com, PhotoAlley.com, eAngler.com, ScrapbookingAlley.com, NeedleCraftsEtc.com, CeilingFansandMore.com, and Greg Norman's ShopAtShark.com, that provides online shoppers with a wide selection of branded products at competitive prices.  The Debtor has twenty-eight employees, twenty-four of whom work from its headquarters in Irvine, California, three work from leased space in Beltsville, Maryland and one warehouseman works from leased space in a Topeka, Kansas warehouse.  The Debtor's headquarters have been located in Irvine, California since it was founded in 1999.  The Debtor grew from just $2.4 million in sales in its first year of operations in 1999 to $111 million in sales in 2007 and $107 million in 2008.  During that time span of revenue growth, the Debtor experienced seven consecutive years of profitability from 2002 through 2008.  In 2008, Internet Retailer, the leading industry publication, ranked the Debtor as the country's 32nd largest internet only e-commerce website.

The Debtor's primary asset is an exclusive, worldwide, nontransferable license to use and reproduce certain names, trademarks, service marks, and/or tradenames owned by Ritz Camera & Image, L.L.C. ("RCI"), (which acquired substantially all of the assets of Ritz Camera Centers, Inc. ("RCC") in July of 2009 out of RCC's bankruptcy), in conjunction with its internet business, and the right to purchase and sell inventory  provided by RCI on Debtor's websites, pursuant to the Second Amended and Restated Agreement dated as of August 1, 2005, by and between RCC and the Debtor as amended by that certain Amendment to the Second Amended and Restated Agreement dated as of May 10, 2010 by and between RCI and the Debtor and that certain Second Amendment to the Second Amended and Restated Agreement dated as of December 23, 2010 (collectively the "Operations Agreement") and the Perpetual License Agreement dated as of August 1, 2005, by and between RCC

and the Debtor, as later acquired by RCI (the "License Agreement").  RCI is the Debtor's principal secured creditor.

In 2005, the Debtor agreed to repurchase a $10 million equity stake of TW AOL Holdings, Inc. ("AOL") and in connection therewith issued a note payable ("AOL Note").  The AOL Note originally matured in December 2006, was amended to extend the maturity date until December 2007 and was later further amended to provide for a November 2012 maturation.

The Debtor began to experience a downturn in revenue in the second half of 2008 in conjunction with the U.S. economic recession.  Then, in February 2009, the Debtor's primary supplier at the time, RCC, filed for bankruptcy under Chapter 11 of the Bankruptcy Code (the "RCC Bankruptcy").  As a result of the RCC Bankruptcy, inventory availability from RCC became greatly impaired, and inventory from RCI has been below appropriate levels from mid-2009 to the current date.  Aside from reduced availability from major manufacturers, Canon U.S.A. Inc. ("Canon") -- whose product historically accounted for over 15% of the Debtor's sales, generating $16.4 million in 2008 revenue -- refused to do business with RCI after having lost significant funds in connection with the RCC Bankruptcy.  As a result, RCI and thus the Debtor lost access to Canon product.  In addition, RCC liquidated its Boaters World stores and warehouse and, as a result, the Debtor lost its main supplier for Boatersworld.com which in 2008 accounted for 13% of its sales, generating revenues of approximately $13.5 million with a gross profit margin of nearly 40%.   The U.S. economic recession, dramatic changes in Debtor's revenue from Canon products and Boatersworld.com and impaired inventory availability from RCC and RCI have resulted in operating losses in 2009, 2010 and year-to-date 2011.

As of November 2009, the Debtor was not able to pay all of its obligations, stopped making payments on the AOL Note and is in default thereon.  The Debtor does not have any ability to make further payments on the AOL Note.  Moreover, the Debtor has been unable to fund the purchase of inventory on a continuing basis.  In May and December 2010, the Debtor's principal supplier, RCI, offered to make further financial accommodations including  amending the Operations Agreement, distinguishing between payment terms on pre-existing debt and future balances and eliminating

handling and licensor fees and mark-ups on inventory.  Despite these accommodations, the Debtor has not been able to remain current on its payments to RCI and continues to experience financial difficulty.

Following significant discussion and investigation of several alternatives, the Debtor has elected to pursue a voluntary restructuring of its debt.  On August 19, 2011 (the "Petition Date"), the Debtor filed a voluntary petition commencing its chapter 11 case.  The Debtor has continued the management and control of its business and property as debtor in possession pursuant to Bankruptcy Code §§ 1107 and 1108.  To date, no trustee or official committee of creditors has been appointed in the case.

**B.    FACTS SPECIFIC TO THE MOTION**

The Debtor has negotiated the proposed Plan with RCI to allow the Debtor to continue its business as a going concern and to provide significant value to the Estate's creditors.  Without the cooperation and consent of RCI, the Debtor's only viable option would likely be to liquidate its assets with an attendant loss of jobs and with little, if any, value returned to the Estate's creditors.  As a condition to RCI's support for the Debtor's reorganization efforts, the Debtor has agreed to seek confirmation of the Plan on an expedited basis.  Proceeding on an expedited basis will enable the Debtor to conserve its limited resources and thereby maximize distributions to creditors.  With these objectives in mind, the Debtor seeks to utilize the streamlined procedures set forth in LBR 3017-2(a) which allow for the conditional approval of disclosure statements in small business cases.

**II.**

**ARGUMENT**

A.  **Proposed Solicitation, Voting and Confirmation Dates**

Provided that an order, in substantially the same form as the Proposed Order, is entered on or before September 26, 2011, the Debtor requests that the following dates and deadlines apply to the solicitation process to comply with Rule 2002(b) and LBR 3017-2, and that such dates be modified as appropriate relative to the date that an order is entered:

| DATE | ACTION |
|------|--------|
| October 3, 2011 | Last date for Debtor to mail Solicitation Packages to each Creditor. |
| October 24, 2011 | Last date for Debtor to file Motion seeking to Confirm Plan. |
| November 3, 2011 | Last date for filing objections to (a) approval of the Disclosure Statement or (b) confirmation of the Debtor's Plan.<br><br>Deadline for returning ballots to accept or reject the Debtor's Plan. |
| November 10, 2011 | Last day to file and serve brief(s) in support of (a) final approval of the Disclosure Statement and (b) confirmation of the Plan. |
| November 17, 2011 | Hearing on Final Approval of the Disclosure Statement[1] and Confirmation of the Plan. |

**B. Form of Ballots**

FRBP 3017(d) generally requires that ballots for accepting or rejecting a plan conform with Official Form No. 14. In accordance with Rule 3017(d), the Debtor proposes to utilize ballots in the form of Official Form No. 14 as modified to fit the circumstance of the Plan. Copies of each of the Ballots to be utilized are set forth in Exhibit C hereto. With respect to the tabulation of ballots, the Debtor requests that the Court approve the following procedures:

---

[1] Pursuant to LBR 3017-2(c)(2), a hearing on final approval of the Disclosure Statement shall occur only if a timely objection is filed and served on the Debtor, any committee appointed under the Bankruptcy Code and counsel for any of the foregoing.

- The amount of claim for voting purposes shall be the claim amount as listed in the Debtor's schedule of assets and liabilities ("Schedules") if such claim is not listed as contingent, unliquidated or disputed and no proof of claim has been timely filed;

- If a proof of claim in a specified liquidated amount has been timely filed and is neither subject of an objection to claim filed before the confirmation hearing nor has been disallowed prior to the confirmation hearing, nor designated as a disputed claim in the Plan or the Disclosure Statement, the amount of the claim for voting purposes shall be such specified liquidated amount;

- If a creditor submits a ballot for a claim for which a proof of claim has not been timely filed, or which is listed on the Schedules as contingent, unliquidated or disputed, or against which an objection has been timely filed and is not resolved or which is designated in the Plan or Disclosure Statement as disputed, then the ballot should not be counted in accordance with Rule 3018, unless the Court temporarily allows the claim for voting purposes in accordance with Rule 3018(a);

- If a creditor casts more than one ballot voting the same claim, the last ballot received prior to the deadline for submitting ballots shall supersede any prior ballot(s), even if the dollar amount of the earlier claim was greater;

- Votes cast by a creditor pursuant to a ballot that is not signed or is not timely received shall not be counted; and

- Signed ballots that are timely received but which do not indicate any vote on the Plan shall be treated as a vote to accept the Plan.

**C.  Solicitation Package**

In accordance with LBR 3017-2(c), the Debtor proposes to send, by first-class mail, to each creditor and equity security holder and the United States Trustee, the following items (the "Solicitation Package"): (a) the Disclosure Statement; (b) the Plan (as an Exhibit to the Disclosure Statement); (c) a Ballot (only to creditors entitled to vote to accept or reject the Plan); and (d) a notice of the dates and times set by the Court with respect to final approval of the Disclosure Statement and confirmation of

the Plan (the "Confirmation Notice").  A proposed form of the Confirmation Notice is attached hereto as Exhibit D.

### III.

### CONCLUSION

**WHEREFORE**, the Debtor requests that the Bankruptcy Court enter an Order granting the Motion such other and further relief as may be appropriate under the circumstances.

Dated:  September 14, 2011                    PEITZMAN, WEG & KEMPINSKY LLP

                                              By:    /s/ Scott F. Gautier
                                                   Scott F. Gautier
                                                   Lauren N. Gans
                                                   Kathryn F. Russo

                                              Proposed Attorneys for
                                              the Debtor and Debtor in Possession

### **Declaration of Fred H. Lerner**

I, Fred H. Lerner, declare as follows:

1.      I am the President and CEO of Ritz Interactive, Inc. (the "Debtor"). The facts and matters set forth herein are true and based upon my own personal knowledge and, if called to testify, I could and would competently testify thereto.

2.      I make this Declaration in support of the Debtor's *Exparte* Motion Pursuant to L.B.R. 3017-2 For Conditional Approval of Disclosure Statement and Solicitation Procedures (the "Motion").

3.      All capitalized terms that are used, but not defined, herein, shall have the meanings ascribed to such terms in the Motion.

4.      The Debtor is an e-commerce network of interactive websites including: RitzCamera.com, WolfCamera.com, BoatersWorld.com, CameraWorld.com, PhotoAlley.com, eAngler.com, ScrapbookingAlley.com, NeedleCraftsEtc.com, CeilingFansandMore.com, and Greg Norman's ShopAtShark.com, that provides online shoppers with a wide selection of branded products at competitive prices.  The Debtor has twenty-eight employees, twenty-four of whom work from its headquarters in Irvine, California, three work from leased space in Beltsville, Maryland and one warehouseman works from leased space in a Topeka, Kansas warehouse.  The Debtor's headquarters have been located in Irvine, California since it was founded in 1999.  The Debtor grew from just $2.4 million in sales in its first year of operations in 1999 to $111 million in sales in 2007 and $107 million in 2008.  During that time span of revenue growth, the Debtor experienced seven consecutive years of profitability from 2002 through 2008.  In 2008, Internet Retailer, the leading industry publication, ranked the Debtor as the country's 32nd largest internet only e-commerce website.

5.      The Debtor's primary asset is an exclusive, worldwide, nontransferable license to use and reproduce certain names, trademarks, service marks, and/or tradenames owned by Ritz Camera & Image, L.L.C. ("RCI"), (which acquired substantially all of the assets of Ritz Camera Centers, Inc. ("RCC") in July of 2009 out of RCC's bankruptcy), in conjunction with its internet business, and the right to purchase and sell inventory  provided by RCI on Debtor's websites, pursuant to the Second Amended and Restated Agreement dated as of August 1, 2005, by and between RCC and the Debtor as

amended by that certain Amendment to the Second Amended and Restated Agreement dated as of May 10, 2010 by and between RCI and the Debtor and that certain Second Amendment to the Second Amended and Restated Agreement dated as of December 23, 2010 (collectively the "Operations Agreement") and the Perpetual License Agreement dated as of August 1, 2005, by and between RCC and the Debtor, as later acquired by RCI (the "License Agreement").  RCI is the Debtor's principal secured creditor.

6.    In 2005, the Debtor agreed to repurchase a $10 million equity stake of TW AOL Holdings, Inc. ("AOL") and in connection therewith issued a note payable ("AOL Note").  The AOL Note originally matured in December 2006, was amended to extend the maturity date until December 2007 and was later further amended to provide for a November 2012 maturation.

7.    The Debtor began to experience a downturn in revenue in the second half of 2008 in conjunction with the U.S. economic recession.  Then, in February 2009, the Debtor's primary supplier at the time, RCC, filed for bankruptcy under Chapter 11 of the Bankruptcy Code (the "RCC Bankruptcy").  As a result of the RCC Bankruptcy, inventory availability from RCC became greatly impaired, and inventory from RCI has been below appropriate levels from mid-2009 to the current date.  Aside from reduced availability from major manufacturers, Canon U.S.A. Inc. ("Canon") -- whose product historically accounted for over 15% of the Debtor's sales, generating $16.4 million in 2008 revenue -- refused to do business with RCI after having lost significant funds in connection with the RCC Bankruptcy.  As a result, RCI and thus the Debtor lost access to Canon product.  In addition, RCC liquidated its Boaters World stores and warehouse and, as a result, the Debtor lost its main supplier for Boatersworld.com which in 2008 accounted for 13% of its sales, generating revenues of approximately $13.5 million with a gross profit margin of nearly 40%.    The U.S. economic recession, dramatic changes in Debtor's revenue from Canon products and Boatersworld.com and impaired inventory availability from RCC and RCI have resulted in operating losses in 2009, 2010 and year-to-date 2011.

8.    As of November 2009, the Debtor was not able to pay all of its obligations, stopped making payments on the AOL Note and is in default thereon.  The Debtor does not have any ability to make further payments on the AOL Note.  Moreover, the Debtor has been unable to fund the purchase

of inventory on a continuing basis.  In May and December 2010, the Debtor's principal supplier, RCI, offered to make further financial accommodations including amending the Operations Agreement, distinguishing between payment terms on pre-existing debt and future balances and eliminating handling and licensor fees and mark-ups on inventory.  Despite these accommodations, the Debtor has not been able to remain current on its payments to RCI and continues to experience financial difficulty.

9.      Following significant discussion and investigation of several alternatives, the Debtor has elected to pursue a voluntary restructuring of its debt.  On August 19, 2011 (the "Petition Date"), the Debtor filed a voluntary petition commencing its chapter 11 case.  The Debtor has continued the management and control of its business and property as debtor in possession pursuant to Bankruptcy Code §§ 1107 and 1108.  To date, no trustee or official committee of creditors has been appointed in the case.

10.      The Debtor has negotiated the proposed Plan with RCI to allow the Debtor to continue its business as a going concern and to provide significant value to the Estate's creditors.  Without the cooperation and consent of RCI, the Debtor's only viable option would likely be to liquidate its assets with an attendant loss of jobs and with little, if any, value returned to the Estate's creditors.  As a condition to RCI's support for the Debtor's reorganization efforts, the Debtor has agreed to seek confirmation of the Plan on an expedited basis.  Proceeding on an expedited basis will enable the Debtor to conserve its limited resources and thereby maximize distributions to creditors.  With these objectives in mind, the Debtor seeks to utilize the streamlined procedures set forth in LBR 3017-2(a) which allow for the conditional approval of disclosure statements in small business cases.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 30 th day of August, 2011 at Irvine, California.

Fred H. Lerner

**EXHIBIT A**

**Proposed Form of Order**

1  Scott F. Gautier (State Bar No. 211742)
   *sgautier@pwkllp.com*
2  Lauren N. Gans (State Bar No. 247542)
   *lgans@pwkllp.com*
3  PEITZMAN, WEG & KEMPINSKY LLP
   2029 Century Park East, Suite 3100
4  Los Angeles, CA  90067
   Telephone: (310) 552-3100
5  Facsimile: (310) 552-3101

6  Proposed Attorneys for Debtor and Debtor in Possession

7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                    **SANTA ANA DIVISION**

11  In re:                              Case No.:  8:11-bk-21690-ES

12  RITZ INTERACTIVE, INC.,             Chapter 11

13        Debtor and Debtor-in-Possession.    SMALL BUSINESS CASE UNDER FRBP 1020

14  .                                   **ORDER GRANTING *EX PARTE* MOTION
                                        PURSUANT TO L.B.R. 3017-2 FOR**
15                                      **CONDITIONAL APPROVAL OF
                                        DISCLOSURE STATEMENT AND**
16                                      **SOLICITATION PROCEDURES**

17

18

19         The Court considered the *Ex Parte* Motion Pursuant To L.B.R. 3017-2 For Conditional

20  Approval Of Disclosure Statement And Solicitation Procedures (the "Motion"), filed by Ritz

21  Interactive, Inc. (the "Debtor") for an order conditionally approving the Disclosure Statement For The

22  Debtor's Plan Of Reorganization, Dated as of September 14, 2011 (the "Disclosure Statement") and

23  certain specified solicitation, voting, and confirmation procedures concerning the Disclosure Statement

24  and the Debtor's Plan Of Reorganization, Dated as of August 30, 2011 (the "Plan").

25         After consideration of the Motion and accompanying supporting papers, the Disclosure

26  Statement and the Plan, the files and records in this chapter 11 case, the Court hereby

27         FINDS THAT:

28         1.      The form of the Disclosure Statement conforms with Form 25B.

                                        1

2.      The proposed form and manner of notice of the time set for filing objections to, and the time, date, and place of, a final hearing on approval of the Disclosure Statement is adequate and comports to due process.

3.      The form of ballot, substantially in the form attached to the Motion as Exhibit B (the "Ballot"), adequately addresses the particular needs of this chapter 11 case and is appropriate for each class of claims entitled to vote to accept or reject the Plan.

4.      Holders of claims in Classes 1 and 3 under the Plan (collectively, "Unimpaired Classes") are unimpaired and, thus, are conclusively presumed to accept the Plan.  Accordingly, holders of claims in the Unimpaired Classes shall not be provided with a Ballot.

5.      Holders of claims in Classes 6 and 7 will not receive or retain any property under the Plan and, thus, are deemed to reject the Plan.  Accordingly, holders of claims in Classes 6 and 7 shall not be provided a Ballot.

6.      As set forth herein, the period during which the Debtor may solicit acceptances to the Plan is a reasonable period of time for entities entitled to vote on the Plan to make an informed decision whether to accept or reject the Plan.

7.      The procedures for the solicitation and tabulating of votes to accept or reject the Plan (as set forth in the Motion) provide a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code.

8.      The procedures set forth in the Motion regarding notice to all parties in interest of the time, date, and place of the Confirmation Hearing and the distribution and contents of the Solicitation Package comply with Rules 2002(b) and 3017 of the Federal Rules of Bankruptcy Procedure and LBR 3017-2 and constitute sufficient notice to all interested parties.

Accordingly, it is hereby

ORDERED THAT:

A.      The Motion is GRANTED.

B.      The Disclosure Statement is conditionally approved pursuant to Rule 3017.1 and LBR 3017-2.

Exhibit A
Page 13

C.     The Debtor is authorized to immediately distribute the Plan and Disclosure Statement and the Solicitation Package.

D.     The procedures set forth in the Motion for the solicitation and tabulation of votes on the Plan are approved.  Peitzman, Weg & Kempinsky LLP ("PWK") is designated as the entity that will tabulate the ballots and prepare the ballot summary.

E.     The Ballots and the related instructions attached to the Motion are approved and shall be used for voting to accept or reject the Plan.

F.     The form of Confirmation Hearing Notice to be mailed to all creditors, equity security holders and other parties in interest is approved substantially in the form attached to the Motion as Exhibit D.

G.     The Confirmation Hearing shall take place before the Bankruptcy Court on November 17, 2011, at 10:30 a.m.

H.     The Ballots must be delivered so as to be received by PWK no later than November 3, 2011, at 5:00 p.m. (PST).  Ballots may be provided to PWK by e-mail, fax, or mail (by overnight courier or United States Postal Service) at the following:

If by fax:      (310) 552-3101

If by e-mail:   lgans@pwkllp.com

If by mail:     Peitzman, Weg & Kempinsky LLP

                c/o Lauren Gans

                2029 Century Park East

                Suite 3100

                Los Angeles, CA 90067

I.     The last day and time to file with the Bankruptcy Court and deliver to the Debtor's counsel, counsel for RCI and the United States Trustee any objections to either (a) the adequacy of the Disclosure Statement or (b) confirmation of the Plan is November 3, 2011.

J.     The Debtor shall file any reply memorandum of points and authorities or other papers in support of confirmation of the Plan, including any reply to any timely filed and served

3

objection to confirmation of the Plan, on or before November 10, 2011, and shall serve a copy on each

objecting party.  The Debtor shall file with the Bankruptcy Court and serve on the United States

Trustee, counsel for RCI, a ballot summary on or before November 16, 2011.

        K.      In accordance with section 1125(e) of the Bankruptcy Code, any person that

solicits acceptance of the Plan in accordance with the procedures set forth in the Motion, or that

participates in the offer, issuance, sale or purchase of any securities offered or sold under the Plan of

the Debtor, shall not be liable, on account of such solicitation or participation, for violation of any

applicable law, rule or regulation governing solicitation of acceptance of a plan or the offer, issuance,

sale or purchase of securities.

###

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT B**

**Disclosure Statement**

**With The Plan as an Exhibit Thereto**

Scott F. Gautier (State Bar No. 211742)
*sgautier@pwkllp.com*
Lauren Gans (State Bar No. 247542)
*lgans@pwkllp.com*
PEITZMAN, WEG & KEMPINSKY LLP
2029 Century Park East, Suite 3100
Los Angeles, CA  90067
Telephone: (310) 552-3100
Facsimile: (310) 552-3101

Proposed Attorneys for
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>RITZ INTERACTIVE, INC.,<br>a Delaware corporation<br><br>      Debtor and Debtor-in-Possession. | Case No.: 8:11-21690-ES<br><br>Chapter 11<br><br>**SMALL BUSINESS CASE UNDER FRBP 1020**<br><br>**DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION, DATED AS OF AUGUST 30, 2011** |

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

    A.   PURPOSE OF THIS DOCUMENT ................................................................................. 1
    B.   DEADLINES FOR VOTING AND OBJECTING; DATE OF PLAN CONFIRMATION HEARING............ 2
        1.   Time and Place of the Hearing to Finally Approve This Disclosure Statement and
            Confirm the Plan ................................................................................................. 2
        2.   Deadline For Voting to Accept or Reject the Plan ........................................... 2
        3.   Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan ..... 2
        4.   Identity of Person to Contact for More Information........................................... 3
    C.   DISCLAIMER ....................................................................................................... 3

II. BACKGROUND .......................................................................................................... 3

    A.   DESCRIPTION AND HISTORY OF THE DEBTOR'S BUSINESS ......................................... 3
    B.   INSIDERS OF THE DEBTOR ..................................................................................... 5
    C.   MANAGEMENT OF THE DEBTOR BEFORE AND DURING THE BANKRUPTCY ................... 5
    D.   EVENTS LEADING TO CHAPTER 11 FILING ............................................................... 6
    E.   SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE............................................ 7
    F.   PROJECTED RECOVERY OF AVOIDABLE TRANSFERS ................................................. 7
    G.   CLAIMS OBJECTIONS ........................................................................................... 9
    H.   CURRENT AND HISTORICAL FINANCIAL CONDITIONS .............................................. 10

III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS
AND EQUITY INTERESTS .............................................................................................. 10

    A.   WHAT IS THE PURPOSE OF THE PLAN OF REORGANIZATION?.................................... 10
    B.   UNCLASSIFIED CLAIMS ....................................................................................... 10
        1.   Administrative Expenses ................................................................................. 10
        2.   Priority Tax Claims ......................................................................................... 11
    C.   CLASSES OF CLAIMS AND EQUITY INTERESTS ....................................................... 12
        1.   Classes of Secured Claims .............................................................................. 12
        2.   Classes of Priority Unsecured Claims ........................................................... 144
        3.   Classes of General Unsecured Claims ............................................................ 14
        4.   Classes of Equity Interest Holders .................................................................. 15
    D.   MEANS OF IMPLEMENTING THE PLAN .................................................................... 16
        1.   Source of Payments ......................................................................................... 16
        2.   Post-confirmation Management ...................................................................... 16
    E.   RISK FACTORS .................................................................................................... 16
    F.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................................. 18
    G.   TAX CONSEQUENCES OF PLAN ............................................................................. 18
        1.   Tax Consequences to Holders of Claims......................................................... 18
        2.   Allocation of Plan Distributions between Principal and Interest.................... 19
        3.   Character of Gain or Loss ............................................................................... 20
        4.   Backup Withholding ........................................................................................ 20

IV. CONFIRMATION REQUIREMENTS AND PROCEDURES ........................................ 21

    A.   WHO MAY VOTE OR OBJECT ............................................................................... 21
        1.   What Is an Allowed Claim or an Allowed Equity Interest? ............................. 21
        2.   What Is an Impaired Claim or Impaired Equity Interest?............................... 22
        3.   Who is Not Entitled to Vote ............................................................................. 22
        4.   Who Can Vote in More Than One Class .......................................................... 23
    B.   VOTES NECESSARY TO CONFIRM THE PLAN .......................................................... 23
        1.   Votes Necessary for a Class to Accept the Plan ............................................. 23
        2.   Treatment of Nonaccepting Classes ............................................................... 23
    C.   LIQUIDATION ANALYSIS ...................................................................................... 24
    D.   FEASIBILITY ....................................................................................................... 24
        1.   Ability to Initially Fund Plan........................................................................... 24
        2.   Ability to Make Future Plan Payments And Operate Without Further Reorganization... 24

V. EFFECT OF CONFIRMATION OF PLAN................................................................... 25

i

Exhibit B
Page 17

    A.    DISCHARGE OF THE DEBTOR .................................................................. 25
    B.    MODIFICATION OF PLAN ....................................................................... 25
    C.    FINAL DECREE .................................................................................... 25

VI. OTHER PLAN PROVISIONS ............................................................................ 25
    A.    SETTLEMENT OF DISPUTED CLAIMS ........................................................ 25
    B.    RCI CONTRIBUTIONS ........................................................................... 26
    C.    EXEMPTION FROM TRANSFER TAXES ........................................................ 26
    D.    EXCULPATION, RELEASES, DISCHARGE AND INJUNCTIONS ......................... 27

ii

# I.

## INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") in the small business chapter 11 case of Ritz Interactive, Inc. (the "Debtor" or "Plan Proponent").  This Disclosure Statement contains information about the Debtor and describes the Plan of Reorganization of Ritz Interactive, Inc. dated August 30, 2011 (the "Plan"[1]) filed by the Debtor on August 30, 2011.  A full copy of the Plan is attached to this Disclosure Statement as Exhibit A.  Your rights may be affected.  You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.

The proposed distributions under the Plan are discussed at pages 11 through 17 of this Disclosure Statement.  General unsecured creditors are classified in Class 5, and will receive a distribution of approximately  20% of their allowed claims, to be distributed in cash upon the later of (a) the Effective Date of the Plan and (b) the date upon which the last disputed Class 5 claim has been resolved by order of the court or settlement as permitted under the Plan.  The Plan also contains a "convenience class", Class 4, for those allowed unsecured claims less than $15,000, or creditors that voluntarily elect to reduce their claims to $15,000.  Class 4 will receive distributions equal to approximately 99% of the allowed unsecured claims in such class.

## A.    Purpose of This Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case,
- How the Plan proposes to treat claims or equity interests of the type you hold (i.e., what you will receive on your claim or equity interest if the plan is confirmed),
- Who can vote on or object to the Plan,
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan,

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Plan.

- Why the Proponent believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and

- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

**B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

*1.    Time and Place of the Hearing to Finally Approve This Disclosure Statement and Confirm the Plan*

The hearing at which the Court will determine whether to finally approve this Disclosure Statement and confirm the Plan will take place on _____ , at __:__ _.m., in Courtroom 5A, at the Ronald Reagan Federal Courthouse, 411 West Fourth Street, Santa Ana, CA 92701.

*2.    Deadline For Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to: Peitzman, Weg & Kempinsky LLP, attn. Ritz Interactive, Inc., Lauren Gans, 2029 Century Park East, Suite 3100, Los Angeles, CA 90067. See section IV.A. below for a discussion of voting eligibility requirements.

Your ballot must be received by _____ __, 2011 at __:__ _.m. or it will not be counted.

*3.    Deadline For Objecting to the Adequacy of Disclosure and Confirmation of the Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon (i) the Office of the United States Trustee at: Frank Cadigan, Office of the U.S. Trustee, 411 West Fourth Street, Suite 9041, Santa Ana, CA 92701-8000, fax: (714) 338-3422; (ii) the Debtor at: Peitzman, Weg & Kempinsky LLP, attn. Ritz Interactive, Inc.,

Lauren Gans, 2029 Century Park East, Suite 3100, Los Angeles, CA 90067; and (iii) RCI at: Adam

M. Starr, Greenberg Traurig, LLP, 2450 Colorado Avenue, Suite 400E, Santa Monica, CA 90404.

    **4.**    *Identity of Person to Contact for More Information*

    If you want additional information about the Plan, you should contact Peitzman, Weg &

Kempinsky LLP, attn. Ritz Interactive, Inc., Lauren Gans, 2029 Century Park East, Suite 3100, Los

Angeles, CA 90067.

**C.**    **Disclaimer**

    The Court has conditionally approved this Disclosure Statement as containing adequate

information to enable parties affected by the Plan to make an informed judgment about its terms.

The Court has not yet determined whether the Plan meets the legal requirements for confirmation,

and the fact that the Court has approved this Disclosure Statement does not constitute an

endorsement of the Plan by the Court, or a recommendation that it be accepted.  The Court's

approval of this Disclosure Statement is subject to final approval at the hearing on confirmation of

the Plan.  Objections to the adequacy of this Disclosure Statement may be filed until _____ __,

2011 at __:__ _.m.

**II.**

**BACKGROUND**

**A.**    **Description and History of the Debtor's Business**

    The Debtor is an e-commerce network of interactive websites including: RitzCamera.com,

WolfCamera.com, BoatersWorld.com, CameraWorld.com, PhotoAlley.com, eAngler.com,

ScrapbookingAlley.com, NeedleCraftsEtc.com, CeilingFansandMore.com, and Greg Norman's

ShopAtShark.com, that provides online shoppers with a wide selection of branded products at

competitive prices.  The Debtor has twenty-eight employees, twenty-four work from its

headquarters in Irvine, California, three work from leased space in Beltsville, Maryland and one

warehouseman works from leased space in a Topeka, Kansas warehouse.  The Debtor's

headquarters have been located in Irvine, California since it was founded in 1999.  The Debtor

grew from just $2.4 million in sales in its first year of operations in 1999 to $111 million in sales in

2007 and $107 million in 2008.  During that time span of revenue growth, the Debtor experienced seven consecutive years of profitability from 2002 through 2008.  In 2008, Internet Retailer, the leading industry publication, ranked the Debtor as the country's 32nd largest internet only e-commerce website.

The Debtor's primary asset is an exclusive, worldwide, nontransferable license to use and reproduce certain names, trademarks, service marks, and/or tradenames owned by Ritz Camera & Image, L.L.C. ("RCI"), (which acquired substantially all of the assets of Ritz Camera Centers, Inc. ("RCC") in July of 2009 out of RCC's bankruptcy), in conjunction with its internet business, and the right to purchase and sell inventory provided by RCI on the Debtor's websites, pursuant to the Second Amended and Restated Agreement dated as of August 1, 2005, by and between RCC and the Debtor as amended by that certain Amendment to the Second Amended and Restated Agreement dated as of May 10, 2010 by and between RCI and the Debtor and that certain Second Amendment to the Second Amended and Restated Agreement dated as of December 23, 2010 (collectively the "Operations Agreement") and the Perpetual License Agreement dated as of August 1, 2005, by and between RCC and the Debtor, as later acquired by RCI (the "License Agreement").  RCI is the Debtor's principal secured creditor.

In 2005, the Debtor agreed to repurchase a $10 million equity stake of TW AOL Holdings, Inc. ("AOL") and in connection therewith issued a note payable ("AOL Note").  The AOL Note originally matured in December 2006, was amended to extend the maturity date until December 2007 and was later further amended to provide for a November 2012 maturation.

4

**B.    Insiders of the Debtor**

| Name (Position) | Compensation Paid in 2 years prior to the Petition Date | Compensation (estimated) Projected to Be Paid During the Chapter 11 Case (Approx. 90 days) |
|---|---|---|
| Fred Lerner (Director, President, CEO) | $ 651,000 | $ 75,000 |
| Scott Neamand (Officer, Executive VP, CFO) | $ 508,000 | $ 60,000 |
| Steve LaMastra (Director) | $ 0 | $ 0 |
| David Ritz (Director) | $ 0 | $ 0 |

**C.    Management of the Debtor Before and During the Bankruptcy**

During the two years prior to the date on which the bankruptcy petition was filed, the officers, directors, managers or other persons in control of the Debtor  (collectively the "Managers") were Fred Lerner (CEO/President/Director), Scott Neamand (CFO/Executive VP/Officer), Steve LaMastra (Director), David Ritz (Director).

The Managers of the Debtor during the Debtor's chapter 11 case will be: Fred Lerner (CEO/President/Director), Scott Neamand (CFO/Executive VP/Officer), Steve LaMastra (Director), David Ritz (Director).

After the Effective Date of the Plan, the Reorganized Debtor will be a Delaware limited liability company and it will be managed by its sole member, RCI.  RCI's senior management is set forth below:

**Stephen M. LaMastra --** Mr. LaMastra is the President and CEO of Ritz Camera & Image, and joined RCI upon its inception in July 2009.  Mr. LaMastra has spent over 15 years in the retail, franchise, and related industries, including over a decade in the retail photo and imaging business.

**Tom Hermann --** Mr. Hermann is the Chief Financial Officer of RCI, where he has been since its inception in July 2009.  Prior to joining RCI, Mr. Hermann served as the CFO of Raving Brands Holdings, where he helped to engineer its turnaround, and has served as CFO before at several companies in turnaround, transition and rapid growth mode.

**Jeff Israel** -- Mr. Israel is Vice President and General Counsel of RCI, where he oversees all legal and real estate matters, and has served in that role since January 2010. Prior to his involvement with RCI, Mr. Israel spent over a decade with Home Depot, during the period when that company went from $25 billion to $75 billion in annual sales.

**D.    Events Leading to Chapter 11 Filing**

The Debtor began to experience a downturn in revenue in the second half of 2008 in conjunction with the U.S. economic recession. Then, in February 2009, the Debtor's primary supplier at the time, RCC, filed for bankruptcy under Chapter 11 of the Bankruptcy Code (the "RCC Bankruptcy"). As a result of the RCC Bankruptcy, inventory availability from RCC became greatly impaired, and inventory from RCI has been below appropriate levels from mid 2009 to the current date. Aside from reduced availability from major manufacturers, Canon U.S.A. Inc. ("Canon") -- whose product historically accounted for over 15% of the Debtor's sales, generating $16.4 million in 2008 revenue -- refused to do business with RCI after having lost significant funds in connection with the RCC Bankruptcy. As a result, RCI and thus the Debtor lost access to Canon product. In addition, RCC liquidated its Boaters World stores and warehouse and, as a result, the Debtor lost its main supplier for Boatersworld.com which in 2008 accounted for 13% of its sales, generating revenues of approximately $13.5 million with a gross profit margin of nearly 40%. The U.S. economic recession, dramatic changes in the Debtor's revenue from Canon products and Boatersworld.com and impaired inventory availability from RCC and RCI have resulted in operating losses in 2009, 2010 and year-to-date 2011.

Since November 2009, the Debtor has been unable to pay all of its obligations, stopped making payments on the AOL Note and is in default thereon. The Debtor does not have any ability to make further payments on the AOL Note. Moreover, the Debtor would have been unable to fund the purchase of inventory on a continuing basis but for financial accommodations from RCI in May and December 2010 which included amending the Operations Agreement, distinguishing between payment terms on pre-existing debt and future balances and eliminating handling and licensor fees and mark-ups on inventory. Despite these accommodations, the Debtor

6

has not been able to remain current on its payments to RCI and continues to experience financial difficulty.

Following significant evaluation and investigation of several alternatives, the Debtor elected to pursue a voluntary restructuring of its debt. On August 19, 2011 (the "Petition Date"), the Debtor filed a voluntary petition commencing its chapter 11 case. The Debtor has continued the management and control of its business and property as debtor in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

**E.    Significant Events During the Bankruptcy Case**

This Disclosure Statement was drafted as of the commencement of the Chapter 11 Case. Accordingly, except for the Court granting the Debtor's certain customary relief in "first-day" hearings (i.e. payment of employees, continuation of customer programs) there were no events that had occurred at the time that the Disclosure Statement was drafted. The Debtor anticipates that the Chapter 11 Case will be conducted in an efficient and timely manner.

**F.    Projected Recovery of Avoidable Transfers**

In consideration of the treatment afforded claims under the Plan, as well as the contributions provided by certain creditors (RCI) thereunder, the Debtor will waive preference, fraudulent conveyance, or other avoidance actions as to those creditors and persons that support the Plan and an efficient reorganization process.

Based upon a cursory review of the Debtor's payment practices over the past years, the Debtor believes that a relatively minor number of preference claims could be successfully prosecuted against vendors that have received payments on trade receivables from the Debtor in the 90 days preceding the Petition Date ("Trade Preference Claims"). During the 90 day pre-Petition Date period, payments to the Debtor's ordinary trade vendors, in the amount of approximately $8 million, have been made to vendors. However, virtually all of such payments were made on terms that are significantly the same as the payment terms historically made by the Debtor. In almost all

Exhibit B
Page 25

1  instances, the Debtor's recent trade payment schedule is consistent with the regular payment

2  intervals (i.e. 20 – 30 day terms) that the Debtor was able to adhere to in past years.

3       The Debtor believes that there may be grounds to avoid certain payments, totaling

4  approximately $4.5 million, that were made to equity participant, AOL, in connection with an

5  agreement by the Debtor to repurchase AOL's equity interest ("AOL Avoidance Claims").  In May

6  2005, the Debtor entered into a "Securities Purchase Agreement" with AOL by which the Debtor

7  agreed to repurchase AOL's shares of the Debtor's Series A Convertible Redeemable Preferred

8  Stock ("AOL Preferred Stock") with the AOL Note.  The Debtor has made approximately $2

9  million in principal payments and approximately $2.5 million in interest payments on the AOL

10  Note in the past five years.  The Debtor believes that there is a basis to avoid and recover any

11  payments to AOL on account of its equity interest because such equity interest was acquired from

12  the Debtor in a transaction that appears to fall in line with what the SEC has labeled an improper

13  "round-trip transaction."  Although no courts have explicitly held that "round-trip" transactions are

14  illegal *per se*, there are arguments that support the proposition that such transactions are voidable

15  and/or unenforceable.

16

17       Finally, given the timing of the perfection of security interests by the Debtor's affiliate,

18  RCI, the Debtor may have the ability to avoid RCI's security interest and to treat RCI's claim with

19  other unsecured creditors ("RCI Avoidance Claims").  RCI perfected a security interest in "all

20  assets of the Debtor" by the filing of a UCC-1 financing statement in December 2010.  Because

21  RCI may be an insider of the Debtor and the perfection occurred within one-year of the Petition

22  Date, the Debtor may be able to avoid such security interest.  If the Debtor were successful in such

23  litigation against RCI, the likely result would be that RCI's claims of approximately $3.5 million

24  would be re-classified as unsecured claims (exclusive of any portion of RCI's claims entitled to

25  priority under Section 503(b)(9) of the Bankruptcy Code which is estimated at nearly $300,000).

26       Pursuant to the Plan, the Debtor proposes to waive, among other claims and causes of

27  action, all claims and causes of action related to the Trade Preference Claims, AOL Avoidance

28  Claims and the RCI Avoidance Claim (collectively, the "Avoidance Actions") in exchange for the

8

respective support of the Plan by trade creditors, AOL and RCI.  The Debtor believes that the benefits provided to creditors under the Plan far outweigh the cost and likely recovery from pursuing the Avoidance Actions.  For example, under the Plan, RCI will subordinate or waive approximately $3.5 million in claims in exchange for 100% of the equity in the Reorganized Debtor.  As well, RCI will insure that up to $150,000 in allowed administrative priority claims are paid in full (to the extent that the Debtor's cash on hand on the Effective Date is insufficient to pay such claims) and will provide Reorganized Debtor's payment of approximately $1 million of allowed unsecured trade claims.  Accordingly, under the Plan, the Debtor will satisfy, at a minimum, over $4.5 million in claims.

Moreover, if the Debtor were to engage in litigation with trade vendors and RCI, RCI would not support the Plan and the Debtor's assets would have to be liquidated.  Because the Debtor's principal asset is a license that cannot be assumed without RCI's consent, it is unlikely that the value of the Debtor's assets would be more than $2 million, consisting of approximately $1 million in physical assets (cash, furniture and equipment) and approximately $1 million in expected litigation recoveries (e.g. the Avoidance Actions described above).  It is expected that the bulk of such recoveries would be consumed by the costs of litigation.  Moreover, any recoveries from the Trade Preference Claims would need to be set-off against the increased claims from trade vendors.  It should be noted, however, that if the litigation with AOL were unsuccessful, it is likely that AOL's interest (or claim arising from equity) would be equitably subordinated to other creditors' claims and AOL would receive nothing on account of such claim or interest.

Accordingly, the Debtor believes that waiver of all Avoidance Actions against consenting and cooperating creditors is in the best interest of the Debtor's estate.

**G.    Claims Objections**

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims.  Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld.  The procedures for resolving disputed claims are set forth in Article V of the Plan.

Exhibit B
Page 27

**H.      Current and Historical Financial Conditions**

The identity and fair market value of the estate's assets are listed in Exhibit B.  The fair market value of the assets has been estimated by the Debtor's CEO and CFO.

The Debtor's most recent financial statements issued before bankruptcy, each of which was filed with the Court, are set forth in Exhibit C.

The Debtor will file periodic financial reports as required by the Court.

**III.**

**SUMMARY OF THE PLAN OF REORGANIZATION**

**AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

**A.      What is the Purpose of the Plan of Reorganization?**

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive.  The Plan also states whether each class of claims or equity interests is impaired or unimpaired.  If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

**B.      Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Code.  They are not considered impaired, and holders of such claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code.  As such, the Plan Proponent has not placed the following claims in any class:

*1.      Administrative Expenses*

Administrative expenses are costs or expenses of administering the Debtor's chapter 11 case which are allowed under § 507(a)(2) of the Code.  Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition.  The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses, and their proposed treatment under the Plan:

10

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | $0 (all expenses shall be paid in the Ordinary Course) | Paid in full on the Effective Date of the Plan, or upon such other terms as may be agreed upon by the holder of the claim and the Reorganized Debtor |
| The Value of Goods Received in the Ordinary Course of Business Within 20 Days Before the Petition Date | $500,000 (excluding claims of RCI) | Paid in full upon the later of  (1) the Effective Date, or (2) the date on which such claim is allowed by a final non-appealable order. |
| Professional Fees, as approved by the Court. | $200,000 | Paid in full on the later of (1) the Effective Date, or (2) the date the Court allows such fees and expenses pursuant to a final order. |
| Clerk's Office Fees | $0 | Paid in full on the Effective Date of the Plan |
| Other administrative expenses | $0 | Paid in full on the Effective Date of the Plan or upon such other terms as may be agreed upon by the holder of the claim and the Reorganized Debtor |
| Office of the U.S. Trustee Fees | $13,000 | Paid in full on the Effective Date of the Plan |
| TOTAL | $713,000 | |

### 2. *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code.  Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

The following chart lists the Debtor's estimated § 507(a)(8) priority tax claims and their proposed treatment under the Plan:

| Description (name and type of tax) | Estimated Amount Owed | Date of Assessment | Treatment |
|---|---|---|---|
| None | $0 | | Pmt interval = <br> [Monthly] payment = <br> Begin date = <br> End date = <br> Interest Rate % = <br> Total Payout Amount = $ 0 |

C.      **Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1.      ***Classes of Secured Claims***

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as an unsecured claim and classified in either Class 4 or Class 5, depending upon the nature of the claim.

The following chart lists all classes containing Debtor's secured prepetition claims and their proposed treatment under the Plan:

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---|---|---|---|---|
| 2 | *Secured claim of*: Ritz Camera & Image, LLC<br><br>Collateral description: All assets of the Debtor<br><br>Allowed Secured Amount: Approx. $3.5 million<br><br>Priority of lien: First priority<br><br>Principal owed: Approx. $3.5 million<br><br>Pre-pet. Arrearage: Approx. $3.5 million<br><br>Total claim: Approx. $3.5 million | YES[2] | Impaired | The Holder of the Allowed Class 2 Claim shall receive, on account of its Class 2 Claim and the RCI Contributions as are set forth in the Plan, in complete satisfaction of all Class 2 Claims, 100% of the equity interests in the Reorganized Debtor. |
| 3 | *Secured claim of*: "Other Secured Creditors" - Western Finance & Lease Inc. And - U.S. Bancorp Business Equipment Finance Group<br><br>Collateral description: Certain computer hardware and software licenses<br><br>Allowed Secured Amount: $168,000 (combined)<br><br>Priority of lien: First<br><br>Principal owed: $168,000<br><br>Pre-pet. Arrearage: $0<br><br>Total claim: $168,000 (combined) | NO | Unimpaired | On the Effective Date, the Reorganized Debtor will either (i) assume any valid and allowed obligations owed to any Holder of an allowed Class 3 Claim or (ii) shall surrender the collateral subject to any valid first-priority liens (after giving effect to the Plan and any discharges thereunder) to the lien holder of the particular allowed Class 3 Claim. |

---

[2] RCI has not acknowledged or conceded that it is a statutory insider under Section 101(31) of the Bankruptcy Code or a non-statutory insider.

Exhibit B
Page 31

2.    *Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes.  The Code requires that each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim.  However, a class of holders of such claims may vote to accept different treatment.

The following chart lists all classes containing claims under §§ 507(a)(1), (4), (5), (6), and (a)(7) of the Code and their proposed treatment under the Plan:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| | | | |
| 1 | Priority unsecured claim pursuant to Section 507(a)(4)<br><br>Total amt of claims:<br>Approx. $200,000 | Unimpaired | Paid in the ordinary course of the Reorganized Debtor's business |

3.    *Classes of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Code.

//

//

//

//

//

//

//

//

//

//

14

The following chart identifies the Plan's proposed treatment of Classes 4 and 5, which contain general unsecured claims against the Debtor:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 4 | Convenience Class Unsecured Claims | Impaired | Each Holder of a Class 4 Claim shall receive cash payments from the Reorganized Debtor equal to the full amount of its Class 4 claim (but in no event more than $15,000) no later than the later of (a) 60 days from the Effective Date of the Plan and (b) the time at which such obligations would have been due and payable pursuant to any agreement between the holder of such claim and the Debtor.<br><br>Estimated percent of claims paid 99% |
| 5 | General Unsecured Claims | Impaired | If Class 5 accepts the Plan, then each holder of a Class 5 Claim shall receive, in complete satisfaction of its allowed Class 5 Claim, a *pro rata* portion of an aggregate cash payment of $100,000 to all such holders of Class 5 Claims on the Effective Date of the Plan; otherwise, each holder of a Class 5 Claim shall receive no distributions under the Plan on account of any Class 5 Claim.<br><br>Estimated percent of claims paid 20% |

### 4. *Classes of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company ("LLC"), the equity interest holders are the members. Finally, with respect to an individual who is a debtor, the Debtor is the equity interest holder.

//

//

//

15

The following chart sets forth the Plan's proposed treatment of the classes of equity interest holders:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 6 | Converted Equity Security Interests holders | Impaired | Class 6 shall retain no interest and shall receive no distributions under the Plan |
| 7 | Equity Interests | Impaired | Class 7 shall retain no interest and shall receive no distributions under the Plan |

D.    **Means of Implementing the Plan**

1.    *Source of Payments*

Payments and distributions under the Plan will be funded by the Debtor's cash on hand on the Effective Date, from the operation of the Debtor's business during the pendency of the Chapter 11 Case, from contributions from RCI on the Effective Date up to the RCI Contribution Cap (to the extent cash on hand is insufficient) and from the continued operation of the Reorganized Debtor's business.

2.    *Post-confirmation Management*

Upon the Effective Date, the Reorganized Debtor shall become a Delaware limited liability company and the sole member, RCI, shall be the managing member of the Reorganized Debtor.

E.    **Risk Factors**

The proposed Plan is based primarily upon a compromise with the Debtor's largest creditor, RCI, which is owed approximately $3.5 million on a secured basis as of the Petition Date. Pursuant to the compromise embodied in the Plan, RCI has agreed to accept 100% of the equity in the Reorganized Debtor and to continue to operate the Reorganized Debtor and pay the allowed claims of the vast majority of the Debtor's trade vendors in full in the ordinary course of business.

16

Barring RCI's support, the Debtor does not believe that any distribution to creditors would be possible.

The value of the Debtor's business is largely dependent upon the use of the trademarks, tradenames and intellectual property owned by RCI and licensed to the Debtor under a licensing agreement (the "RCI Licensing Agreement"). The Debtor may already be in default under the RCI Licensing Agreement and, if the RCI Licensing Agreement were terminated, the Debtor would be unable to operate most of the websites that make up its e-commerce business.

The Debtor believes that there are two primary risks to the confirmation of the Plan. First, certain general unsecured creditors that are not receiving full payment on their claims may object to confirmation of the Plan on the grounds that the Plan unfairly discriminates against them. However, there is significant caselaw that supports the proposition that the Plan may discriminate as between creditors of similar priority if such discrimination is reasonable and necessary and in the best interest of the Estate. In the present case, because general unsecured creditors will receive distributions under the Plan as high as 20% of claims (depending on the value of claims filed) and would likely receive nothing if the Plan were to fail, a court could find that there is no "unfair" discrimination under the Plan. Under the Plan, the convenience class mechanism pays the majority, in number, of unsecured claimants in full on their prepetition claims. Almost all of these claims are undisputed and are held by trade vendors that the Reorganized Debtor intends to continue to do business with. These claims are relatively modest in amount when compared to the large unsecured, and mostly disputed, claims in Class 5. If Class 4 claims were not paid in full, RCI would not be willing to support the Plan.

Second, the interest of AOL has been classified as a "converted equity interest" because the interest arises from an agreement by which the Debtor was to repurchase AOL's equity interest in the Debtor. It should also be noted that AOL has made no efforts to collect any payments from the Debtor for over a year. AOL may assert that (a) the classification of its interest is incorrect because it has a claim against, not an interest in, the Debtor and (b) the Plan unfairly discriminates against its claim *vis-à-vis* other general unsecured creditors. Because (i) AOL's interest relates

17

entirely to an equity interest in the Debtor and (ii) the acquisition of such equity interest was a result of a type of transaction that has been skeptically regarded by the SEC as "round-tripping"—a transaction aimed at improperly seeking to mislead the public about a company's operating performance—the Debtor believes that, at best, AOL's claim would be equitably subordinated to those of other creditors.  Moreover, if either general unsecured creditors or AOL successfully opposes the Plan, the Debtor will likely have no choice but to convert its Chapter 11 Case to a liquidation under chapter 7 of the Bankruptcy Code and it is likely that there will be little or no value for any creditor constituency.

**F.    Executory Contracts and Unexpired Leases**

The Plan provides that, unless otherwise rejected, the Debtor will assume all executory contracts and unexpired leases listed in Schedule "G" of the Debtor's Schedules.  Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

**G.    Tax Consequences of Plan**

Creditors and equity interest holders concerned with how the plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.

The following are the anticipated tax consequences of the Plan:

**1.    *Tax Consequences to Holders of Claims***

Each Holder of a Claim that receives a distribution pursuant to the Plan generally will recognize gain or loss in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim.  The amount realized for this purpose should generally equal the amount of cash and the fair market value of any other assets received or deemed received for federal income tax purposes under the Plan in respect of such Holder's Claim.

See below regarding the allocation of distributions received between principal and interest and the character of any gain or loss realized.  A Holder that receives or is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of receipt.

The tax book value of any assets received by creditors shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

### 2.    *Allocation of Plan Distributions between Principal and Interest*

In general, to the extent that consideration received pursuant to the Plan by a holder of an Allowed Claim is received in satisfaction of accrued interest or original issue discount ("OID") including imputed interest (if any) during its holding period, such amount will be taxable to the Holder as interest income (to the extent such accrued interest or OID was not previously included in the Holder's gross income).  Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claim or amortized OID was previously included in its gross income and not paid in full.  The Plan provides that any distribution received pursuant to the Plan in satisfaction of Claims shall, to the extent permitted by applicable law, be allocated for U.S. federal income tax purposes first to the principal amount of the Claim and second, to the extent the distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.  Current U.S. federal income tax law is unclear on this point, and no assurance can be given that the IRS will not challenge the allocation set forth in the Plan.  If, contrary to the intended position, such a distribution were treated as allocated first to accrued but unpaid interest, a Holder would realize ordinary income with respect to such distribution in an amount equal to any accrued but unpaid interest not already taken into income under the Holder's method of accounting, regardless of whether the Holder would otherwise realize a loss as a result of the Plan.

19

If a Holder holds Claims acquired at a market discount, any gain recognized by the Holder pursuant to the Exchange normally would be recharacterized as ordinary income to the extent of the accrued market discount that has not been previously included as ordinary income.  In general, the Claims will have accrued market discount if they were acquired after their original issuance at a discount to their adjusted issue price.

### 3.    *Character of Gain or Loss*

Assuming that a Holder of a Claim holds its Claim as a capital asset, gain or loss will be treated as long-term or short-term capital gain or loss depending on the Holder's holding period for the Claim.  The deductibility of capital losses is subject to limitations under the Tax Code.  If a Claim is not held as a capital asset, any gain or loss normally will be treated as ordinary income. Holders are urged to consult their own tax advisors regarding the character of any gain or loss realized.

### 4.    *Backup Withholding*

Under certain circumstances a Holder (other than an exempt recipient, such as a corporation) may be subject to backup withholding with respect to "reportable payments".  Backup withholding is not an additional tax.  Any amount withheld from a payment to a Holder under the backup withholding rules is allowable as a credit against such Holder's U.S. federal income tax liability (and may entitle such Holder to a refund), provided that the required information is furnished to the IRS on a timely basis.  Holders should consult their own tax advisors regarding the application of backup withholding to their particular situation, the availability of an exemption from backup withholding and the procedure for obtaining such exemption, of available.

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming of a loss in excess of certain thresholds.  Holders are urged to consult their own tax advisors regarding these regulations and whether the transactions contemplated under the Plan would be subject to these regulations and require disclosure on such Holders' tax return.

**IV.**

**CONFIRMATION REQUIREMENTS AND PROCEDURES**

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

**A.    Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes 2, 4 and 5 are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that classes 1 and 3 are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan. Classes 6 and 7 do not retain or receive any distributions under the Plan and are deemed to reject the Plan.

**1.    What Is an Allowed Claim or an Allowed Equity Interest?**

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity

21

interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

The deadline for filing a proof of claim in this case is October 7, 2011.

The deadline for filing objections to claims is the earlier of (i) sixty (60) days after the Effective Date, and (ii) such date as may be fixed by the Bankruptcy Court.

### 2. *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is impaired under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3. *Who is Not Entitled to Vote*

The holders of the following five types of claims and equity interests are not entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;
- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.
- holders of claims or equity interests in unimpaired classes;
- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and
- holders of claims or equity interests in classes that do not receive or retain any value under the Plan;
- administrative expenses.

Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.

22

### 4.    Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

## B.    Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section B.2.

### 1.    Votes Necessary for a Class to Accept the Plan

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

### 2.    Treatment of Nonaccepting Classes

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.

23

**C.    Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation.  A liquidation analysis is attached to this Disclosure Statement as Exhibit E.

**D.    Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

**1.    *Ability to Initially Fund Plan***

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.  Tables showing the amount of cash on hand on the effective date of the Plan, and the sources of that cash are attached to this disclosure statement as Exhibit F.

**2.    *Ability to Make Future Plan Payments And Operate Without Further Reorganization***

The Plan Proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payments.

The Plan Proponent has provided projected financial information.  Those projections are listed in Exhibit G.

The Plan Proponent's financial projections show that the Debtor will have an aggregate annual average cash flow, after paying operating expenses and post-confirmation taxes, of approximately $ 1.7 million. The final Plan payment is expected to be paid on or about December 31, 2011.

You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.

## V.

## EFFECT OF CONFIRMATION OF PLAN

**A.    Discharge of the Debtor**

On the confirmation date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Code and as otherwise provided in this Plan, including in Section 12.05 thereof.  After the Effective Date of the Plan your claims against the Debtor and the Reorganized Debtor will be limited as specified in the preceding sentence.

**B.    Modification of Plan**

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan.

The Plan Proponent may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

**C.    Final Decree**

Once the estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.  Alternatively, the Court may enter such a final decree on its own motion.

## VI.

## OTHER PLAN PROVISIONS

**A.    Settlement of Disputed Claims**

Prior to and after the Effective Date of the Plan, the Debtor and the Reorganized Debtor shall have the power and authority to settle and compromise a disputed Claim.  If the settlement of such disputed Claim will result in an allowed claim or value paid to the holder of such Claim in an amount less than $5,000, then the Debtor and the Reorganized Debtor may settle such Claim

without further court approval; in all other cases, settlement of a disputed Claim shall require court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**B.    RCI Contributions**

In consideration, among other things, of the treatment afforded to Class 2 Claims under the Plan, and solely to the extent necessary to make distributions required under the Plan, on the Effective Date:  (a) RCI will either (in its sole and absolute discretion): (i) provide sufficient cash to pay all Allowed Administrative Claims that exceed the Debtor's available cash on hand, in an amount not to exceed $150,000 (the "RCI Administrative Contribution Cap"); or (ii) assume all allowed and unpaid Administrative Claims that exceed the Debtor's available cash on hand on the Effective Date of the Plan, up to the RCI Contribution Cap, which claims shall be paid on terms agreed to by the Reorganized Debtor and the holder of such allowed and unpaid Administrative Claims; and (b) as part of the settlement of RCI's claims against the Debtor, on the Effective Date of the Plan, RCI may (in its sole and absolute discretion) subordinate or waive payment of some or all of: (i) any unsecured deficiency claim; (ii) payments of any outstanding priority section 503(b)(9) claims, (iii) payment of its Allowed Class 5 Claims; (iv) the amount to be reimbursed by Debtor to RCI on account of the cash provided by RCI to RII to pay all Allowed Administrative Claims that exceed the Debtor's available cash on hand up to the RCI Contribution Cap; or (v) any post-petition credit advanced by RCI to RII (collectively (a) and (b), the "RCI Contributions").

**C.    Exemption from Transfer Taxes**

Pursuant to Section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under this Plan; (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under the Plan, will not be subject to any stamp tax or other similar tax..

26

**D.       Exculpation, Releases, Discharge and Injunctions**

*__The Plan provides for customary exculpation, releases, discharge and injunctions for the__*

*__Debtor and those working in concert with the Debtor, creditors and plan supporters to make__*

*__possible the distributions provided for under the Plan.  The Plan provides for the following:__*

*__(a)       Exculpation.  From and after the Effective Date, the Released Parties, as set forth__*

*__in the Plan, shall neither have nor incur any liability to, or be subject to any right of action by,__*

*__any Holder of a Claim or an Equity Interest, or any other party in interest, or any of their__*

*__respective employees, representatives, financial advisors, attorneys, or agents acting in such__*

*__capacity, or affiliates, or any of their successors or assigns, for any act or omission in__*

*__connection with, relating to, or arising out of, the Chapter 11 Case, formulating, negotiating or__*

*__implementing the Plan, the Disclosure Statement, or any of the transactions contemplated under__*

*__the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the__*

*__confirmation of the Plan, the consummation of the Plan, or administration of the Plan, the__*

*__property to be distributed under the Plan, or any other act taken or omitted to be taken in__*

*__connection with or in contemplation of the Chapter 11 Case; provided, however, that this section__*

*__shall not apply to (i) obligations under, and the contracts, instruments, releases, agreements, and__*

*__documents delivered, reinstated or assumed under the Plan, Any of the Released Parties shall be__*

*__entitled to rely, in all respects, upon the advice of counsel with respect to their duties and__*

*__responsibilities under the Plan.__*

*__(b)       Releases by the Debtor.  As of the Confirmation Date, but subject to occurrence of__*

*__the Effective Date, for good and valuable consideration, the adequacy of which is hereby__*

*__confirmed, the Debtor, the Reorganized Debtor, and any person seeking to exercise the rights of__*

*__the Debtor's estate, including, without limitation, any successor to the Debtor or any estate__*

*__representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code,__*

*__shall and shall be deemed to, completely and forever release, waive, void, extinguish and__*

*__discharge unconditionally each and all of the Released Parties of and from any and all Claims,__*

*__obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities of__*

*any nature whatsoever (other than for gross negligence, willful misconduct, intentional fraud, or criminal conduct as determined by a Final Order) in connection with or related to the Debtor, the Chapter 11 Case, or the Plan (other than the rights of the Reorganized Debtor to enforce the Plan and the contracts, instruments, indentures, and other agreements or documents delivered or assumed thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtor or the Reorganized Debtor against the Released Parties; provided, however, that nothing in Section 12.04 and 12.05 of the Plan shall be deemed to prohibit the Debtor or the Reorganized Debtor from asserting and enforcing any Claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee (other than any director or officer) that is based upon an alleged breach of a confidentiality, non-compete or any other contractual or fiduciary obligation owed to the Debtor through the Effective Date.*

*(c)    Releases by Holders of Claims and Equity Interests. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, (i) each Holder of a Claim that votes in favor of the Plan, or is deemed to accept the Plan, or abstains from voting on the Plan and (ii) to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Holder of a Claim or Equity Interest that does not vote to accept the Plan or is deemed to reject the Plan, as applicable, shall and shall be deemed to completely and forever release, waive, void, extinguish and discharge unconditionally each of the Released Parties, from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtor, the Chapter 11 Case, or the Plan whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or*

*thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the Chapter 11 Case, or the Plan.*

       *(d)     Injunction Related to Exculpation and Releases.  As of the Effective Date, (i) all Persons that hold, have held or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, causes of action or liability of any nature whatsoever, or any Equity Interest or other right of a Holder of an Equity Interest, relating to the Debtor, or the Reorganized Debtor or any of their respective assets, property and/or Estate that is released or enjoined pursuant to Section 12.04 and 12.05 of the Plan and (ii) all other parties in interest in this Chapter 11 Case are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Equity Interests or other rights of a Holder of an Equity Interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Sections 9.01 and 12.04  of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.*

*(e)     Discharge of Claims and Termination of Equity Interests.  As of the Effective Date, all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and Equity Interests of any nature whatsoever against the Debtor or its Estate, assets, properties or interest in property, and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests.  On the Effective Date, the Debtor shall be deemed discharged and released under Section 1141(d)(l)(A) of the Bankruptcy Code from any and all Claims and Equity Interests, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, and the Equity Interests shall be terminated.*

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

***<u>As of the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Debtor or the Reorganized Debtor and their respective assets, property and/or Estate, any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Equity Interests or other rights of a Holder of an Equity Interest, relating to any of the Debtor or Reorganized Debtor or any of their respective assets, property and/or Estate, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Equity Interest or other rights of a Holder of an Equity Interest and termination of all rights of any Holder of an Equity Interest in any of the Debtors pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtor or the Reorganized Debtor, or any of their respective assets, property and/or Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated Equity Interest in the Debtor.</u>***

_____

[Signature of the Plan Proponent]


_____

[Signature of the Attorney for the Plan Proponent]

31

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit A**
Copy of Proposed Plan of Reorganization

33

Scott F. Gautier (State Bar No. 211742)
*sgautier@pwkllp.com*
Lauren Gans (State Bar No. 247542)
*lgans@pwkllp.com*
PEITZMAN, WEG & KEMPINSKY LLP
2029 Century Park East, Suite 3100
Los Angeles, CA  90067
Telephone: (310) 552-3100
Facsimile: (310) 552-3101

Proposed Attorneys for
Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

In re:

RITZ INTERACTIVE, INC.,
a Delaware corporation

      Debtor and Debtor-in-Possession.

Case No.: 8:11-bk-21690-ES

Chapter 11
**SMALL BUSINESS CASE UNDER
FRBP 1020**

**DEBTOR'S PLAN OF REORGANIZATION,
DATED AS OF AUGUST 30, 2011**

1

2

# TABLE OF CONTENTS

**ARTICLE I. SUMMARY** ..................................................................................1
**ARTICLE II. CLASSIFICATION OF CLAIMS AND INTERESTS**.........................1
2.01   Class 1..........................................................................................1
2.02   Class 2..........................................................................................1
2.03   Class 3..........................................................................................1
2.04   Class 4..........................................................................................2
2.05   Class 5..........................................................................................2
2.06   Class 6..........................................................................................2
2.07   Class 7..........................................................................................2
**ARTICLE III. TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, U.S.
    TRUSTEES FEES, AND PRIORITY TAX CLAIMS** .................................2
3.01   Unclassified Claims..........................................................................2
3.02   Administrative Expense Claims........................................................2
3.03   Priority Tax Claims...........................................................................3
3.04   United States Trustee Fees...............................................................3
**ARTICLE IV. TREATMENT OF CLAIMS AND INTERESTS UNDER THE
    PLAN**.........................................................................................3
4.01   Treatment of Claims and Interests ..................................................3
**ARTICLE V. ALLOWANCE AND DISALLOWANCE OF CLAIMS**........................6
5.01   Disputed Claim. ..............................................................................6
5.02   Delay of Distribution on a Disputed Claim. ......................................6
5.03   Settlement of Disputed Claims .........................................................6
**ARTICLE VI. PROVISIONS FOR EXECUTORY CONTRACTS AND
    UNEXPIRED LEASES** ...................................................................6
6.01   Assumed Executory Contracts and Unexpired Leases. .....................6
**ARTICLE VII. MEANS FOR IMPLEMENTATION OF THE PLAN**............................7
7.01   Effect of Distribution to Creditors. ...................................................7
7.02   Sources of Consideration for Plan Distributions. ..............................7
7.03   RCI Contributions ...........................................................................7
7.04   Issuance and Distribution of the Reorganized Debtor Equity Interests..........................8
7.05   Section 1145 Exemption. .................................................................8
7.06   Corporate Existence. .......................................................................9
7.07   Vesting of Assets in the Reorganized Debtor. ..................................9
7.08   Cancellation of Equity Securities and Related Obligations................9
7.09   Corporate Action.............................................................................10
7.10   Effectuating Documents, Further Transactions. ...............................10
7.11   Exemption from Certain Transfer Taxes and Recording Fees.........................10
7.12   Management of the Reorganized Debtor. ..........................................11
**ARTICLE VIII. GENERAL PROVISIONS**.........................................................11
8.01   Definitions and Rules of Construction..............................................11
8.02   Effective Date of Plan.......................................................................14
8.03   Severability. ....................................................................................14
8.04   Binding Effect. .................................................................................14

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**1**

8.05    Captions ...................................................................................................14
8.06    Controlling Effect. ....................................................................................14
8.07    Corporate Governance. .............................................................................14
**ARTICLE IX. DISCHARGE** ................................................................................15
9.01.   Discharge. ...................................................................................................15
**ARTICLE X. DISTRIBUTIONS AND DISPUTED CLAIMS** ...........................15
10.01   Distributions..............................................................................................15
10.02   Date of Distributions..................................................................................15
10.03   Postpetition Interest on Claims. .................................................................15
10.04   Disbursing Agent .......................................................................................15
10.05   Powers of Disbursing Agent. .....................................................................16
10.06   Delivery of Distributions. ..........................................................................16
10.07   Setoffs. .......................................................................................................16
10.08   Objections to Claims...................................................................................16
10.09   Payments and Distributions with Respect to Disputed Claims..................17
10.10   Estimation of Claims...................................................................................17
10.11   Distributions Relating to Disputed Claims .................................................17
10.12   Distributions after Allowance ....................................................................17
10.13   Preservation of Rights to Settle Claims .....................................................18
10.14   Disallowed Claims ......................................................................................18
**ARTICLE XI. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**..................18
11.01   Conditions to Effective Date.......................................................................18
**ARTICLE XII. EFFECT OF CONFIRMATION** ................................................19
12.04   Exculpation, Releases and Discharge. .......................................................20
12.05   Injunction. ..................................................................................................24
**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ..........................................28
13.01   Cramdown...................................................................................................28
13.02   Dissolution of Statutory Committee of Unsecured Creditors.....................28
13.03   Substantial Consummation .........................................................................28
13.04   Amendments................................................................................................28
13.05   Effectuating Documents and Further Transactions.....................................28
13.06   Revocation or Withdrawal of this Plan.......................................................29
13.07   Severability ................................................................................................29
13.08   Time ............................................................................................................29
13.09   Binding Effect ............................................................................................29
13.10   Notices. ......................................................................................................29

Exhibit B
Page 53

**ARTICLE I**

**SUMMARY**

This Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of Ritz Interactive, Inc. (the "Debtor" or "Plan Proponent") from its cash on hand, cash flow from operations, certain contributions described herein and future income.  This Plan provides for 2 classes of secured claims; 2 classes of unsecured claims; and 2 classes of equity security holders.  Unsecured creditors holding allowed claims will receive distributions, which the proponent of this Plan has valued at 20 cents on the dollar, except for those creditors in the convenience class who may receive up to 100 cents on the dollar, except for certain claims that may be voluntarily subordinated.  This Plan also provides for the payment of administrative and priority claims in full on the Effective Date of this Plan with respect to any such claim, except that professionals appointed in the case shall be required to file a fee application and have their fees approved by the Court before their administrative claims are paid.

All creditors and equity security holders should refer to Articles III through VI of this Plan for information regarding the precise treatment of their claim.  A disclosure statement that provides more detailed information regarding this Plan and the rights of creditors and equity security holders has been circulated with this Plan.  Your rights may be affected.  You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)

**ARTICLE II**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

2.01    Class 1.  All allowed claims entitled to priority under § 507 of the Code (except administrative expense claims under § 507(a)(2) and priority tax claims under § 507(a)(8)).

2.02    Class 2.  The Allowed Claim of Ritz Camera & Image, LLC ("RCI"), to the extent allowed as a secured claim under § 506 of the Code.

2.03    Class 3.  The Allowed Claims of any creditors, other than RCI, that hold a claim that is allowed as a secured claim under § 506 of the Code ("Other Secured Claims").

**1**

2.04    Class 4.  All Allowed unsecured Claims either : (a) of a creditor that holds Allowed unsecured Claims, in an aggregate amount, that are equal to or less than $15,000; or (b) of a creditor that voluntarily agrees to reduce the aggregate amount of Allowed unsecured Claims held by such creditor to $15,000, which claims have been allowed under § 502 of the Code ("Convenience Class Claims").  For the purpose of determining whether a creditor's claims are placed in Class 4, the "aggregate claims" of every creditor shall include all outstanding unsecured claims on the Petition Date that originated as owing from the Debtor to such creditor whether such claims have been transferred or assigned before or after the Petition Date.

2.05    Class 5.  All Allowed unsecured Claims that are not Convenience Class Claims allowed under § 502 of the Code ("General Unsecured Claims").

2.06    Class 6.  All equity interests of the Debtor that have been converted or reduced to claims for a sum certain prior to the Petition Date allowed under § 502 of the Code ("Converted Equity Interests").

2.07    Class 7.  Equity interests of the Debtor not classified in Class 6.

## ARTICLE III

### TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS,

### U.S. TRUSTEES FEES, AND PRIORITY TAX CLAIMS

3.01    Unclassified Claims.  Under section §1123(a)(1), administrative expense claims, and priority tax claims are not in classes.

3.02    Administrative Expense Claims.

(a) Each holder of an administrative expense claim allowed under § 503 of the Code will be paid in full on the Effective Date of this Plan (as defined in Article VII), in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Reorganized Debtor.

(b) Notwithstanding anything in (a) above, an estimate of professional fees shall be provided by the Reorganized Debtor (in an amount not to exceed the Debtor's cash on hand on the Effective Date plus the RCI Contribution Cap) on the Effective Date until such fees are paid to professionals and (i) professionals appointed in the case shall be required to file a fee application within 30 days of the Effective Date and have their fees approved by the Court before

2

their administrative claims are paid and (ii) all other holders of an administrative expense claim must file a request for payment of their administrative expense claim by no later than 14 days before the Plan confirmation hearing, with the hearing set for the same date and time as the Plan confirmation hearing.

3.03    Priority Tax Claims.  Each holder of an Allowed priority tax claim will be paid either in cash on the Effective Date of this Plan, or, at the election of the Reorganized Debtor, on such other terms of treatment consistent with § 1129(a)(9)(C) of the Code, which alternate terms, if any, shall be set forth in any order approving confirmation of this Plan.

3.04    United States Trustee Fees.  All fees required to be paid by 28 U.S.C. §1930(a)(6) ("U.S. Trustee Fees") will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code.  Any U.S. Trustee Fees owed on or before the Effective Date of this Plan will be paid on the Effective Date.  Thereafter all U.S. Trustee Fees will be timely paid by the Reorganized Debtor.

## ARTICLE IV

## TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

4.01    Claims and interests shall be treated as follows under this Plan:

| CLASS | IMPAIRMENT | TREATMENT |
|---|---|---|
| Class 1 - Priority Claims | Unimpaired | Class 1 is unimpaired by this Plan, and deemed to accept the Plan.  Each Holder of an Allowed Class 1 Priority Claim will be paid in full, in cash, upon the later of the Effective Date, or the date on which such claim is allowed by a final non-appealable order. |
| Class 2 – Secured Claim of RCI | Impaired | Class 2 is impaired by this Plan and entitled to vote.  The Holder of the Allowed Class 2 Claim shall receive, on account of its Class 2 Claim and the RCI Contributions as are set |

3

| | | |
|---|---|---|
| | | forth in this Plan, in complete satisfaction of all Class 2 Claims, 100% of the equity interests in the Reorganized Debtor. |
| Class 3 – Other Secured Claims | Unimpaired | Class 3 is unimpaired by this Plan and deemed to accept the Plan.  On the Effective Date, the Reorganized Debtor will either (i) assume any valid and allowed obligations owed to any Holder of an allowed Class 3 Claim or (ii) shall surrender the collateral subject to any valid first-priority liens (after giving effect to the Plan and any discharges thereunder) to the lien holder of the particular allowed Class 3 Claim. |
| Class 4 – Unsecured Convenience Class Claims | Impaired | Class 4 is impaired under this Plan and entitled to vote.  Each Holder of a Class 4 Claim shall receive cash payments from the Reorganized Debtor equal to the full amount of its Class 4 claim (but in no event more than $15,000) no later than the later of (a) 60 days from the Effective Date of this Plan and (b) the time at which such obligations would have been due and payable pursuant to any agreement between the holder of such claim and the Debtor. |
| Class 5 – General Unsecured Claims | Impaired | Class 5 is impaired under this Plan and entitled to vote.  Class 5 shall be treated as follows:<br>(i)    if Class 5 accepts this Plan, then each holder of a Class 5 Claim shall receive, |

4

| | | |
|---|---|---|
| | | in complete satisfaction of its allowed Class 5 Claim, a *pro rata* portion of an aggregate cash payment of $100,000 to all such holders of Class 5 Claims on the Effective Date of this Plan; <br><br> (ii) otherwise, each holder of a Class 5 Claim shall receive no distributions under this Plan on account of any Class 5 Claim. |
| Class 6 – Converted Equity Security Interests | Impaired | Class 6 is impaired under this Plan and all equity interests and claims of each holder of a Class 6 Interest shall be cancelled on the Effective Date of this Plan. Holders of Class 6 Interests shall neither receive any distribution nor retain any interests on account of their Class 6 Interest under this Plan. Class 6 is deemed to reject the Plan, and is not entitled to vote. |
| Class 7 – Equity Interests | Impaired | Class 7 is impaired under this Plan and all equity interests of each holder of a Class 7 Interest shall be cancelled on the Effective Date of this Plan. Holders of Class 7 Interests shall neither receive any distribution nor retain any interests on account of their Class 7 Interest under this Plan. Class 7 is deemed to reject the Plan, and is not entitled to vote. |

5

**ARTICLE V**

**ALLOWANCE AND DISALLOWANCE OF CLAIMS**

5.01    Disputed Claim.  A "Disputed Claim" is a Claim that has not been allowed or disallowed by a Final Order, and as to which either: (i) a proof of claim has been filed or deemed Filed, and the Debtor or another party in interest has filed an objection; or (ii) no proof of claim has been Filed, and the Debtor has scheduled such Claim as disputed, contingent, or unliquidated.  If no proof of claim has been Filed by the Claims Bar Date, a Disputed Claim shall be forever discharged on the Effective Date.

5.02    Delay of Distribution on a Disputed Claim.  No distribution will be made on account of a Disputed Claim unless such claim is allowed by a Final Order.

5.03    Settlement of Disputed Claims.  The Debtor and the Reorganized Debtor shall have the power and authority to settle and compromise a Disputed Claim.  If the settlement of such Disputed Claim will result in an allowed Claim or value paid to the holder of such Claim in an amount less than $5,000, then the Debtor and the Reorganized Debtor may settle such Claim without further court approval; in all other cases, settlement of a Disputed Claim shall require court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

**ARTICLE VI**

**PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

6.01    Assumed Executory Contracts and Unexpired Leases.

(a)    Unless either (i) previously rejected pursuant to an order of the court or (ii) a motion to reject such executory contract or lease has been filed by the Debtor prior to the Effective Date of this Plan, the Debtor assumes all of the executory contracts and/or unexpired leases to which the Debtor is a party, effective upon the Effective Date of this Plan as provided in Article VII.

(b)    A proof of claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than the later of (i) 30 days after the date of the order confirming this Plan and (ii) 15 days after the Effective Date of this Plan.

6

(c)    All insurance policies pursuant to which the Debtor has any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to this Plan and shall be assumed and shall continue in full force and effect on and after the Effective Date and shall revest in the Reorganized Debtor.

## ARTICLE VII

## MEANS FOR IMPLEMENTATION OF THE PLAN

7.01    Effect of Distribution to Creditors.  Except as specifically provided herein, all Plan distributions made to Creditors holding Allowed Claims in any Class are intended to be and shall be final.

7.02    Sources of Consideration for Plan Distributions.  Except as otherwise provided in this Plan or the Confirmation Order, all consideration necessary for the Reorganized Debtor to make payments pursuant to this Plan shall be obtained from the existing cash balances of the Debtor, the operations of the Debtor or the Reorganized Debtor and from the RCI Contributions, as defined herein.

7.03    RCI Contributions.  In consideration, among other things, of the treatment afforded to Class 2 Claims under this Plan, and solely to the extent necessary to make distributions required under this Plan, on the Effective Date of this Plan:

(a)    RCI will either (in its sole and absolute discretion): (i) provide sufficient cash to pay all Allowed Administrative Claims that exceed the Debtor's available cash on hand, in an amount not to exceed $150,000 (the "RCI Contribution Cap"); or (ii) assume all allowed and unpaid Administrative Claims that exceed the Debtor's available cash on hand on the Effective Date of this Plan, up to the RCI Contribution Cap, which Claims shall be paid on terms agreed to by RCI and the holder of such allowed and unpaid Administrative Claim; and

(b)    as part of the settlement of RCI's Claims against the Debtor, on the Effective Date of this Plan, RCI may (in its sole and absolute discretion) subordinate or waive payment of some or all of: (i) any unsecured deficiency claim; (ii) payments of any outstanding priority section 503(b)(9) claims, (iii) payment of its Allowed Class 5

7

Claims; (iv) the amount to be reimbursed by Debtor to RCI on account of the cash provided by RCI to RII to pay all Allowed Administrative Claims that exceed the Debtor's available cash on hand on the Effective Date up to the RCI Contribution Cap; or (v) any post-petition credit advanced by RCI to RII (collectively (a) and (b), the "RCI Contributions").

7.04    Issuance and Distribution of the Reorganized Debtor Equity Interests.  On the Effective Date or promptly thereafter, the Reorganized Debtor shall issue the Reorganized Debtor Equity Interests to the holder of the Class 2 Claims or its designee.  The Reorganized Debtor Equity Interests, when issued or distributed as provided in this Plan, will be duly authorized, validly issued, and, if applicable, fully paid and non-assessable.  Each distribution and issuance shall be governed by the terms and conditions set forth in this Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

7.05    Section 1145 Exemption.  Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities contemplated by this Plan and any and all settlement agreements incorporated therein, including the Reorganized Debtor Equity Interests, shall, to the fullest extent permitted by applicable law, be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code any Securities contemplated by this Plan, including the Reorganized Debtor Equity Interests will be freely tradable and transferable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (ii) the restrictions, if any, on the transferability of such Securities and instruments set forth in the Stockholders Agreement; and (iii) applicable regulatory approval.

8

7.06    <u>Corporate Existence</u>.  Except as otherwise provided in this Plan, the Debtor shall be replaced entirely and only the Reorganized Debtor shall exist after the Effective Date and the Reorganized Debtor shall be a Delaware limited liability company that shall exist and operate in accordance with its Operating Agreement.

7.07    <u>Vesting of Assets in the Reorganized Debtor</u>.  Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property of the Estate, all Causes of Action, and any property acquired by the Debtor pursuant to this Plan shall vest in the Reorganized Debtor, free and clear of all liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in this Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

7.08    <u>Cancellation of Equity Securities and Related Obligations</u>.  On the Effective Date, except as otherwise specifically provided for in this Plan: (1) any certificate, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Interest (except such certificates, notes, other instruments or documents evidencing indebtedness or obligations of the Debtor that are Reinstated pursuant to this Plan), shall be cancelled and the Reorganized Debtor shall not have any continuing obligations thereunder; and, (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the Debtor's former equity interests and any other certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor (except such agreements or certificates, notes or other instruments evidencing indebtedness or obligations of the Debtor that are specifically reinstated or assumed by the Reorganized Debtor pursuant to this Plan) shall be released and discharged; provided, however, that notwithstanding confirmation of

9

the Plan, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under this Plan and governing the rights and obligations of non-Debtor parties to such agreements vis-à-vis each other; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan, or result in any expense or liability to the Reorganized Debtor.

7.09    Corporate Action.  On the Effective Date, the conversion of the Reorganized Debtor to a Delaware limited liability company, the filing of its Operating Agreement, and each of the matters provided for by this Plan involving the corporate structure of the Debtor or corporate or related actions to be taken by or required of the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in this Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtor, or any other entity.  Without limiting the foregoing, such actions shall include the adoption and filing of the Reorganized Debtor's Certificate of Conversion and its Operating Agreement.

7.10    Effectuating Documents, Further Transactions.  On and after the Effective Date, the Reorganized Debtor, and the officers and members of the boards of directors (or other governing bodies) thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and the securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to this Plan.

7.11    Exemption from Certain Transfer Taxes and Recording Fees.  Pursuant to section 1146(a) of the Bankruptcy Code, the transfer from the Debtor to the Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with this Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in

10

the Debtor or the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

7.12    <u>Management of the Reorganized Debtor</u>.  On the Effective Date, the Reorganized Debtor shall exist as a Delaware limited liability company which shall have RCI as its sole member.

**ARTICLE VIII**

**GENERAL PROVISIONS**

8.01    <u>Definitions and Rules of Construction</u>.  The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan, and they are supplemented by the following definitions:

a.    **Allowed Claim** –  means, except as otherwise provided herein or by Final Order of the Bankruptcy Court, a Claim, proof of which was timely and properly Filed or, if no proof of claim was Filed, which has been or hereafter is listed by the Debtor on its schedules as liquidated in amount and not disputed or contingent, and, in either case, as to which no objection to the allowance thereof, or request for estimation, has been interposed, and that is not otherwise a Disputed Claim.

11

b. **Affiliate** – means, as to any Person, any other Person which, directly or indirectly, controls, or is controlled by, or is under common control with, such Person (for this purpose "control" (including with its correlative meanings, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, by contract or otherwise).

c. **Avoidance Actions** – causes of action arising under, or that are authorized by, chapter 5 of title 11 of the United States Code.

d. **Business Day** – means any day which is not a Saturday, a Sunday, or a "legal holiday" as defined in Bankruptcy Rule 9006(a).

e. **Chapter 11 Case** – the Debtor's bankruptcy case, referenced in the caption to this Plan.

f. **Claim** – has the meaning ascribed to such term under the Bankruptcy Code.

g. **Classes** – means any class of Claim or Interest under the Plan.

h. **Code** – when used without capitalized reference to another title or section of the United States Code, shall be read to refer to title 11 of the United States Code.

i. **Confirmation Date** – the date on which the Court enters an order confirming this Plan.

j. **Confirmation Order** – the Order of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Code.

k. **Creditors' Committee** – a statutorily appointed committee of unsecured creditors, if any, appointed pursuant to section 1102(a) of the Code.

l. **Debtor** – Ritz Interactive, Inc.

m. **Disbursing Agent** – means the Reorganized Debtor.

n. **Disclosure Statement** – means the Disclosure Statement to Debtor's Plan Of Reorganization, Dated as of August 30, 2011.

12

o.  **Distribution(s)** – means the cash (or other value) to be distributed to holders of allowed Administrative Expense Claims and Allowed Claims under (and in accordance with) this Plan.

p.  **Effective Date** – has the meaning set forth in Section 8.02 of this Plan.

q.  **Entity** – means any Person, estate, trust, governmental unit, and United States trustee.

r.  **Equity Interest** – an interest in a equity security of the Debtor.

s.  **Estate** – the estate created pursuant to section 541(a) of the Code.

t.  **File, Filed, Files,** or **Filing** – means properly and timely filed with the Bankruptcy Court in the Chapter 11 Case, as reflected on the official docket of the Bankruptcy Court for the Chapter 11 Case, and served on Persons, as such filing and service are required pursuant to the Bankruptcy Code, Bankruptcy Rules and/or order of the Bankruptcy Court.

u.  **Final Order** – an order from which no further appeal is permitted as of right.

v.  **Holder** – means an Entity holding a Claim against, or Equity Interest in, the Debtor.

w.  **Petition Date** – August 19, 2011.

x.  **Person** – means any individual, corporation, limited liability company, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof, or other Entity.

y.  **Professional** –an Entity that has been employed in this Chapter 11 Case pursuant to section 327 of the Code.

z.  **RCI** – Ritz Camera & Imaging, LLC

aa. **RCI Contributions** – has the meaning set forth in Section 7.03 of this Plan.

bb. **RCI Contribution Cap** – has the meaning set forth in Section 7.03 of this Plan.

13

cc. **Released Parties** – means (a) the Debtor, (b) RCI, (c) the Reorganized Debtor, and (d) any present or former director, manager, officer, member, partner (and their respective Affiliates), agent, representative, counsel or financial advisor of the Persons or parties described in clauses (a) through (d) hereof or any Affiliate thereof.

dd. **Reorganized Debtor** – means the Entity under the Plan in which all of assets of the Debtor's Estate shall vest.

8.02    Effective Date of Plan. The Effective Date of this Plan is the fourteenth business day following the date of the entry of the order of confirmation.  But if a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

8.03    Severability.    If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

8.04    Binding Effect.    The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

8.05    Captions.  The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

8.06    Controlling Effect.    Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of California govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

8.07    Corporate Governance.  The Reorganized Debtor shall operate in accordance with its Operating Agreement.

## ARTICLE IX

## DISCHARGE

9.01.   Discharge.  On the confirmation date of this Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Code and as otherwise provided in this Plan, including in Section 12.04 hereof.

## ARTICLE X

## DISTRIBUTIONS AND DISPUTED CLAIMS

10.01   Distributions.   As of the close of business on the Effective Date, the Reorganized Debtor shall not be responsible for recognizing any further changes in the record holders of any of the Claims or Equity Interests. The Debtor or the Reorganized Debtor shall have no obligation to recognize any transfer of the Claims or Equity Interests occurring on or after the Effective Date.

10.02   Date of Distributions.  Except as otherwise provided herein, any distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon thereafter as is practicable.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

10.03   Postpetition Interest on Claims.  Except as specifically provided in this Plan, no interest shall accrue on or after the Petition Date on any Claims.

10.04   Disbursing Agent.  All distributions hereunder shall be made by the Reorganized Debtor (or such other entity designated by the Reorganized Debtor), as Disbursing Agent, on or after the Effective Date, as otherwise provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that the Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be deducted from the amount payable to the holders of Class 5 Claims.

15

10.05    Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all distributions contemplated hereby, and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan.

10.06    Delivery of Distributions.  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to the Disbursing Agent, who shall transmit such distribution to the applicable holders of Allowed Claims.  In the event that any distribution to any holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one (1) year from the Effective Date, after such date, all unclaimed property or interest in property shall revert to the Reorganized Debtor and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

10.07    Setoffs.  The Debtor and the Reorganized Debtor may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the holder of such Claim but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claim the Debtor or the Reorganized Debtor may have against the holder of such Claim.

10.08    Objections to Claims.  On and after the Effective Date, the Reorganized Debtor shall be entitled to and have the sole right to file objections to all Claims.  Any objections to claims shall be served and filed on or before the earlier of (i) sixty (60) days after the Effective Date, and (ii) such date as may be fixed by the Bankruptcy Court.

16

10.09    <u>Payments and Distributions with Respect to Disputed Claims</u>.    Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such claim unless and until such Disputed Claim becomes an Allowed Claim, except as otherwise permitted under this Plan.

10.10    <u>Estimation of Claims</u>.  The Debtor and the Reorganized Debtor may at any time request that the Bankruptcy Court estimate any contingent Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection and make distributions under this Plan with respect to other Allowed Claims in the same class after making an appropriate reserve based on the estimated amount of such Disputed or contingent Claim.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim.

10.11    <u>Distributions Relating to Disputed Claims</u>.  At such time as a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the holder of such Claim, such holder's pro rata portion of the property distributable with respect to the Class in which such Claim belongs. To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated pro rata to the holders of Allowed Claims in the same class.

10.12    <u>Distributions after Allowance</u>.  To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, a distribution shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a

17

Final Order, the Disbursing Agent shall provide to the holder of such Claim, the distribution to which such holder is entitled hereunder.

10.13    <u>Preservation of Rights to Settle Claims</u>.  In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its estate may hold against any person or entity without the approval of the Bankruptcy Court, the Confirmation Order and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. The Reorganized Debtor or its successor(s) may pursue such retained claims, rights, or causes of action, suits, or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights.

10.14    <u>Disallowed Claims</u>.   All Claims held by persons or entities against whom the Debtor or the Reorganized Debtor has commenced a proceeding asserting a cause of action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code (other than those claims, causes of action and/or right to recover any avoided or avoidable transfer have been waived pursuant to this Plan) shall be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtor or the Reorganized Debtor from such party have been paid.

## ARTICLE XI

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

11.01    <u>Conditions to Effective Date</u>.

(i)    the Confirmation Order, in form and substance satisfactory to the Debtor and the Holder of Class 2 Claims shall have been entered and shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto;

(ii)    all actions, documents, and agreements necessary to implement this Plan, including, without limitation, all actions, documents, and agreements necessary to implement

18

this Plan shall have been effected or executed in form and substance acceptable to the Holder of Class 2 Claims;

(iii)    the Debtor shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents necessary to implement this Plan and that are required by law, regulation, or order.

## ARTICLE XII.

## EFFECT OF CONFIRMATION

12.01    <u>Compromise of Controversies</u>.  Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements and all other compromises and settlement provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlement are in the best interests of the Estate, creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness.

12.02    <u>Binding Effect</u>.  Except as otherwise provided in Section 1141(d)(3) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Equity Interest in, the Debtor and such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

12.03    <u>Vesting of Assets</u>.  On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtor's estate shall vest in the Reorganized Debtor free and clear of all Claims, liens, encumbrances, charges, and other interests.  The Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were

19

no pending cases under any chapter or provision of the Bankruptcy Code, except as provided herein.

12.04   Exculpation, Releases and Discharge.

(a)   Exculpation.  From and after the Effective Date, the Released Parties shall neither have nor incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Equity Interest, or any other party in interest, or any of their respective employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, formulating, negotiating or implementing this Plan, the Disclosure Statement, or any of the transactions contemplated under this Plan, the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan, the consummation of this Plan, or administration of this Plan, the property to be distributed under this Plan, or any other act taken or omitted to be taken in connection with or in contemplation of the Chapter 11 Case; provided, however, that this section shall not apply to (i) obligations under, and the contracts, instruments, releases, agreements, and documents delivered, reinstated or assumed under this Plan, Any of the Released Parties shall be entitled to rely, in all respects, upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(b)   Releases by the Debtor.  As of the Confirmation Date, but subject to occurrence of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, the Reorganized Debtor, and any person seeking to exercise the rights of the Debtor's estate, including, without limitation, any successor to the Debtor or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall and shall be deemed to, completely and forever release, waive, void, extinguish and discharge unconditionally each and all of the Released Parties of and from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities of

20

any nature whatsoever (other than for gross negligence, willful misconduct, intentional fraud, or criminal conduct as determined by a Final Order) in connection with or related to the Debtor, the Chapter 11 Case, or this Plan (other than the rights of the Reorganized Debtor to enforce this Plan and the contracts, instruments, indentures, and other agreements or documents delivered or assumed thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the Chapter 11 Case, or this Plan, and that may be asserted by or on behalf of the Debtor or the Reorganized Debtor against the Released Parties; provided, however, that nothing in this Section 12.04(b) shall be deemed to prohibit the Debtor or the Reorganized Debtor from asserting and enforcing any Claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee (other than any director or officer) that is based upon an alleged breach of a confidentiality, non-compete or any other contractual or fiduciary obligation owed to the Debtor through the Effective Date.

(c)     Releases by Holders of Claims and Equity Interests. As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, (i) each Holder of a Claim that votes in favor of this Plan, or is deemed to accept this Plan, or abstains from voting on the Plan and (ii) *to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date*, each Holder of a Claim or Equity Interest that does not vote to accept this Plan or is deemed to reject this Plan, as applicable, shall and shall be deemed to completely and forever release, waive, void, extinguish and discharge unconditionally each of the Released Parties, from any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever in connection with or related to the Debtor, the Chapter 11 Case, or this Plan whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or

21

unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Reorganized Debtor, the Chapter 11 Case, or this Plan.

(d)    Injunction Related to Exculpation and Releases.    As of the Effective Date, (i) all Persons that hold, have held or may hold a Claim or any other obligation, suit, judgment, damages, debt, right, remedy, causes of action or liability of any nature whatsoever, or any Equity Interest or other right of a Holder of an Equity Interest, relating to the Debtor, or the Reorganized Debtor or any of their respective assets, property and/or Estate that is released or enjoined pursuant to this Section 12.04(d) of the Plan and (ii) all other parties in interest in this Chapter 11 Case are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions against any Released Party or its property on account of such released liabilities, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and of all Equity Interests or other rights of a Holder of an Equity Interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation that is discharged under Section 9.01 and 12.04 of this Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

22

(e)    <u>Discharge of Claims and Termination of Equity Interests</u>.    As of the Effective Date, all consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and Equity Interests of any nature whatsoever against the Debtor or its Estate, assets, properties or interest in property, and regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Equity Interests.  On the Effective Date, the Debtor shall be deemed discharged and released under Section 1141(d)(l)(A) of the Bankruptcy Code from any and all Claims and Equity Interests, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, and the Equity Interests shall be terminated.

As of the Effective Date, except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities shall be precluded from asserting against the Debtor or the Reorganized Debtor and their respective assets, property and/or Estate, any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and all Equity Interests or other rights of a Holder of an Equity Interest, relating to any of the Debtor or Reorganized Debtor or any of their respective assets, property and/or Estate, based upon any act, omission, transaction or other activity of any nature that occurred prior to the Effective Date.  In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Equity Interest or other rights of a Holder of an Equity Interest and termination of all rights of any Holder of an Equity Interest in the Debtor pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against the Debtor or the Reorganized Debtor, or any of their respective assets, property and/or Estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated Equity Interest in the Debtor.

23

12.05  <u>Injunction.</u>

(a)      As of the Effective Date all Persons who have held, hold or may hold Claims against or Equity Interests in the Debtor, are permanently enjoined from taking any of the following actions against the Reorganized Debtor or its property on account of such Claims or Equity Interests: (A) commencing or continuing, in any manner or in any place, any action, or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting or enforcing any lien or encumbrance; (D) asserting any right of setoff, subrogation or recoupment of any kind and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of this Plan.

(b)      By accepting Distributions pursuant to this Plan each Holder of an Allowed Claim shall be deemed to have specifically consented to the releases, exculpations and discharges set forth in Section 12.04 and the injunctions set forth in this section 12.05.

12.06  <u>Retention of Causes of Action/Reservation of Rights</u>.

(a)      Nothing contained herein or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or causes of action that the Debtor or the Reorganized Debtor may have or which the Reorganized Debtor may choose to assert on behalf of its estate under any provision of the Bankruptcy Code or any applicable non-bankruptcy law or rule, common law, equitable principle or other source of right or obligation, including, without limitation, (i) any and all Claims against any person or entity, to the extent such person or entity asserts a cross-claim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtor, the Reorganized Debtor, their officers, directors, or representatives; and (ii) the turnover of any property of the Debtor's Estate.

24

(b)      Nothing contained herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any Claim, cause of action, right of setoff, or other legal or equitable defense which the Debtor had immediately prior to the Petition Date, against or with respect to any Claim left unimpaired by this Plan. The Reorganized Debtor shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Chapter 11 Case had not been commenced, and all of the Reorganized Debtor's legal and equitable rights respecting any Claim left unimpaired by this Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

12.07    Waiver of Section 547 Claims.  As of the Effective Date, the Debtor, the Reorganized Debtor shall and shall be deemed to have waived any and all claims causes of action and/or rights to recover any avoided or avoidable transfer under section 547 of the Bankruptcy Code against (i) any holder of a Class 2 or Class 4 Claim, (ii) any supplier of goods or services who would become a Holder of a Class 4 Claim if an action pursuant to section 547 of the Bankruptcy Code was successfully brought against it, and (iii) any Person employed by the Reorganized Debtor.

12.08    Solicitation of this Plan.  As of and subject to the occurrence of the Confirmation Date: (i) the Debtor shall be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (ii) the Debtor, the Reorganized Debtor and each of their respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, Professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under

25

this Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of this Plan or the offer and issuance of any securities under this Plan.

12.09    <u>Retention of Jurisdiction</u>.  On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that distributions to Holders of Allowed Claims are accomplished as provided herein;

(d)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the disclosure statement for this Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

26

(h)     to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments contemplated hereby or under any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)     to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate this Plan or to maintain the integrity of this Plan following consummation;

(k)     to hear any disputes arising out of, and to enforce, the order approving alternative dispute resolution procedures to resolve personal injury, employment litigation, and similar claims pursuant to section 105(a) of the Bankruptcy Code;

(l)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(o)     to enter a final decree closing the Debtor's chapter 11 case;

(p)     to recover all assets of the Debtor and property of the Debtor's Estate, wherever located; and

(q)     to hear and determine any rights, Claims, or causes of action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

27

# ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

13.01   <u>Cramdown</u>.  In the event that sufficient votes to confirm the Plan are not received, the Debtor reserves the right to request confirmation of the Plan pursuant to the provisions of section 1129(b) of the Bankruptcy Code with respect to any and all Classes.

13.02   <u>Dissolution of Statutory Committee of Unsecured Creditors</u>.   On the Effective Date, to the extent that one has been appointed, the Creditors' Committee shall be released and discharged from the rights and duties arising from or related to the Debtor's chapter 11 case, except with respect to its Professionals' interim and final applications for professionals' compensation.

13.03   <u>Substantial Consummation</u>.  On the Effective Date, this Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

13.04   <u>Amendments</u>.

(a)      <u>Plan Modifications</u>.  This Plan may be amended, modified, or supplemented by the Debtor or the Reorganized Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, and the Reorganized Debtor may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan.

(b)      <u>Other Amendments</u>.   Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court, so long as such adjustments or modifications do not adversely impact the distributions hereunder.

13.05   <u>Effectuating Documents and Further Transactions</u>.  Each of the officers of the Reorganized Debtor is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as

28

may be necessary or appropriate to effectuate and further evidence the winks and conditions of this Plan.

       13.06   <u>Revocation or Withdrawal of this Plan</u>.  The Debtor reserves the right to revoke or withdraw this Plan prior to the Effective Date.  If the Debtor takes such action, this Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in further proceedings involving the Debtor.

       13.07   <u>Severability</u>.  If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

       13.08   <u>Time</u>.  In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

       13.09   <u>Binding Effect</u>.  This Plan shall be binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, the holders of Claims and Equity Interests, and each of their respective successors and assigns.

       13.10   <u>Notices</u>.  All notices, requests, and demands to or upon the Debtor to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in

1    the case of notice by facsimile transmission, when received and telephonically confirmed,

2    addressed as follows: Peitzman, Weg & Kempinsky, LLP, Attention: Scott F. Gautier, 2029

3    Century Park East, Suite 3100, Los Angeles, CA 90067.

4

5        September      , 2011                          Respectfully submitted,

6                                                       By:  RITZ INTERACTIVE, INC.
                                                         Debtor and Debtor in Possession
7                                                        The Plan Proponent

8

9                                                    By _____

10

11                                                      Scott F. Gautier

12                                                      PEITZMAN, WEG & KEMPINSKY LLP
                                                        2029 Century Park East, Suite 3100
13                                                      Los Angeles, CA  90067
                                                        Telephone: (310) 552-3100
14                                                      Facsimile: (310) 552-3101

15                                                      Proposed Attorneys for the
                                                        Debtor and Debtor in Possession

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit B**
Identity and Value of Material Assets of Debtor

| Asset | Value (est. as of August 29, 2011) |
|---|---|
| **Cash** | **$ 650,000** |
| **Accounts Receivable** | **$ 50,000** |
| **Professional Retainers** | **$ 110,000** |
| **Furniture, Fixtures and Equipment** | **$ 40,000** |
| | |
| **TOTAL** | **$ 850,000** |

34

1

**Exhibit C**
Prepetition Financial Statements
(to be taken from those filed with the court)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

35

**RITZ INTERACTIVE**

**BALANCE SHEETS**

**AS OF JUNE 30, 2011 & 2010**

**(Draft)**

| | Jun 30, 11 | Jun 30, 10 |
|---|---|---|
| **ASSETS** | | |
| **Current Assets** | | |
| **Checking/Savings** | | |
| 1010 · Business Checking | $            2,117 | $                 - |
| 1012 · CNB Checking 402 141786 | -507,012 | 1,276,591 |
| 1013 · CNB Incoming Wire 402 150068 | 1,617 | 18,393 |
| 1020 · S-T Investments | 10,001 | 10,001 |
| 1022 · CNB New Deposit-402150041 | 0 | -3,111 |
| **Total Checking/Savings** | -493,276 | 1,301,873 |
| | | |
| **Accounts Receivable** | | |
| 1200 · Accounts Receivable | | |
| 1210 · A/R Cash (Mzrt) | 4,090 | 4,135 |
| **Total 1200 · Accounts Receivable** | 4,090 | 4,135 |
| | | |
| **Total Accounts Receivable** | 4,090 | 4,135 |
| | | |
| **Other Current Assets** | | |
| 1120 · Inventory Asset | 280,000 | 341,000 |
| 1205 · Other Receivable | 133,319 | 133,801 |
| 1212 · Credit Card Clearing Accts | | |
| 1215 · Credit Card Clearing Amex | 59,993 | 56,291 |
| 1220 · Credit Card Clearing Visa/MC | 110,542 | 158,276 |
| 1225 · Credit Card Clearing Discvr | 3,251 | 10,511 |
| **Total 1212 · Credit Card Clearing Accts** | 173,787 | 225,079 |
| | | |
| 1310 · Deposits | 32,666 | 32,666 |
| 1313 · Manual  Payroll Check | 0 | 1,404 |
| 1320 · Prepaid Expenses | 177,485 | 216,411 |
| 1325 · Short-Term Deferred Tax Asset | 322,202 | 322,202 |
| **Total Other Current Assets** | 1,119,458 | 1,272,562 |
| | | |
| **Total Current Assets** | 630,272 | 2,578,571 |
| | | |
| **Fixed Assets** | | |
| 1500 · Fixed Asset | | |
| 1510 · Computer Equipment | 1,215,864 | 1,184,818 |
| 1515 · Office Equipment | 219,998 | 218,569 |
| 1520 · Office Furniture | 65,972 | 65,972 |
| 1525 · Software | 832,272 | 832,272 |
| 1530 · Web Site Development | 527,427 | 527,427 |

(Draft)

| | Jun 30, 11 | Jun 30, 10 |
|---|---|---|
| 1540 · Leasehold Improvement | 62,616 | 62,616 |
| 1590 · Accumulated Depreciation | -1,523,728 | -1,480,569 |
| 1595 · Amortization | -1,359,700 | -1,355,800 |
| **Total 1500 · Fixed Asset** | 40,722 | 55,307 |
| | | |
| **Total Fixed Assets** | 40,722 | 55,307 |
| | | |
| **Other Assets** | | |
| 1600 · Intangibles | 671,000 | 671,000 |
| 1620 · Long-Term Deferred Tax Asset | 3,186,163 | 3,186,163 |
| **Total Other Assets** | 3,857,163 | 3,857,163 |
| | | |
| **TOTAL ASSETS** | $    4,528,158 | $    6,491,041 |
| | | |
| **LIABILITIES & EQUITY** | | |
| **Liabilities** | | |
| **Current Liabilities** | | |
| **Accounts Payable** | | |
| 2000 · Trade Accounts Payable | $    3,340,860 | $    3,452,495 |
| 2020 · Accrued Accounts Payable | 1,338,716 | 583,767 |
| **Total Accounts Payable** | 4,679,576 | 4,036,262 |
| | | |
| **Other Current Liabilities** | | |
| 2015 · Unearned Revenue | 450,750 | 540,000 |
| 2030 · Sales Taxes Payable (Mzrt) | 43,025 | 43,846 |
| 2032 · Deferred Rent | 54,875 | 122,049 |
| 2033 · Accrued Payroll | 146,644 | 149,801 |
| 2035 · Payroll Taxes Payable | 9,936 | 10,370 |
| 2045 · Gift Certificate Liability | 291,869 | 276,681 |
| 2050 · Prepaid Order Liability (Mzrt) | -245,164 | -180,485 |
| 2055 · Electronic Checks Refunds Due | 13,841 | -8,989 |
| 2061 · Returns Reserve | 75,000 | 50,000 |
| 2062 · Charge Back Reserve | 60,000 | 50,000 |
| 2075 · Other Short Term Liability | 2,646,517 | 2,646,517 |
| **Total Other Current Liabilities** | 3,547,294 | 3,699,790 |
| | | |
| **Total Current Liabilities** | 8,226,870 | 7,736,052 |
| | | |
| **Long Term Liabilities** | | |
| 2510 · Long-Term Note Payable | 5,283,142 | 5,283,142 |
| **Total Long Term Liabilities** | 5,283,142 | 5,283,142 |
| | | |
| **Total Liabilities** | 13,510,011 | 13,019,194 |

**(Draft)**

| | Jun 30, 11 | Jun 30, 10 |
|---|---|---|
| **Equity** | | |
| **3100 · Common Stock** | 28,431 | 28,431 |
| **3200 · Additional Paid In Capital** | 4,390,139 | 4,386,276 |
| **3300 · Treasury Stock** | -147,529 | -147,529 |
| **3500 · Retained Earnings** | -11,577,294 | -10,243,908 |
| **Net Income** | -1,675,600 | -551,422 |
| **Total Equity** | -8,981,854 | -6,528,153 |
| **TOTAL LIABILITIES & EQUITY** | $ 4,528,158 | $ 6,491,041 |

**RITZ INTERACTIVE**

**INCOME STATEMENTS**

**FOR THE YEARS ENDING DECEMBER 31, 2010, 2009 & 2008**

(Unaudited)

| | Jan - Dec 10 | Jan - Dec 09 | Jan - Dec 08 |
|---|---:|---:|---:|
| **Ordinary Income/Expense** | | | |
| **Income** | | | |
| 4000 · Sales | $ 38,587,572 | $ 46,439,418 | $ 107,211,790 |
| **Total Income** | 38,587,572 | 46,439,418 | 107,211,790 |
| | | | |
| **Cost of Goods Sold** | | | |
| 5000 · Cost of Goods Sold | 32,694,320 | 40,203,857 | 89,060,988 |
| **Total COGS** | 32,694,320 | 40,203,857 | 89,060,988 |
| | | | |
| **Gross Profit** | 5,893,252 | 6,235,561 | 18,150,802 |
| | | | |
| **Expense** | | | |
| 6050 · Advertising | 2,932 | 68,078 | 86,163 |
| 6080 · Marketing Program | 1,737,167 | 2,345,088 | 5,140,514 |
| 6090 · Auction Fees | 4,045 | 24,401 | 84,971 |
| 6130 · Bank Charges | 4,757 | 3,415 | 8,505 |
| 6144 · Bad Debt | 0 | -359 | 139 |
| 6145 · Call Center Operations | 502,561 | 461,482 | 854,288 |
| 6150 · Consultants/Contractors | 92,872 | 108,534 | 177,256 |
| 6170 · Credit Card Processing | 689,594 | 844,734 | 1,931,708 |
| 6180 · Charge Back | 117,139 | 96,066 | 177,371 |
| 6200 · Depreciation Expense | 92,156 | 173,197 | 216,702 |
| 6220 · Dues and Subscriptions | 6,440 | 5,497 | 13,311 |
| 6250 · e Mail | 35,861 | 73,233 | 57,468 |
| 6280 · Employee Expense | 3,260,703 | 3,862,868 | 4,577,773 |
| 6340 · Equipment & Other Rental | 1,265 | 1,350 | 1,377 |
| 6380 · Insurance | 71,499 | 86,379 | 122,594 |
| 6410 · Interest Expense | 475,785 | 480,314 | 543,522 |
| 6440 · Licenses and Permits | 75 | 105 | 105 |
| 6450 · Miscellaneous | -649 | -138 | 0 |
| 6455 · RCC License Fee | 41,008 | 249,339 | 937,125 |
| 6500 · Postage and Delivery | 1,270 | 3,848 | 18,359 |
| 6600 · Professional Fees | 170,819 | 193,471 | 309,621 |
| 6620 · Public Relations | 1,640 | 2,740 | 2,320 |
| 6630 · Rent | 359,842 | 361,155 | 355,326 |
| 6660 · Repairs & Maintenance | 865 | 3,993 | 4,744 |
| 6679 · Stock Based Compensation | 7,727 | 44,833 | 107,800 |
| 6680 · Supplies | 26,015 | 31,734 | 46,727 |
| 6700 · Taxes (property & franchise) | 16,493 | 23,138 | 21,972 |
| 6750 · Telephone | 76,307 | 88,695 | 176,439 |
| 6780 · Travel & Ent | 25,157 | 27,422 | 83,807 |
| 6900 · Web Site Management | 456,889 | 481,607 | 500,849 |
| **Total Expense** | 8,278,232 | 10,146,218 | 16,558,855 |
| | | | |
| **Net Ordinary Income** | -2,384,980 | -3,910,657 | 1,591,947 |
| | | | |
| **Other Income/Expense** | | | |
| **Other Income** | | | |
| 7010 · Interest Income | 268 | 11,711 | 431,335 |
| 7030 · Other Income | 824,665 | 0 | 11 |
| **Total Other Income** | 824,933 | 11,711 | 431,346 |
| | | | |
| **Other Expense** | | | |
| 8020 · Taxes - Income | -226,661 | 75,639 | 705,408 |
| **Total Other Expense** | -226,661 | 75,639 | 705,408 |
| | | | |
| **Net Other Income** | 1,051,594 | -63,928 | -274,062 |
| | | | |
| **Net Income** | $ (1,333,386) | $ (3,974,585) | $ 1,317,885 |

Financial Statements and Report of
Independent Certified Public Accountants

**RITZ INTERACTIVE, INC.**

December 31, 2007 and 2006

**CONTENTS**

|                                                           | Page |
|-----------------------------------------------------------|------|
| REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS        | 3    |
| FINANCIAL STATEMENTS                                       |      |
|     BALANCE SHEETS                     | 4    |
|     STATEMENTS OF OPERATIONS           | 5    |
|     STATEMENTS OF STOCKHOLDERS' DEFICIT| 6    |
|     STATEMENTS OF CASH FLOWS           | 7    |
|     NOTES TO FINANCIAL STATEMENTS      | 8    |

**Grant Thornton** 🜚

Accountants and Business Advisors

## REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

Board of Directors
Ritz Interactive, Inc.

We have audited the accompanying balance sheets of Ritz Interactive, Inc. as of December 31, 2007 and 2006 (as restated), and the related statements of operations, stockholders' deficit and cash flows for the three years ended December 31, 2007, 2006 (as restated) and 2005. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America as established by the American Institute of Certified Public Accountants. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Ritz Interactive, Inc. as of December 31, 2007 and 2006 (as restated), and the results of its operations and its cash flows for the three years ended December 31, 2007, 2006 (as restated) and 2005, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 12 to the accompanying financial statements, the Company has restated previously issued financial statements as of and for the year ended December 31, 2006.

*Grant Thornton LLP*

Irvine, California
June 6, 2008

18400 Von Karman Avenue
Suite 900
Irvine, CA 92612-0525
T 949.553.1600
F 949.553.0168
W www.grantthornton.com

Grant Thornton LLP
US Member of Grant Thornton International

Ritz Interactive, Inc.

BALANCE SHEETS
(in thousands)

| | December 31, | |
| | 2006 | 2007 |
| | (as restated) | |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 24,534 | $ 12,268 |
| Marketable securities | — | 19,550 |
| Accounts receivable, net of allowance for doubtful accounts of $282 and $70 at December 31, 2006 and 2007 | 1,555 | 2,531 |
| Inventory | 736 | 818 |
| Prepaid expenses and other current assets | 630 | 590 |
| Deferred income taxes | 351 | 322 |
| Total current assets | 27,806 | 36,079 |
| Property and equipment, at cost: | | |
| Computer software and equipment | 2,056 | 2,497 |
| Furniture and fixtures | 272 | 272 |
| | 2,328 | 2,769 |
| Less accumulated depreciation | (2,220) | (2,378) |
| | 108 | 391 |
| Deferred income taxes | 4,563 | 3,816 |
| Intangibles | 171 | 171 |
| Total assets | $ 32,648 | $ 40,457 |
| **Liabilities and Stockholders' Deficit** | | |
| Current liabilities: | | |
| Accounts payable | $ 5,417 | $ 4,025 |
| Accounts payable to related party | 18,001 | 27,085 |
| Accrued liabilities | 1,205 | 1,386 |
| Deferred service obligation | 736 | 818 |
| Deferred revenue | 2,151 | 760 |
| Note payable, current portion | 143 | 1,777 |
| Total current liabilities | 27,653 | 35,851 |
| Note payable, long-term portion | 9,860 | 8,083 |
| Stockholders' deficit: | | |
| Common stock, $0.001 par value; 45,000,000 shares authorized; 28,420,589 and 28,420,589 shares issued; 27,491,178 shares outstanding at December 31, 2006 and 2007 | 28 | 28 |
| Additional paid-in capital | 4,083 | 4,230 |
| Treasury stock at cost — 929,411 shares at December 31, 2006 and 2007 | (148) | (148) |
| Accumulated deficit | (8,828) | (7,587) |
| Total stockholders' deficit | (4,865) | (3,477) |
| Total liabilities and stockholders' deficit | $ 32,648 | $ 40,457 |

See accompanying notes to financial statements.

4

Ritz Interactive, Inc.

STATEMENTS OF OPERATIONS
(in thousands)

| | Year ended December 31, | | |
|---|---|---|---|
| | 2005 | 2006 (as restated) | 2007 |
| Revenues (Note 1b): | | | |
| Net revenues from product sales | $ 1,588 | $ 4,727 | $ 12,031 |
| Net service fee revenues | 20,400 | 23,208 | 22,321 |
| Net revenues | 21,988 | 27,935 | 34,352 |
| Operating expenses: | | | |
| Cost of goods sold from product sales | 818 | 3,225 | 9,075 |
| Marketing, merchandising and selling | 11,925 | 13,606 | 15,810 |
| General and administrative | 4,209 | 4,435 | 4,011 |
| Customer support and fulfillment | 2,681 | 3,147 | 3,477 |
| IPO expenses | 1,174 | 77 | — |
| Non-employee stock-based compensation | 493 | 72 | — |
| Total operating expenses | 21,300 | 24,562 | 32,373 |
| Income from operations | 688 | 3,373 | 1,979 |
| Other income (expense): | | | |
| Interest and other income | 179 | 450 | 698 |
| Interest expense | (358) | (600) | (601) |
| Other income (expense), net | (179) | (150) | 97 |
| Income before (provision) benefit for income taxes | 509 | 3,223 | 2,076 |
| (Provision) benefit for income taxes | (27) | 4,822 | (835) |
| Net income | $ 482 | $ 8,045 | $ 1,241 |

See accompanying notes to financial statements.

5

Ritz Interactive, Inc.

STATEMENTS OF STOCKHOLDERS' DEFICIT
(in thousands)

| | Common Stock | | Additional Paid-In Capital | Treasury Stock | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| **Balance, December 31, 2004**................................... | 28,283 | $ 28 | $ 3,465 | $ (148) | $ (17,355) | $ (14,010) |
| Non-employee stock-based compensation ...................... | — | — | 493 | — | — | 493 |
| Exercise of options................ | 113 | — | 33 | — | — | 33 |
| Net income ............................. | — | — | — | — | 482 | 482 |
| **Balance, December 31, 2005**................................... | 28,396 | $ 28 | $ 3,991 | $ (148) | $ (16,873) | $ (13,002) |
| Stock-based compensation... | — | — | 81 | — | — | 81 |
| Exercise of options................ | 25 | — | 11 | — | — | 11 |
| Net income (as restated)........ | — | — | — | — | 8,045 | 8,045 |
| **Balance, December 31, 2006 (as restated)** ............... | 28,421 | $ 28 | $ 4,083 | $ (148) | $ (8,828) | $ (4,865) |
| Stock-based compensation... | — | — | 147 | — | — | 147 |
| Net income ............................. | — | — | — | — | 1,241 | 1,241 |
| **Balance, December 31, 2007**................................... | 28,421 | $ 28 | $ 4,230 | $ (148) | $ (7,587) | $ (3,477) |

See accompanying notes to financial statements.

6

Ritz Interactive, Inc.

STATEMENTS OF CASH FLOWS
(in thousands)

| | Year ended December 31, | | |
|---|---|---|---|
| | 2005 | 2006 | 2007 |
| | | (as restated) | |
| **Cash flows from operating activities:** | | | |
| Net income ............................................................$ | 482 | $ 8,045 | $ 1,241 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | |
| Deferred income taxes....................................... | — | (4,912) | 776 |
| Provision for (recovery of) doubtful accounts ......... | — | 275 | (156) |
| Depreciation...................................................... | 167 | 103 | 158 |
| Stock-based compensation ................................ | 493 | 81 | 147 |
| Changes in operating assets and liabilities: | | | |
| Increase in accounts receivable ...................... | (643) | (423) | (820) |
| (Increase) decrease in inventory ..................... | (81) | 8 | (82) |
| (Increase) decrease in prepaid expenses and other current assets. | (140) | (259) | 40 |
| Increase (decrease) in accounts payable........... | 136 | 3,733 | (1,392) |
| Increase (decrease) in accounts payable to related party...... | (1,877) | 1,044 | 9,084 |
| Increase (decrease) in deferred service obligation................. | 81 | (8) | 82 |
| Increase (decrease) in deferred revenue.............. | 156 | 1,325 | (1,391) |
| Increase (decrease) in accrued liabilities............. | 193 | (74) | 181 |
| Net cash provided by (used in) operating activities................... | (1,033) | 8,938 | 7,868 |
| **Cash flows from investing activities:** | | | |
| Purchases of marketable securities............................ | — | — | (20,450) |
| Proceeds from sales of marketable securities ............... | — | — | 900 |
| Purchases of property and equipment....................... | (100) | (52) | (441) |
| Net cash used in investing activities......................... | (100) | (52) | (19,991) |
| **Cash flows from financing activities:** | | | |
| Payments made on note payable ............................. | — | — | (143) |
| Payments made on note payable to related party ........... | — | (25) | — |
| Proceeds from exercise of stock options .................. | 33 | 11 | — |
| Net cash provided by (used in) financing activities......... | 33 | (14) | (143) |
| Net increase (decrease) in cash and cash equivalents.............. | (1,100) | 8,872 | (12,266) |
| Cash and cash equivalents, beginning of year ..................... | 16,762 | 15,662 | 24,534 |
| Cash and cash equivalents, end of year........................$ | 15,662 | $ 24,534 | $ 12,268 |
| **Supplemental disclosure of cash flow information:** | | | |
| Cash paid for interest.........................................$ | 358 | $ 600 | $ 601 |
| Cash paid for income taxes.................................$ | 125 | $ — | $ 64 |
| **Non-cash investing and financing activities:** | | | |
| None | | | |

See accompanying notes to financial statements.

7

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

**(1) Summary of Significant Accounting Policies**

*(a) Description of Business Activities and Relationship with Ritz Camera Centers, Inc.*

Ritz Interactive, Inc. ("Ritz Interactive" or the "Company") is a specialty online retailer and e-commerce provider that operates a network of websites offering high quality, branded lifestyle products. The websites include, among others, RitzCamera.com, WolfCamera.com, CameraWorld.com, PhotoAlley.com and BoatersWorld.com. These websites offer products for purchase by consumers and businesses and include a broad array of digital cameras and photographic products, as well as marine, boating and fishing products. Photography related net revenues for the years ended December 31, 2005, 2006 (as restated) and 2007 aggregated $14.3 million, $16.7 million and $16.1 million, respectively. Marine, boating and fishing related net revenues for the years ended December 31, 2005, 2006 (as restated) and 2007 aggregated $6.1 million, $6.5 million and $6.3 million, respectively. The Company also generates revenue through advertising and operates other lifestyle websites in different stages of development, including, but not limited to, ShopAtShark.com and RitzElectronics.com. In 2006, the Company began to sell general consumer electronics on its photography related websites rather than through RitzElectronics.com. Advertising, consumer electronics and other sources of revenue for the years ended December 31, 2005, 2006 (as restated) and 2007 aggregated $1.6 million, $4.7 million and $12.0 million, respectively. Ritz Interactive outsources nearly all fulfillment of its photography and marine related orders to Ritz Camera Centers, Inc. ("RCC"). General consumer electronics and other product categories are fulfilled by several third-party distributors. The Company operates in a single business segment and sells its products principally to customers in the United States.

Ritz Interactive was incorporated in Delaware in February 1999. The Company began offering products for sale through its website in October 1999.

The Company purchases substantially all of its inventory from RCC. RCC owns and operates photographic product and services retail stores and boating, marine and fishing product retail stores throughout the United States. At December 31, 2006 and 2007, RCC owned approximately 11% of the Company's outstanding common stock and various employees and stockholders of RCC and certain of their family members owned an additional approximately 57% of the Company's common stock. RCC's Chairman and its President hold two of the nine seats on the Company's board of directors. RCC and the Company maintain a perpetual agreement that covers not only the supplier relationship, but also grants to the Company an exclusive license to use certain of the primary trademarks of RCC, including Ritz Camera, Wolf Camera, Boater's World and related brands, and to sell online the products purchased from RCC. See also Note 9 below.

The Company's revenues fluctuate from period to period as a result of seasonality, as well as special promotional offers and the introduction of popular new products.

*(b) Service Fees and Revenue*

The Company applies the provisions of Securities and Exchange Commission ("SEC") Staff Accounting Bulletin ("SAB") No. 104, *Revenue Recognition in Financial Statements* ("SAB 104"), which provides guidance on the recognition, presentation and disclosure of revenue in financial statements filed with the SEC. SAB 104 outlines the basic criteria that must be met to recognize revenue and provides guidance for disclosure related to revenue recognition policies. The Company recognizes revenue when (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred or services have been rendered; (iii) the sales price charged is fixed and determinable; and (iv) collection is reasonably assured.

The Company evaluates the criteria outlined in Emerging Issues Task Force ("EITF") Issue No. 99-19, *Reporting Revenue Gross as a Principal Versus Net as an Agent* ("EITF 99-19"), in determining whether it is appropriate to record as revenue the gross amount of product revenue and related costs or the net amount earned as service fees. The majority of revenue generated by the Company is derived from the sale by the Company of inventory purchased from RCC. With respect to these transactions, the Company takes title and possession of the inventory, coordinates shipping to its customers, has physical loss inventory risk, latitude in pricing and bears 100% of the credit risk. The Company, however, sells product under RitzCamera.com, BoatersWorld.com and other domain names pursuant to the Company's

8

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

trademark license with RCC. As a result, Ritz Interactive customers may believe they are doing business with Ritz Camera Centers as opposed to Ritz Interactive. Given this and the related party nature of the relationship between RCC and the Company, the Company is not, for GAAP purposes, considered to be the primary obligor with respect to the sale of products purchased by the Company from RCC and as a result, these sales are recorded net of the related cost of goods as if the Company were generating a commission on each sale. Accordingly, such sales transactions are presented as net service fee revenues in the accompanying Statements of Operations. With respect to the Company's other revenue activity, if the Company is the primary obligor, has latitude in establishing prices and selecting suppliers, and bears the credit risk, revenue is recorded on a gross basis.

The Company classifies net revenues into two categories: net revenues from product sales and net service fee revenues. Net revenues from product sales represent sales by the Company of products sourced from suppliers other than RCC. Net revenues from product sales consists of product sales and fees from shipping, advertising and warranties, and are net of discounts, sales taxes paid by the Company on behalf of its customers and an allowance for returns. Net service fee revenues represent sales by the Company of products sourced from RCC, net of the related cost of goods sold, as if the Company were generating a commission from RCC on each sale. Net service fee revenues also include shipping and warranty revenue, and are net of discounts, sales taxes paid by the Company on behalf of its customers and an allowance for sales returns.

The Company recognizes net revenue when both title and risk of loss to the products has transferred to the customer, which the Company has determined to occur upon estimated date of receipt of products by the customer. Product is shipped to customers using F.O.B. destination point terms. The Company estimates the date of receipts of products by its customers through the calculation of average delivery days. The calculated average number of days for delivery is then used to determine the amount of revenue and service fees to defer at the end of any reporting period. See also Note 1(c) below. The Company's primary accepted method of payment is credit cards, and to a lesser extent, the Company grants credit to business customers on normal credit terms.   The Company also accepts alternative methods of payment such as Google Checkout, Bill-Me-Later and PayPal.

The reserve for sales returns is determined based on historical experience using management's best estimates. The Company periodically provides incentive offers to its customers including percentage discounts off current purchases and such discounts are recorded as a reduction of the related purchase price at the time of sale. The Company also periodically offers coupons, based on minimum current purchase requirements, which can be used as discounts against future purchases. Because these coupons expire after 30 days, will not result in a loss on a sale, and future redemption rates cannot be estimated reliably, the coupons are recorded as reductions to the related sale to the customer when redeemed.

*(c) Deferred Service Obligation and Deferred Revenue*

On those transactions for which the Company records revenue on a net basis (see Service Fees and Revenue above) in accordance with EITF 99-19, the Company records a deferred service obligation equal to the value of inventory that has been purchased by the Company and is estimated to be in-transit to customers. When the Company's customers have received the in-transit inventory, the Company relieves the inventory and the related deferred service obligation. Deferred revenue primarily consists of service fees on sales of RCC products when the inventory is in-transit to the customer, gift certificates sold but not yet redeemed, and advertising fees paid in advance to the Company.

*(d) Cash and Cash Equivalents*

For the purposes of the statement of cash flows, the Company considers all highly liquid debt instruments with original maturity of three months or less to be cash equivalents.

9

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

*(e) Marketable Securities*

Marketable securities are classified as available-for-sale and accordingly are recorded at fair value, based on quoted market rates, with unrealized gains and losses reflected as a separate component of stockholders' equity titled accumulated other comprehensive income (loss), net of tax, until realized or until a determination is made that an other-than-temporary decline in market value has occurred. Factors considered by management in assessing whether an other-than-temporary impairment has occurred include: the nature of the investment; whether the decline in fair value is attributable to specific adverse conditions affecting the investment; the financial condition of the investee; the severity and the duration of the impairment; and whether the Company has the ability to hold the investment to maturity. When it is determined that an other-than-temporary impairment has occurred, the investment is written down to its market value at the end of the period in which it is determined that an other-than-temporary decline has occurred. The cost of marketable securities sold is based upon the specific identification method. The Company determined that no impairment of its marketable securities existed at December 31, 2007. In addition, the Company classifies marketable securities as current or non-current based upon whether such assets are reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the business.

At December 31, 2007, the Company's marketable securities were comprised entirely of municipal obligations in the form of auction rate securities which are securities that are structured with short-term interest reset dates of generally less than 90 days, but with maturities generally greater than 10 years. At the end of each reset period, investors can attempt to sell or continue to hold the securities at par value. As of December 31, 2007, there were no auction rate securities in an unrealized loss or gain position and there were no failed auctions associated with the Company's auction rate securities through that date. Subsequent to December 31, 2007, the Company liquidated all of its auction rate securities at par.

*(f) Accounts Receivable*

Accounts receivable primarily consist of credit card and trade receivables arising in the normal course of business. Credit card receivables total $509,000 and $652,000 at December 31, 2006 and 2007, respectively. Goods sold to customers are shipped directly from the vendors' warehouse facilities. The Company typically does not bill customers' credit cards until the goods have been shipped. Accounts receivable are recorded at the invoiced amount and do not bear interest. The allowance for doubtful accounts is the Company's best estimate of the amount of probable credit losses in the Company's existing accounts receivable. The Company determines the allowance based on historical write-off experience and through analysis and consideration of accounts past due more than 30 days. In addition, the amounts due from credit card transactions are typically paid in one to three days and are deemed to be collectible. The Company believes it does not have any off-balance sheet credit exposure related to its customers.

*(g) Inventory*

The Company purchases its products from RCC and other suppliers. Inventory is stated at cost. Upon receipt of a customer order, the Company purchases the customer specific product and records it in inventory until it is delivered to the customer. At any point in time, the inventory recorded primarily represents products that are in transit to the customers. See also (b) and (c) above for related discussion on inventory.

*(h) Property and Equipment*

Property and equipment are stated at cost less accumulated depreciation. Depreciation on property and equipment is calculated using the straight-line method over the estimated useful lives of the assets. The Company also capitalizes computer software costs that meet both the definition of internal-use software and defined criteria for capitalization in accordance with Statement of Position No. 98-1, *Accounting for the Cost of Computer Software Developed or Obtained for Internal Use*. Total depreciation expense for the years ended December 31, 2005, 2006 and 2007 was $167,000, $103,000 and

10

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

$158,000, respectively, and was recorded in general and administrative expense each year. Maintenance and repair expenditures are charged to operations as incurred.

Estimated useful lives used in computing depreciation of property and equipment are as follows:

| | |
|---|---|
| Computer software and equipment | two to three years |
| Furniture and fixtures | five years |
| Leasehold improvements | remaining life of the lease |

### (i) Long-Lived Assets

In accordance with Statement of Financial Accounting Standards ("SFAS") No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* ("SFAS 144,") long-lived assets, such as property and equipment, are reviewed for impairment on an annual basis or whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of the assets to an estimated undiscounted future cash flow to be generated by those assets. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Assets to be disposed of would be separately presented in the balance sheet and reported at the lower of the carrying amount or fair value less costs to sell, and are no longer depreciated. The assets of a disposed group classified as held for sale would be presented separately in the appropriate asset and liability sections of the balance sheet.

### (j) Shipping and Handling Charges

Outbound shipping and handling charges billed to customers are included in net service fee revenues or net revenues from product sales, as applicable, and amounted to $1,956,000, $2,338,000 and $1,815,000 for the years ended December 31, 2005, 2006 and 2007, respectively. Outbound shipping and handling charges incurred by the Company are included within marketing, merchandising and selling expense and amounted to $3,194,000, $3,503,000 and $4,056,000 for the years ended December 31, 2005, 2006 and 2007, respectively.

### (k) Advertising and Marketing Costs

Advertising and marketing costs included in marketing, merchandising and selling expenses are expensed as incurred. Advertising and marketing costs include traditional online advertising, revenue share arrangements, newsletters and, to a lesser extent, offline advertising. For the years ended December 31, 2005, 2006 and 2007, these costs were $4,601,000, $5,575,000 and $6,437,000, respectively.

### (l) Income Taxes

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is provided for deferred tax assets when it is more likely than not that all or some portion of the deferred tax asset will not be realized.

11

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

*(m) IPO Expenses*

On April 13, 2006, the Company made the decision to withdraw its proposed initial public offering. This withdrawal resulted in the Company having to expense costs that were directly attributable to the proposed offering that would have otherwise been deferred and subsequently charged against the gross proceeds of the offering. The Company expensed $1,174,000, $77,000 and $0 of these costs in 2005, 2006 and 2007, respectively.

*(n) Stock-Based Compensation*

On January 1, 2006, the Company adopted Statement of Financial Accounting Standard No. 123R, *Share-Based Payment*, or SFAS 123R. In accordance with SFAS 123R, the Company measures the cost of employee services received in exchange for an award of equity instruments based on the grant-date fair value of the award. That cost is recognized over the period during which an employee is required to provide service in exchange for the award – the requisite service period. No compensation cost is recognized for equity instruments for which employees do not render the requisite service. The Company determines the grant-date fair value of employee share options granted after the adoption of SFAS 123R using the Black-Scholes option-pricing model adjusted for the unique characteristics of these options.

Prior to adoption of SFAS 123R, the Company accounted for grants under the stock option plan using either the minimum value method as permitted for non-public entities in SFAS No. 123 *Accounting for Stock-Based Compensation*, or SFAS 123, for grants at the market price at the date of the grant or the intrinsic value method for grants issued below the market price at the date of the grant in accordance with Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees*, or APB 25, adopting the disclosure only provisions of SFAS 123. Options accounted for under the intrinsic value method will continue to be expensed over the vesting period.

SFAS 123R, requires that nonpublic entities that used the minimum value method of measuring equity share options and similar instruments for either recognition or pro forma disclosure purposes under SFAS 123 apply SFAS 123R using the "prospective" method. Under the "prospective" method, SFAS 123R will only apply to new options granted or modified, repurchased or canceled starting in 2006. Accordingly, periods prior to the adoption of SFAS 123R will not be restated. The portion of awards outstanding as of December 31, 2005 will continue to be accounted for using the minimum value method under SFAS 123. Adoption of SFAS 123R did not have a material effect on the Company's financial statements.

The Company accounts for equity instruments issued to non-employees in accordance with the provisions of SFAS 123 and EITF No. 96-18, *Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services* ("EITF 96-18"). Under SFAS 123 and EITF 96-18, equity awards issued to non-employees are accounted for at fair value using the Black-Scholes option-pricing model. Management believes that the fair value of the stock options is more reliably measured than the fair value of the services received. The fair value of each non-employee stock option is re-measured each period until a commitment date is reached, which is generally the vesting date of the option. As of December 31, 2006 and 2007, the Company has outstanding stock options issued to non-employees, as defined by SFAS 123 and EITF 96-18, to purchase up to 1,725,000 and 1,755,000, respectively, of the Company's common stock. The Company recorded compensation expense for stock options issued to non-employees of $493,000, $72,000 and $0 for the years ended December 31, 2005, 2006 and 2007, respectively. See also Notes and 9(c) for related discussion on non-employee stock options.

Because there has been no public market for the Company's stock, the board of directors of the Company has determined the fair value of the Company's common stock based upon several factors, including, but not limited to the Company's operating and financial performance, valuations of comparable online retailers and a valuation analysis performed by an independent valuation firm. All stock options issued to employees were issued with an exercise price equal to or greater than the estimated fair value of the common stock at the date of grant.

12

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

*(o)  Concentration Risks*

The Company sells the majority of its products to customers that make payment via credit card. Accounts receivable potentially subject the Company to credit risk. The Company extends credit to selected commercial customers based upon an evaluation of the customer's financial condition and credit history. Two commercial customers represent 58.9% of the Company's net trade receivable balance at December 31, 2007. Subsequent to December 31, 2007, these two customers have paid the amounts that were outstanding at December 31, 2007. The Company has historically incurred minimal credit losses.

The Company maintains its cash balances in one financial institution, which at times may exceed federally insured limits. The Company has not experienced any losses in such account and believes it is not exposed to any significant credit risk on cash and cash equivalents.

A substantial majority of the Company's products are purchased under an agreement with RCC (see also Notes 1(a), 1(b) and 9). Loss of this vendor could have a materially adverse effect on the Company's operations.

*(p)  Website Development Costs*

In accordance with the provisions of Statement of Position 98-1, *Accounting for Costs of Computer Software Developed for Internal Use*, the Company capitalizes direct costs incurred in the development and implementation phases of internally developed software and then amortizes those costs over the product's estimated useful life of two years. The Company expenses costs related to the planning and post implementation phases of its website efforts. Costs associated with minor enhancements and maintenance for the websites are included in general and administrative expense and are expensed as incurred.

*(q)  Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America ("GAAP") requires management to make a number of estimates and assumptions relating to the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant items subject to such estimates and assumptions include the carrying amount of long-lived assets, sales returns and chargeback reserves, allowance for uncollectible receivables, and valuation allowance on deferred income tax assets. Actual results could differ from those estimates.

*(r)  Fair Value of Financial Instruments*

The carrying amounts reported in the balance sheets for cash and cash equivalents, accounts receivable and payable and accrued liabilities approximated fair value due to the short-term nature of these items. The carrying value of the note payable approximates fair value as of December 31, 2007 based upon current rates offered to the Company for similar debt with the same remaining maturities. Marketable securities are recorded at fair value, based on quoted market rates (see also Note 1 (e)).

*(s)  Recent Accounting Pronouncements*

In July 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes* ("FIN 48"). FIN 48 is an interpretation of FASB Statement No. 109, *Accounting for Income Taxes*. FIN 48 prescribes how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the company has taken or expects to take on a tax return. FIN 48 is effective for fiscal years beginning after December 15, 2007. We do not believe that the adoption of this statement will have a material impact on our results of operations or financial condition.

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements* ("SFAS 157"). SFAS 157 establishes a common definition for fair value, establishes a framework for measuring fair value, and

13

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

expands disclosure about such fair value measurements. SFAS 157 is effective for fiscal years beginning after November 15, 2007. In January 2008, the FASB issued FSP FAS 157-2 delaying the effective date of SFAS 157 by one year for nonfinancial assets and nonfinancial liabilities that are recognized or disclosed at fair value in the financial statements on a nonrecurring basis. For these items, SFAS 157 will go into effect in fiscal years beginning after November 15, 2008. The adoption of this statement is not expected to have a material impact on our results of operations or financial condition.

In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* ("SFAS 159"). SFAS 159 permits all entities to elect to measure certain financial instruments and other items at fair value with changes in fair value reported in earnings. SFAS 159 is effective as of the beginning of the first fiscal year that begins after November 15, 2007. The adoption of this statement is not expected to have a material impact on our consolidated results of operations or financial condition.

*(t) Other Comprehensive Income*

Comprehensive income is defined as the change in equity during a period from transactions and other events and circumstances, excluding those resulting from investments by and distributions to owners. Comprehensive income generally includes net income, foreign currency translation adjustments, minimum pension liability adjustments, and unrealized holding gains and losses on available-for-sale securities. For the years ended December 31, 2005, 2006 and 2007, the Company had no comprehensive income except for net income.

*(u) Reclassifications*

Certain reclassifications have been made to the prior years financial statements to conform to the 2007 presentation. Such reclassifications had no effect on previously reported results of operations; however, accounts receivable and deferred revenue increased by $404,000.

**(2) Prepaid Expenses and Other Current Assets**

The components of prepaid expenses and other current assets are as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2006 | 2007 |
| Prepaid insurance and rent | $ 68 | $ 81 |
| Prepaid software licensing and maintenance | 66 | 73 |
| Deposits | 29 | 33 |
| Interest and other receivables | 438 | 392 |
| Prepaid income taxes | 17 | — |
| Other | 12 | 11 |
|  | $ 630 | $ 590 |

**(3) Property and Equipment, Net**

The components of property and equipment are as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2006 | 2007 |
| Computer equipment | $ 872 | $ 1,148 |
| Furniture and fixtures | 210 | 210 |
| Software | 657 | 822 |
| Website development costs | 527 | 527 |
| Leasehold improvements | 62 | 62 |
|  | 2,328 | 2,769 |
| Less accumulated depreciation and amortization | (2,220) | (2,378) |
|  | $ 108 | $ 391 |

14

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

**(4) Accrued Liabilities**

The components of accrued liabilities are as follows (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2006 | 2007 |
| Sales taxes payable | $ 277 | $ 291 |
| Returns reserve | 188 | 205 |
| Charge back reserve | 140 | 318 |
| Bonus | 318 | 250 |
| Accrued payroll | 220 | 273 |
| Accrued payroll taxes | 20 | 33 |
| Deferred rent | 37 | 14 |
| Other | 5 | 2 |
|  | $ 1,205 | $ 1,386 |

**(5) Commitments and Contingencies**

*(a) Operating Leases*

The Company has non-cancelable operating leases for office space for its principal corporate offices, which expires in 2008 (see also Note 11), and a non-cancelable lease for office/warehouse space from a related party, which expires in 2015. Future minimum lease payments under these operating leases as of December 31, 2007 are as follows (in thousands):

Year ending December 31:

| 2008 | 159 |
|---|---|
| 2009 | 11 |
| 2010 | 11 |
| 2011 | 11 |
| 2012 | 11 |
| Thereafter | 22 |
|  | $ 225 |

Rent expense under operating lease agreements for the years ended December 31, 2005, 2006 and 2007 was $198,000, $228,000 and $255,000, respectively. See also Note 9(a) and 11 below.

*(b) Marketing Agreements*

In March 2000, the Company, RCC and America Online, Inc. ("AOL") entered into a strategic marketing agreement, pursuant to which the Company agreed to purchase promotions and integration on AOL properties valued at $50 million over a period of five years. Under this agreement, RCC received a $10 million recoupable advance from AOL for their participation in an AOL member acquisition program in RCC's store locations. Concurrent with the execution of this strategic marketing agreement, RCC advanced $5 million to the Company in the form of a note payable to RCC to supplement the Company's on-going working capital needs. In April 2000, AOL purchased 1,495,294 shares of the Company's Series A convertible redeemable preferred stock (the "Series A Stock") for total consideration of $10,004,000 (see also Note 7 below).

During June 2001, the Company renegotiated principle components of its strategic marketing agreement with AOL. As a result of this renegotiation, in July 2001, the Company, RCC and AOL entered into an amendment to the March 2000 strategic marketing agreement, pursuant to which the Company's advertising purchase commitment was reduced from $50.0 million to $7.0 million and the contract termination date was extended from April 2005 to June 2006 in consideration for a one-time payment of $3.3 million in addition to the $9.7 million that had previously been paid under the March 2000 agreement.

15

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

In February 2002, the strategic marketing agreement was further renegotiated such that the Company and AOL entered into a mutual termination and settlement of the Company's advertising purchasing commitment.

*(c)  Purchase Agreements*

In March 2002, the Company entered into an agreement with PhotoAlley, Inc. and CMA Business Credit Services to purchase the inventory, any rights to the URL/Internet sites and Internet related assets, which included customer email lists, of PhotoAlley, Inc. The Company paid approximately $394,000 for the inventory and website server, which was immediately resold to RCC at the Company's purchase price. The intangible assets were acquired for future consideration equal to a percentage of net merchandise sales generated from the site for the period of five years ending March 31, 2007. During 2005 and 2006 and the three months ended March 31, 2007, the Company recorded marketing expenses under this agreement of $21,000, $26,000 and $4,000, respectively. Net merchandise sales generated through the PhotoAlley.com website for the years ended December 31, 2005 and 2006 and for the three months ended March 31, 2007 were $416,000, $522,000 and $89,000, respectively.

In May 2002, the Company entered into an agreement with CameraWorld.com, Inc. and NACM-Oregon Service Company to purchase any rights to the URL/Internet sites and Internet related assets, which included customer email lists, of CameraWorld.com. This agreement required the Company to pay NACM a percentage of net merchandise sales generated from the CameraWorld.com website for the period of five years ending April 30, 2007. During 2005 and 2006 and the four months ended April 30, 2007, the Company recorded marketing expenses under this agreement of $197,000, $162,000 and $37,000, respectively. Net merchandise sales generated through the CameraWorld.com website for the years ended December 31, 2005 and 2006 and for the four months ended April 30, 2007 were $4.0 million, $3.2 million and $0.7 million, respectively.

In August 2004, the Company entered into an agreement with eAngler, Inc. to purchase any rights to the eAngler.com URL/Internet sites and Internet related assets, which included customer email lists of eAngler.com. This agreement requires that the Company pay eAngler $75,000 at closing, $25,000 two years from the closing date (net of any post closing obligations), a percentage of net merchandise sales generated from the site if merchandise sales from the site exceed approximately $1.4 million within three years from the closing date, and 100,000 shares of the Company's common stock. As a result of exceeding the $1.4 million merchandise sales threshold, the Company released the $25,000 contingent payment and paid an incremental $29,000 in 2006 and an incremental $38,000 in 2007. The Company's common stock had a value of $0.71 per share at the date of the closing of this acquisition. At December 31, 2006 and 2007, the Company has an intangible asset of $171,000 pertaining to this agreement. Management has determined that the intangible asset has an indefinite life and, as such, the intangible asset will be evaluated on an annual basis for impairment, or in the event of an impairment indicator, and will not be subject to amortization in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets.*

*(d)  State Sales and Use Tax Matters*

The Company has sales and use tax nexus in California, Georgia, Kansas and Maryland, the four states in which the Company maintains a physical presence. The Company remits sales and use taxes to the appropriate taxing authorities on sales of products shipped to customers in those states.

The Company's policy for sales and use tax activities is based on interpretation of decisions of the U.S. Supreme Court that restrict a state's ability to impose sales and use tax collection and remittance obligations to those retailers that have a physical presence in, or substantial nexus with, the state. Each state and local taxing authority has its own interpretation of these Supreme Court decisions, and the interpretations have not always been consistent. Accordingly, although the Company believes that these Supreme Court decisions currently restrict state and local taxing authorities outside of California, Georgia, Kansas and Maryland from requiring it to collect and remit sales and use taxes from customers located within their jurisdictions, it is possible that other taxing authorities could disagree with the Company's interpretation of these decisions and assert a deficiency.

16

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

The Company has received inquiries from 21 states and the Multistate Tax Commission ("MTC") as to whether the scope of its operations in those states subjects it to sales, use or other tax collection obligations in those states. After review by those states, 4 of such states have notified the Company that they would not challenge its position that its sales in their state were not subject to sales and use tax while 2 other states have sent generic correspondence about their sales tax nexus laws but have not claimed the Company has nexus or requested a response from the Company. In 12 of the 21 states, the Company has responded to oral or written inquiries from such states and has not received further correspondence from those states on this matter during 2007. In May of 2005, the state of Washington confirmed to the Company that its photography websites were not subject to sales and use tax. In spite of this, in October of 2005, the Company received written correspondence from the state of Washington claiming that the Company's marine, boating and fishing websites were subject to sales and use tax in Washington state. The Company responded in November 2005 and in February 2007 received a letter from Washington state which outlined the state's reasoning for the nexus claim. The Company believes the state's nexus claim to be based on inaccurate data and assumptions and has communicated this to the state. No correspondence has been received from Washington state since April 2007. In Illinois, the Company is one of many retailer-defendants in a lawsuit brought by a private citizen under a whistle-blower act alleging that the defendants owe Illinois sales or use taxes. See also Note 5(e) below. In Texas, the state conducted a sales tax audit in November of 2005. The state issued an assessment in June 2007 for which the Company has requested a redetermination. The state of Texas has not yet set a hearing date for the redetermination.  In January 2007, the MTC sent correspondence claiming the Company has sales in use tax nexus in twelve states that they are representing plus Washington D.C. This list erroneously includes one state in which the Company has been registered and remitting sales and use taxes since Company inception due to a physical presence in that state. Of the remaining eleven states, the Company has previously corresponded with six of them.  The Company has had no correspondence with the MTC since September 2007.  In Washington, Illinois and Texas, the Company has generated merchandise sales from inception in 1999 through December 31, 2007 of $80.0 million. If sales taxes were charged on these merchandise sales at each state's respective base sales tax rate, the possible resulting obligation to the Company for back taxes over this period (excluding any interest or penalties) would be approximately $5.1 million. Additional states, including those states from which the Company has received no further correspondence as discussed above, or parties could contact the Company or initiate actions related to back sales and use taxes, which could result in substantial additional obligations to the Company. The accompanying financial statements do not include an accrual for potential losses, if any, related to these sales and use tax inquires.

*(e) Legal*

The Company is currently a defendant, along with RCC, in a suit brought under the Illinois Whistleblower Act in January 2002. The suit is one of approximately 60 nearly identical suits brought on behalf of the State of Illinois by Beeler, Schad & Diamond, P.C. ("Beeler"), a plaintiffs' class action law firm, against various retailers and Internet retailers under the Whistleblower Act. Illinois has intervened to prosecute the case along with Beeler.

Illinois and Beeler allege that the defendants committed reverse false claims violations by failing to keep records and remit sales tax on Internet purchases made by Illinois consumers, which defrauded Illinois out of sales tax proceeds. The suit further alleges that out-of-state Internet retailers should pay sales tax to Illinois because their affiliations with entities that have brick and mortar stores in Illinois creates a sufficient physical presence or nexus to permit local taxation. Under the Whistleblower Act, Illinois and Beeler seek recovery of back taxes, interest, penalties up to $10,000 per violation of the Act and attorneys' fees. If Illinois and Beeler are successful, the Company could be found liable for back taxes in excess of $1.3 million. The accompanying financial statements do not include an accrual for potential losses, if any, related to this lawsuit.

The Company is also involved from time to time in certain legal actions and claims arising in the ordinary course of its business. Management believes that the outcome of such litigation and claims will not have a material adverse effect on the financial position, results of operation or cash flows of the Company.

17

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

## (6) Income Taxes

The provision (benefit) for income taxes consists of the following for the years ended December 31 (in thousands):

|  | 2005 | 2006 | 2007 |
|---|---|---|---|
|  |  | (as restated) |  |
| Current: |  |  |  |
| Federal | $ 16 | $ 73 | $ 39 |
| State and local | 11 | 17 | 20 |
|  | 27 | 90 | 59 |
| Deferred: |  |  |  |
| Federal | — | (3,983) | 676 |
| State and local | — | (929) | 100 |
|  | — | (4,912) | 776 |
| Net provision (benefit) for income taxes | $ 27 | $(4,822) | $ 835 |

The provision (benefit) for income taxes differed from the amount computed by applying the U.S. federal statutory rate to income before income taxes due to the effects of the following:

|  | 2005 | 2006 | 2007 |
|---|---|---|---|
|  |  | (as restated) |  |
| Expected taxes at federal statutory tax rate | 34.0% | 34.0% | 34.0% |
| Increase (reduction) in income taxes resulting from: |  |  |  |
| State income taxes, net of Federal tax benefit | 6.9 | 3.7 | 4.0 |
| Nondeductible expenses and others | 1.8 | 0.1 | 3.4 |
| Change in valuation allowance | (37.4) | (189.0) | (37.4) |
| Income tax expense | 5.3% | (151.2)% | 41.4% |

The tax effects of temporary differences that give rise to significant portions of the deferred tax assets as of December 31, 2006 and 2007, are presented below (in thousands):

|  | 2006 | 2007 |
|---|---|---|
|  | (as restated) |  |
| **Deferred Tax Assets** |  |  |
| Net operating loss carryforwards | $ 4,377 | $ 3,545 |
| Temporary nondeductible reserves and accruals | 304 | 295 |
| Stock-based compensation | 329 | 387 |
| Depreciation and other | 191 | 174 |
|  | 5,201 | 4,401 |
| **Deferred Tax Liabilities** |  |  |
| State taxes | (287) | (247) |
| Intangibles | — | (16) |
|  | (287) | (263) |
| Net deferred tax asset | $4,914 | $4,138 |

In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income and tax planning strategies in making this assessment. At December 31, 2006, the Company recorded a reduction of $4.9 million in its previously

18

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

existing valuation allowance, as the Company believes it is more likely than not that it will generate sufficient taxable income in future years to utilize its deferred tax assets, including net operating loss carryforwards, within any applicable carryover periods.

At December 31, 2007, the Company had federal and state net operating loss ("NOL") carryforwards of approximately $8.5 million and $8.0 million, respectively, which are available to offset future taxable income. The federal NOLs will expire from 2020 through 2022 and the state NOLs will expire from 2012 through 2022.

### (7)  Note Payable

During 2000, the Company issued 1,495,294 shares of Series A Stock to AOL at an issuance price of $6.69 per share for total consideration of $10,004,000 (see also Note 5(b)).  Each share of Series A Stock was convertible into one share of common stock at the option of the holder at any time and was automatically converted into shares of common stock upon the consummation of a firm commitment underwritten public offering of common stock at a price per share not less than $2.34 and that generates net proceeds to the Company of at least $25 million.  The conversion price was initially set at the original issue price, subject to certain anti dilution provisions.

On May 27, 2005, the Company entered into a securities purchase agreement with AOL, pursuant to which the Company repurchased all of the 1,495,294 outstanding shares of the Series A Stock from AOL by issuing AOL a promissory note in the original principal amount of $10,004,000. The note was originally due the earlier of the closing of a public offering by the Company of its common stock, a change in control of the Company (as defined therein) or December 31, 2006. This note accrues interest at the rate of 6% per annum, which is payable monthly. This note contains certain negative and affirmative covenants for which the Company is in compliance at December 31, 2007.  On February 15, 2006, the Company and AOL executed an amendment to the $10,004,000 promissory note due to AOL and the related securities purchase agreement. The amendment changed the maturity date of the principal from December 31, 2006 to December 31, 2007.  The promissory note was subsequently amended again on January 30, 2007 to change the maturity date to November 1, 2012. The promissory note, as amended, provides for monthly principal and interest payments of $193,396 commencing December 1, 2007.  As of the date of this report, the Company has made all payments required by the promissory note. Consistent with the original promissory note, the principal is due on the earlier of the maturity date, the closing of a public offering by the Company of its common stock or a change in control of the Company (as defined therein). The Company recorded approximately $600,000 of interest expense relating to the note in each of 2006 and 2007.

Future minimum principal payments under the AOL Promissory Note as of December 31 are as follows (in thousands):

Year ending December 31:

| | |
|---|---|
| 2008 | $1,777 |
| 2009 | 1,887 |
| 2010 | 2,004 |
| 2011 | 2,127 |
| 2012 | 2,065 |
| | $9,860 |

19

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

**(8) Stock Option Plan**

In 1999, the Company adopted the 1999 Stock Option Plan (as amended to date, the "Plan") to promote the interests of the Company and its stockholders. The Plan provides for the grant of options to purchase up to 4,500,000 (increased from 2,750,000 in December 2003) shares of the Company's common stock. Under the Plan, stock options can be granted to employees and directors with an exercise price less than, equal to or greater than the fair market value of the underlying common stock at the date of grant. All stock options granted under the Plan have ten-year terms and vest and become fully exercisable after varying periods but typically three years from the date of grant.

At December 31, 2005, 2006 and 2007, there were 697,500, 475,000 and 382,500 additional shares available for grant under the Plan.

Under the prospective transition method prescribed by SFAS 123R, the Company is required to record compensation expense for all awards granted after the date of adoption. The Company measured stock based compensation using the Black-Scholes option pricing model based on the following assumptions:

|  | 2005 | 2006 | 2007 |
|---|---|---|---|
| Risk free interest rates | 4.0% | 4.4% | 4.5% |
| Expected dividend yield | none | none | none |
| Expected lives (years) | 4.0 | 4.0 | 4.0 |
| Expected volatility | 0% | 58% | 58% |
| Forfeiture rate | none | 35% | 35% |
| Weighted-average grant date fair value | $0.10 | $0.70 | $0.62 |

Expected volatility is based upon an appropriate peer group within the Company's industry sector. The expected life of the awards represents the period of time that management estimates that options granted will be outstanding.

The Company used historical information to estimate forfeitures within the valuation model. The risk-free interest rate for periods within the expected life of the option is based on implied yields on U.S. Government Issues in effect at the time of grant. Compensation cost is recognized over the vesting period using the straight-line attribution method and is net of estimated forfeitures.

Using the prospective transition method prescribed by SFAS 123R, the Company recognized in the statement of operations $9,000 and $147,000 of stock based compensation for the years ended December 31, 2006 and 2007, respectively, which is included in general and administrative expenses in our Statements of Operations. As of December 31, 2007, there was approximately $120,000 of total employee unrecognized compensation expense related to nonvested grants under the Plan which is expected to be recognized over a weighted average period of approximately 2.8 years.

We received cash from options exercised during fiscal 2006 and 2007 of $11,200 and $0, respectively. The impact of these cash receipts is included in financing activities in the accompanying Statements of Cash Flows.

Stock option activity during the periods indicated is as follows:

|  | Options Outstanding | |
|---|---|---|
|  | Number of Shares | Weighted Average Exercise Price |
| Outstanding at December 31, 2004 | 2,957,500 | 0.79 |
| Granted | 790,000 | 1.33 |
| Exercised | (112,500) | 0.29 |
| Forfeited | (20,000) | 1.30 |

20

Ritz Interactive, Inc.
## NOTES TO FINANCIAL STATEMENTS

| | | |
|---|---|---|
| Outstanding at December 31, 2005 | 3,615,000 | 0.92 |
| Granted | 327,500 | 1.50 |
| Exercised | (25,000) | 0.45 |
| Forfeited | (105,000) | 2.43 |
| Outstanding at December 31, 2006 | 3,812,500 | 0.93 |
| Granted | 312,500 | 1.50 |
| Exercised | — | — |
| Forfeited | (220,000) | 1.30 |
| Outstanding at December 31, 2007 | 3,905,000 | $ 0.96 |

The following table summarizes information about stock options outstanding at December 31, 2007:

| | | Options Outstanding | | Options Exercisable | |
|---|---|---|---|---|---|
| Exercise Prices | Number of Shares | Weighted Average Remaining Contractual Life (Years) | Weighted Average Exercise Price | Number of Shares | Weighted Average Exercise Price |
| $0.04 | 25,000 | 1.69 | $ 0.04 | 25,000 | $ 0.04 |
| 0.50-0.60 | 2,515,000 | 5.71 | 0.59 | 2,515,000 | 0.59 |
| 1.05-1.50 | 1,195,000 | 8.01 | 1.40 | 595,000 | 1.37 |
| 3.40 | 170,000 | 2.25 | 3.40 | 170,000 | 3.40 |
| | 3,905,000 | 6.24 | $ 0.96 | 3,305,000 | $ 0.87 |

## (9) Related Party Transactions

### (a) Supply, Fulfillment and Other Arrangements

In August 1999, the Company entered into an agreement with RCC, a stockholder which owned approximately 11% of the Company's common stock as of December 31, 2006 and 2007. Under this agreement, as amended and restated in August 2005, RCC provides the Company with the photographic, fishing and boating and marine supplies and products for sale on the Company's websites. The agreement requires that the Company purchase at least 51% of its aggregate annual purchases of photography, boating, fishing and marine products from RCC. The purchase price for RCC products is based on a fixed percentage of RCC's average cost of product, as defined in the agreement. For the years ended December 31, 2005, 2006 and 2007, the Company purchased $61.2 million, $71.1 million $76.6 million of products from RCC, respectively. In connection with this agreement, the Company pays to RCC a licensing fee representing a percentage of the sales of RCC products, net of discounts, returns and sales taxes, made by the Company and the sale of advertising on the Company's Internet sites. License fee expenses incurred under this agreement were $792,000, $916,000 and $967,000 for the years ended December 31, 2005, 2006 and 2007, respectively. In addition, the Company pays RCC a specified fulfillment charge for each package fulfilled by RCC for a customer of the Company. The fulfillment charges incurred under this agreement were $928,000, $1,054,000 and $1,017,000 for the years ended December 31, 2005, 2006 and 2007, respectively. The license fees are included in marketing, merchandising and selling expenses and the fulfillment charges are included in customer support and fulfillment expenses. Per the terms of this agreement, the Company holds an exclusive right to market and sell photographic and marine products online under the Ritz Camera and Boaters' World names. This agreement continues for an indefinite period of time provided that the Company is not in breach of the terms and conditions of the agreement.

The Company also recorded approximately $10,000 in each year ended December 31, 2005, 2006 and 2007 as rent expense paid to RCC for space leased in their three warehouses and for office space for the Company's merchandising personnel, for which the lease terms were annual through December 31, 2004. Effective January 1, 2005, the Company entered into an amended operating lease related to the use of the warehouse and office space which expires on January 1, 2015 and requires minimum annual rent payments of approximately $10,000 adjusted for the Consumer Price Index on January 1st of each year.

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

In July 2002, the Company entered into an agreement with RCC where the Company pays a monthly fee to RCC to be included in advertising inserts for the Company's photo-oriented websites in a periodic photography magazine. This agreement was terminated as of March 31, 2006. The advertising expenses incurred under this agreement were $120,000 and $30,000 for the years ended December 31, 2005 and 2006.

In April 2005, the Company entered into an oral agreement with RCC, whereby the Company agreed to advertise and promote certain of RCC's websites, online printing products and services through Company websites, in exchange for the promotion of Company websites on the RCC websites the Company promoted. Each party would pay the other a fixed percentage of merchandise sales generated through such promotion. For the years ended December 31, 2005, 2006 and 2007, the Company received net payments from RCC totaling $43,000, $69,000 and $42,000, respectively. The terms of this arrangement were incorporated into the Company's principal agreement with RCC upon the execution of an amended and restated version of that agreement in August 2005.

*(b) Accounts Payable to Related Party*

As of December 31, 2006 and 2007, accounts payable to RCC was $18.0 million and $27.1 million, respectively, relating to the agreements described above. These amounts due to RCC are non-interest bearing and generally provide for 45-day payment terms.

*(c) Services*

In December 2003, the Company entered into an endorsement agreement with one of its Directors. Under this agreement, the board member was granted an option to purchase 1,500,000 shares of the Company's common stock, of which 150,000 shares were deemed to be Board compensation and the remaining 1,350,000 shares were in exchange for endorsement services expected to be received by the Company through December 2008. The option vests monthly over 36 months commencing on the date of grant. The Company has accounted for the options issued under the endorsement agreement as a non-employee stock award in accordance with SFAS 123 and EITF 96-18. The Company recorded stock-based compensation expense for this option of $471,000 for the year ended December 31, 2005. On April 22, 2005, the Company amended this option agreement to immediately vest the remaining unvested shares under this agreement.

In December 2003, the Company entered into an agreement with Greg Norman Interactive, LLC ("GNI"). One of the Company's Directors is the Chairman and Chief Executive Officer of GNI's parent company. Under this agreement, the Company operates and promotes certain websites for GNI, over which the Company sells products provided by GNI. This agreement provides that the Company will pay GNI a fixed percentage of the net merchandise sales generated by the GNI websites. The Company has made payments to GNI of $62,000, $33,000 and $39,000 for the years ended December 31, 2005, 2006 and 2007, respectively.

**(10) Employee Benefit Plan**

The Company sponsors a 401(k) Profit Sharing Plan (the "Profit Sharing Plan"), which covers all eligible employees. The Profit Sharing Plan is a qualified defined contribution plan in which all eligible employees may elect to have a percentage of their pretax compensation contributed to the Profit Sharing Plan, subject to certain guidelines by the Internal Revenue Service. The Company can match contributions made by participating employees based on a percentage of what they contribute to the Profit Sharing Plan per pay-period. The Company made matching contributions to the Profit Sharing Plan of $20,000, $19,000 and $25,000 in the years ended December 31, 2005, 2006 and 2007, respectively.

22

Ritz Interactive, Inc.
NOTES TO FINANCIAL STATEMENTS

## (11)  Subsequent Events

On May 1, 2008, the Company entered into an amendment to its operating lease for its principal corporate offices.  The amendment extended the term for 63 months through October 2013.  Future minimum lease payments during the term of this operating lease aggregate $1,647,000.

## (12)  Restatement

During 2007, management identified a cut-off error in its calculation of deferred revenue, which resulted in the inadvertent recording of certain 2007 net revenues as 2006 net revenues.  The effect of this correction decreased net revenues in 2006.  This correction resulted in changes to net revenues from product sales, net service fee revenues, net revenues, income from operations, income before benefit for income taxes, net income, deferred revenue, and accumulated deficit.  Accordingly, the accompanying balance sheet and statement of operations as of and for the year ended December 31, 2006 have been restated as summarized below:

| Effect of Cut-off Error on Net Revenues | As Previously Reported | Restatement Adjustment | As Restated |
|---|---|---|---|
| At December 31, 2006 (in thousands) | | | |
| - Deferred revenue | $ 1,266 | $ 481 | $ 1,747 |
| - Accumulated deficit | $ (8,539) | $ (289) | $ (8,828) |
| - Total stockholder's deficit | $ (4,576) | $ (289) | $ (4,865) |
| Year 2006 (in thousands) | | | |
| - Net revenues from product sales | $ 4,746 | $ (19) | $ 4,727 |
| - Net service fee revenues | $ 23,670 | $ (462) | $ 23,208 |
| - Net revenues | $ 28,416 | $ (481) | $ 27,935 |
| - Income from operations | $ 3,854 | $ (481) | $ 3,373 |
| - Income before benefit for income taxes | $ 3,704 | $ (481) | $ 3,223 |
| - Net income | $ 8,334 | $ (289) | $ 8,045 |

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit D**
[Most Recently Filed Postpetition Operating Report]
[Summary of Postpetition Operating Reports]

_(Note: None filed as of August 30, 2011)_

36

**Exhibit E**
Liquidation Analysis

***Plan Proponent's Estimated Liquidation Value of Assets***

**Assets**

| | | |
|---|---|---|
| a. | Cash on hand | $   750,000 |
| b. | Accounts receivable | $  50,000 |
| c. | Inventory | $   0 |
| d. | Office furniture & equipment | $  40,000 |
| e. | Machinery & equipment | $ 0 |
| f. | Automobiles | $ 0 |
| g. | Building & Land | $ 0 |
| h. | Customer list | $ 0 |
| i. | Investment property  (such as stocks, bonds or other financial assets) | $ 0 |
| j. | Lawsuits or other claims against third-parties | $ 0 |
| k. | Other intangibles (such as avoiding powers actions) | **$ 1,000,000** |

| | |
|---|---|
| ***Total Assets at Liquidation Value*** | **$1,840,000** |
| **Less:**<br>Secured creditors' recoveries | **$ 3,500,000** |
| **Less:**<br>Chapter 7 trustee fees and expenses | $ 125,000 |
| **Less:**<br>Chapter 11 administrative expenses | $  200,000 |
| **Less:**<br>Priority claims, excluding administrative expense claims | $ 500,000 |
| (1) Balance for unsecured claims | $ 0 |
| (2) Total dollar amount of unsecured claims | $1,500,000 |
| ***Percentage of Claims Which Unsecured Creditors Would Receive Or Retain in a Chapter 7 Liquidation:*** | $0 |
| ***Percentage of Claims Which Unsecured Creditors Will Receive or Retain under the Plan:*** | ____20% |

37

**Exhibit F**
Cash on hand on the effective date of the Plan

**Cash on hand on effective date of the Plan**:                    $ 900,000

*Less B*

Amount of  administrative expenses payable on effective date of       -    700,000
the Plan

Amount of statutory costs and charges                                 **-     13,000**

Amount of cure payments for executory contracts                       -         0

Other Plan Payments due on effective date of the Plan                 -         0

          Balance after paying these amounts...............           $   187,000

The sources of the cash Debtor will have on hand by the effective date of the Plan are estimated as follows:

$   650,000        Cash in Debtor's bank account now

+ 250,000          Additional cash Debtor will accumulate from
                   net earnings between now and effective date of the Plan [state the
                   basis for such projections]

+       0          Borrowing [separately state terms of repayment]

+       0          Capital Contributions

+       0          Other

$   900,000        Total [matches "cash on hand", above]

**1**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit G**
Projections of Cash Flow and Earnings for Post-Confirmation Period

2

RITZ INTERACTIVE
P&L & Cashflow by 6th 2012-2013

| | 1/31/2012 | 2/29/2012 | 3/31/2012 | 4/30/2012 | 5/31/2012 | 6/30/2012 | 7/31/2012 | 8/31/2012 | 9/30/2012 | 10/31/2012 | 11/30/2012 | 12/31/2012 | 1/31/2013 | 2/28/2013 | 3/31/2013 | 4/30/2013 | 5/31/2013 | 6/30/2013 | 7/31/2013 | 8/31/2013 | 9/30/2013 | 10/31/2013 | 11/30/2013 | 12/31/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Income | 3,663,494 | 3,582,996 | 4,402,534 | 3,813,230 | 3,387,515 | 4,270,802 | 3,455,794 | 2,787,050 | 3,504,690 | 4,232,850 | 2,674,177 | 4,197,155 | 5,987,047 | 4,533,102 | 5,260,041 | 4,572,876 | 4,062,016 | 5,321,963 | 4,443,953 | 5,341,480 | 5,076,420 | 3,206,012 | 5,033,356 | 11,601,457 |
| Total COGS | 3,198,973 | 2,966,721 | 3,645,298 | 3,157,354 | 2,804,862 | 3,536,224 | 2,861,398 | 2,307,636 | 3,044,690 | 2,214,218 | 4,197,155 | 3,473,283 | 7,938,075 | 3,838,283 | 4,371,874 | 3,786,341 | 3,363,351 | 4,240,985 | 3,431,193 | 2,765,679 | 4,203,276 | 2,654,578 | 4,167,790 | 9,523,206 |
| Gross Profit | 664,521 | 616,275 | 757,236 | 655,876 | 582,653 | 734,578 | 594,397 | 479,364 | 459,998 | 721,982 | 1,648,972 | 796,909 | 739,014 | 798,167 | 906,669 | 786,535 | 689,667 | 880,978 | 712,760 | 574,721 | 873,144 | 551,434 | 865,767 | 1,978,251 |
| Total 6060 - Marketing Program | 183,262 | 169,905 | 208,930 | 180,868 | 160,586 | 202,657 | 163,847 | 132,000 | 200,850 | 126,627 | 199,146 | 455,612 | 219,914 | 203,895 | 290,716 | 217,042 | 243,189 | 192,715 | 156,617 | 158,400 | 241,020 | 151,953 | 238,977 | 548,074 |
| Total 6145 - Call Center Operations | 30,908 | 28,864 | 35,220 | 30,506 | 27,100 | 34,186 | 27,646 | 22,296 | 33,883 | 21,393 | 33,577 | 76,896 | 37,096 | 34,373 | 42,240 | 36,583 | 32,496 | 40,976 | 33,152 | 26,731 | 40,611 | 25,648 | 40,358 | 92,012 |
| Total 6170 - Credit Card Processing | 81,892 | 76,843 | 91,595 | 80,987 | 73,324 | 89,223 | 74,553 | 62,515 | 86,540 | 60,484 | 87,887 | 184,916 | 95,756 | 89,688 | 107,390 | 94,651 | 85,485 | 99,584 | 86,940 | 72,484 | 103,725 | 70,057 | 102,952 | 219,375 |
| Total 6280 - Employee Expense | 212,429 | 213,491 | 214,599 | 215,651 | 216,783 | 217,793 | 218,852 | 219,076 | 221,076 | 222,152 | 223,293 | 224,409 | 225,531 | 226,659 | 227,742 | 228,931 | 230,076 | 231,226 | 232,382 | 233,544 | 234,712 | 235,885 | 237,065 | 238,250 |
| Total 6380 - Insurance | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 | 3,172 |
| Total 6410 - Internet Expense | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 | 2,002 |
| Total 6600 - Postage and Delivery | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Total 6660 - Professional Fees | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 | 4,289 |
| Total 6680 - Rent | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 | 18,000 |
| Total 6665 - Repairs & Maintenance | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 |
| Total 6680 - Supplies & Temp Help | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 | 1,650 |
| Total 6760 - Taxes (property & franchise) | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Total 6770 - Telephone | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 | 7,258 |
| Total 6750 - Travel & Ent | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 | 3,206 |
| Total 6900 - Web Site Management | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 | 34,000 |
| Total Expense | 600,656 | 579,956 | 644,535 | 599,867 | 567,981 | 637,545 | 575,374 | 524,557 | 637,882 | 516,000 | 627,234 | 1,656,803 | 673,411 | 675,411 | 725,880 | 672,129 | 633,622 | 717,044 | 642,233 | 561,157 | 716,995 | 572,993 | 716,918 | 1,218,238 |
| Net Profit | 63,955 | 36,419 | 112,701 | 56,009 | 14,751 | 97,033 | 19,023 | (45,193) | (56,046) | (58,046) | 84,578 | 592,169 | 123,498 | 123,498 | 182,287 | 114,405 | 65,045 | 163,934 | 70,672 | (6,436) | (21,555) | 148,746 | 729,012 | |
| **Cash Flow Adjustments:** | | | | | | | | | | | | | | | | | | | | | | | | |
| **Timing of Payments** | | | | | | | | | | | | | | | | | | | | | | | | |
| 7 day terms on COGS | 680,133 | (58,063) | 169,664 | (121,966) | (88,123) | 162,841 | (168,707) | (138,446) | 200,635 | 126,627 | (1,025,446) | 1,115,718 | (883,997) | 123,498 | 203,573 | (146,383) | (150,748) | 219,409 | (202,448) | (198,128) | 359,149 | (387,174) | 378,295 | 1,338,862 |
| 15 day terms on below the line expenses | 167,035 | 236,529 | 21,985 | 10,005 | (38,317) | 18,839 | 3,736 | (66,464) | 299,291 | 315,246 | 280,399 | 280,399 | 16,044 | 26,234 | 11,858 | (204,185) | (85,697) | 22,457 | 4,353 | (87,944) | 37,303 | (4,094) | (485) | 323,125 |
| Adjusted Weekly Cash | 911,124 | 216,885 | 304,330 | (55,872) | (111,688) | 296,713 | (145,948) | (246,127) | 420,713 | 399,545 | 399,545 | 1,977,286 | (883,997) | 1,977,286 | 412,095 | (26,120) | (127,643) | 405,800 | (127,643) | (246,568) | 552,652 | (412,813) | 527,555 | 2,420,998 |
| Beginning Cash Balance | 218,343 | 1,129,467 | 1,346,352 | 1,650,682 | 1,594,710 | 1,483,022 | 1,781,734 | 1,635,787 | 1,395,660 | 1,816,373 | 1,432,405 | 1,831,950 | 3,809,237 | 2,925,330 | 2,742,081 | 3,154,156 | 3,647,265 | 3,084,864 | 3,637,506 | 3,234,692 | 3,752,248 | | | |
| Ending Cash Balance | 1,129,467 | 1,346,352 | 1,650,682 | 1,594,710 | 1,483,022 | 1,781,734 | 1,635,787 | 1,395,660 | 1,816,373 | 1,432,405 | 1,831,950 | 3,809,237 | 2,925,330 | 2,742,081 | 3,154,156 | 3,647,265 | 3,653,095 | 3,084,864 | 3,637,506 | 3,234,692 | 3,752,248 | | | 6,173,246 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT C**

**Form of Ballots**

<table>
<tr><td>

Scott F. Gautier (State Bar No. 211742)

Peitzman, Weg & Kempinsky LLP

2029 Century Park East, Suite 3100

Los Angeles, CA 90067

Telephone: (310) 552-3100

Fax: (310) 552-3101

☒ Attorney for Plan Proponent <u>Ritz Interactive, Inc.</u>
<u>Debtor and Debtor in Possession</u>

</td><td>

FOR COURT USE ONLY

</td></tr>
</table>

|  |  |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br><br>**CENTRAL DISTRICT OF CALIFORNIA** | CHAPTER 11<br>**Small Business Case FRBP 1020**<br><br>CASE No.: 8:11-bk-21690-ES |
| In re:<br>RITZ INTERACTIVE, INC., a Delaware corporation,<br><br>               Debtor and Debtor-in-Possession. | DATE:<br>TIME:<br>CTRM:  Courtroom 5A<br>      411 West Fourth Street<br>      Santa Ana, California 92701 |

## CLASS 2 BALLOT FOR ACCEPTING OR REJECTING
## PLAN OF REORGANIZATION

Ritz Interactive, Inc. (the "Debtor") filed a plan of reorganization dated August 30, 2011 (the "Plan") for the Debtor in this case.  The Court has conditionally approved a disclosure statement with respect to the Plan (the "Disclosure Statement").  The Disclosure Statement provides information to assist you in deciding how to vote your ballot.  If you do not have a Disclosure Statement, you may obtain a copy from: Peitzman, Weg & Kempinsky LLP, c/o Lauren Gans, 2029 Century Park East, Suite 3100, Los Angeles CA 90067.  Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

**You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan.  Your claim has been placed in Class 2 under the Plan.  If you hold claim(s) or equity interest(s) in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.**

**Votes in favor of acceptance of the Plan from Class 2 must be delivered to Peitzman, Weg & Kempinsky LLP, c/o Lauren Gans, 2029 Century Park East, Suite 3100, Los Angeles CA 90067, prior to 5:00 PM (PST), _____(the "<u>Voting Deadline</u>").  If your ballot is not received by the Voting Deadline, and such deadline is not extended, your vote will not count as either an acceptance or rejection of the Plan, unless the Judge otherwise determines that a non-vote will be treated as a rejection of the Plan.**

**If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote.**

Exhibit C
Page 118

## ACCEPTANCE OR REJECTION OF THE PLAN

The undersigned is the holder of a Class 2 claim against the Debtor in the principal amount of $ _____ (For purposes of this Ballot, it is not necessary and you should not adjust the principal amount for any accrued or unmatured interest).

**The undersigned** *[check one box only]*:

☐   **ACCEPTS THE PLAN**        ☐        **REJECTS THE PLAN**

Dated: _____

Name *[Print or type]*:          _____

Signature:                       _____

Title *[if corporation or partnership]*:   _____

Address:                         _____

                                 _____

                                 _____

Telephone No.:                   _____

Fax No.:                         _____

## RETURN THIS BALLOT TO:

Peitzman, Weg & Kempinsky LLP
c/o Lauren Gans
2029 Century Park East
Suite 3100
Los Angeles, CA 90067

Exhibit C
Page 119

| | |
|---|---|
| Scott F. Gautier (State Bar No. 211742)<br>Peitzman, Weg & Kempinsky LLP<br>2029 Century Park East, Suite 3100<br>Los Angeles, CA 90067<br>Telephone: (310) 552-3100<br>Fax: (310) 552-3101<br><br>☒ Attorney for Plan Proponent <u>Ritz Interactive, Inc.</u><br><u>Debtor and Debtor in Possession</u> | FOR COURT USE ONLY |
| **UNITED STATES BANKRUPTCY COURT**<br><br>**CENTRAL DISTRICT OF CALIFORNIA** | CHAPTER 11<br>**Small Business Case FRBP 1020**<br><br>CASE No.: 8:11-bk-21690-ES |
| In re:<br>RITZ INTERACTIVE, INC., a Delaware corporation,<br><br>          Debtor and Debtor-in-Possession. | DATE:<br>TIME:<br>CTRM:  Courtroom 5A<br>     411 West Fourth Street<br>     Santa Ana, California 92701 |

## CLASS 4 BALLOT FOR ACCEPTING OR REJECTING
## PLAN OF REORGANIZATION

Ritz Interactive, Inc. (the "Debtor") filed a plan of reorganization dated August 30, 2011 (the "Plan") for the Debtor in this case.  The Court has conditionally approved a disclosure statement with respect to the Plan (the "Disclosure Statement").  The Disclosure Statement provides information to assist you in deciding how to vote your ballot.  If you do not have a Disclosure Statement, you may obtain a copy from: Peitzman, Weg & Kempinsky LLP, c/o Lauren Gans, 2029 Century Park East, Suite 3100, Los Angeles CA 90067.  Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

**You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan.  Your claim has been placed in Class 4 under the Plan.  If you hold claim(s) or equity interest(s) in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.**

**Votes in favor of acceptance of the Plan from Class 4 must be delivered to Peitzman, Weg & Kempinsky LLP, c/o Lauren Gans, 2029 Century Park East, Suite 3100, Los Angeles CA 90067, prior to 5:00 PM (PST), _____(the "<u>Voting Deadline</u>").  If your ballot is not received by the Voting Deadline, and such deadline is not extended, your vote will not count as either an acceptance or rejection of the Plan, unless the Judge otherwise determines that a non-vote will be treated as a rejection of the Plan.**

**If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote.**

Exhibit C<br>Page 120

## ACCEPTANCE OR REJECTION OF THE PLAN

The undersigned is the holder of a Class 4 claim against the Debtor in the principal amount of $ _____* (For purposes of this Ballot, it is not necessary and you should not adjust the principal amount for any accrued or unmatured interest).

*If your claim exceeds $15,000 in principal amount, please contact the Debtor's counsel, Lauren Gans at (310) 552-3100, to request a Class 5 ballot.

**The undersigned** *[check one box only]*:

☐  **ACCEPTS THE PLAN**        ☐        **REJECTS THE PLAN**


Dated: _____


Name *[Print or type]*:        _____

Signature:        _____

Title *[if corporation or partnership]*:        _____

Address:        _____

_____

_____

Telephone No.:        _____

Fax No.:        _____


**RETURN THIS BALLOT TO:**

Peitzman, Weg & Kempinsky LLP
c/o Lauren Gans
2029 Century Park East
Suite 3100
Los Angeles, CA 90067

Exhibit C
Page 121

| | |
|---|---|
| Scott F. Gautier (State Bar No. 211742)<br>Peitzman, Weg & Kempinsky LLP<br>2029 Century Park East, Suite 3100<br>Los Angeles, CA 90067<br>Telephone: (310) 552-3100<br>Fax: (310) 552-3101<br><br>☒ Attorney for Plan Proponent <u>Ritz Interactive, Inc.</u><br><u>Debtor and Debtor in Possession</u> | FOR COURT USE ONLY |
| **UNITED STATES BANKRUPTCY COURT**<br><br>**CENTRAL DISTRICT OF CALIFORNIA** | CHAPTER 11<br>**Small Business Case FRBP 1020**<br><br>CASE No.: 8:11-bk-21690-ES |
| In re:<br>RITZ INTERACTIVE, INC., a Delaware corporation,<br><br>        Debtor and Debtor-in-Possession. | DATE:<br>TIME:<br>CTRM:  Courtroom 5A<br>     411 West Fourth Street<br>     Santa Ana, California 92701 |

## CLASS 5 BALLOT FOR ACCEPTING OR REJECTING
## PLAN OF REORGANIZATION

Ritz Interactive, Inc. (the "Debtor") filed a plan of reorganization dated August 30, 2011 (the "Plan") for the Debtor in this case.  The Court has conditionally approved a disclosure statement with respect to the Plan (the "Disclosure Statement").  The Disclosure Statement provides information to assist you in deciding how to vote your ballot.  If you do not have a Disclosure Statement, you may obtain a copy from:  Peitzman, Weg & Kempinsky LLP, c/o Lauren Gans, 2029 Century Park East, Suite 3100, Los Angeles CA 90067.  Court approval of the Disclosure Statement does not indicate approval of the Plan by the Court.

**You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan.  Your claim has been placed in Class 5 under the Plan.  If you hold claim(s) or equity interest(s) in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.**

**Votes in favor of acceptance of the Plan from Class 5 must be delivered to Peitzman, Weg & Kempinsky LLP, c/o Lauren Gans, 2029 Century Park East, Suite 3100, Los Angeles CA 90067, prior to 5:00 PM (PST), _____ (the "Voting Deadline").  If your ballot is not received by the Voting Deadline, and such deadline is not extended, your vote will not count as either an acceptance or rejection of the Plan, unless the Judge otherwise determines that a non-vote will be treated as a rejection of the Plan.**

**If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote.**

Exhibit C
Page 122

## ACCEPTANCE OR REJECTION OF THE PLAN

The undersigned is the holder of a Class 5 claim against the Debtor in the principal amount of
$ _____ .

## <u>VOLUNTARY ELECTION TO BE TREATED IN CLASS 4 – CONVENIENCE CLASS</u>

By checking this box ☐ and voting to ACCEPT the Plan (below) (**<u>NOTE that this election shall be VOID unless the undersigned has also voted to ACCEPT the Plan</u>**), the undersigned hereby elects to waive its Class 5 claim, to be treated in the Class 4 "Convenience Class" and to receive payment of 100% of the allowed amount of its claim, up to $15,000.  **To the extent that the undersigned holder's allowed Class 5 claim exceeds $15,000, the undersigned holder acknowledges and agrees, by checking the box above, that upon confirmation of the Plan it <u>will receive no more than $15,000 in full satisfaction of its allowed claim.</u>**

**The undersigned** *[check one box only]*:

☐   **ACCEPTS THE PLAN**        ☐   **REJECTS THE PLAN**


Dated: _____


Name *[Print or type]*:        _____

Signature:        _____

Title *[if corporation or partnership]*:    _____

Address:        _____

_____

_____

Telephone No.:        _____

Fax No.:        _____


## RETURN THIS BALLOT TO:

Peitzman, Weg & Kempinsky LLP
c/o Lauren Gans
2029 Century Park East
Suite 3100
Los Angeles, CA 90067

Exhibit C
Page 123

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT D**

**Form of Confirmation Notice**

1  Scott F. Gautier (State Bar No. 211742)
   *sgautier@pwkllp.com*
2  Lauren N. Gans (State Bar No. 247542)
   *lgans@pwkllp.com*
3  Kathryn F. Russo (State Bar No. 274042)
   *krusso@pwkllp.com*
4  PEITZMAN, WEG & KEMPINSKY LLP
   2029 Century Park East, Suite 3100
5  Los Angeles, CA  90067
   Telephone: (310) 552-3100
6  Facsimile: (310) 552-3101

7  Proposed Attorneys for Debtor and Debtor in Possession

8

9                   UNITED STATES BANKRUPTCY COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11                        SANTA ANA DIVISION

12

13  In re:                                Case No.:  8:11-bk-21690-ES

14  RITZ INTERACTIVE, INC.,               Chapter 11

15        Debtor and Debtor-in-Possession. **SMALL BUSINESS CASE UNDER FRBP 1020**

16                                         **NOTICE OF HEARING FOR FINAL
                                           APPROVAL OF DISCLOSURE STATEMENT**
17                                         **AND PLAN CONFIRMATION**

18

19

20

21      **TO THE HONORABLE ERITHE SMITH, UNITED STATES BANKRUPTCY**

22  **JUDGE, THE UNITED STATES TRUSTEE, AND ALL CREDITORS AND PARTIES**

23  **IN INTEREST:**

24      **PLEASE TAKE NOTICE** that on November 17, 2011 at 10:30 a.m. (the "Confirmation

25  Hearing"), or as soon thereafter as the matter can be heard, before the Honorable Erithe Smith, United

26  States Bankruptcy Judge, in Courtroom 5A, located at 411 West Fourth Street, Santa Ana, California,

27  the Bankruptcy Court will consider confirmation of the Debtor's Plan of Reorganization, Dated as of

28

                                          1

August 30, 2011 (the "Plan").[1]

 **PLEASE TAKE FURTHER NOTICE** that the Bankruptcy Court has conditionally approved the Debtor's Disclosure Statement, pursuant to Local Bankruptcy Rule 3017-2, a copy of which has been included with this Notice.  To the extent that any objections to the adequacy of the Debtor's Disclosure Statement have been timely filed and served (see below), the Bankruptcy Court will consider approval of the Debtor's Disclosure Statement on a final basis at the time and place set for the Confirmation Hearing.

 **PLEASE TAKE FURTHER NOTICE** that, if you are a creditor of the Debtor, your rights may be "impaired" under the Plan.  If you have received a voting package, please review and consider carefully and return your ballot accepting or rejecting the Plan promptly and timely.

 **PLEASE TAKE FURTHER NOTICE** that if you are the holder of a Claim that has been objected to or was scheduled by the Debtor as contingent, unliquidated, or disputed, you are not entitled to vote on the Plan unless you file and serve a motion for an order temporarily allowing the Claim for voting purposes under Federal Rule of Bankruptcy Procedure 3018(a).

 **PLEASE TAKE FURTHER NOTICE** that the <u>confirmation of the Plan will enjoin all holders of Claims and Equity Interests from asserting against the Reorganized Debtor or any of its assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest.</u>

 **PLEASE TAKE FURTHER NOTICE** that any objections to either (a) the adequacy of the Debtor's Disclosure Statement or (b) confirmation of the Plan, must be filed with the Bankruptcy Court and served  upon the following parties no later than 5:00 p.m. (PST), on November 3, 2011: (a) counsel for the Debtor: Lauren Gans, Peitzman, Weg & Kempinsky LLP, 2029 Century Park East, Suite 3100, Los Angeles, CA 90067, fax: (310) 552-3101; (b) counsel for RCI: Adam M. Starr, Greenberg Traurig, LLP, 2450 Colorado Avenue, Suite 400E, Santa Monica, CA 90404; and (c) the Office of the United States Trustee: Frank Cadigan, Office of the U.S. Trustee, 411 West Fourth Street, Suite 9041, Santa Ana, CA  92701-8000, fax: (714) 338-3422.

---

1 Capitalized terms used herein, and not defined, shall have the meaning ascribed to them in the Plan.

**PLEASE TAKE FURTHER NOTICE** that the last day for the receipt of ballots accepting or rejecting the Plan is November 3, 2011, at 5:00 p.m. (PST) (the "Voting Deadline").  For a ballot to be counted it must be actually received prior to the Voting Deadline by the Debtor's counsel at the following:

|  |  |
|---|---|
| If by fax: | (310) 552-3101 |
| If by e-mail: | lgans@pwkllp.com |
| If by mail: | Peitzman, Weg & Kempinsky LLP |
|  | c/o Lauren Gans |
|  | 2029 Century Park East |
|  | Suite 3100 |
|  | Los Angeles, CA 90067 |

Dated:  September 14, 2011                    PEITZMAN, WEG & KEMPINSKY LLP


By:    /s/ Scott F. Gautier
       Scott F. Gautier
       Lauren N. Gans
       Kathryn F. Russo

Proposed Attorneys for
the Debtor and Debtor in Possession